# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

STACIE PERCELLA,

*Plaintiff,*

v.

CITY OF BAYONNE, JOSEPH WAKS,
INDIVIDUALLY, AND RICHARD CENSULLO,
INDIVIDUALLY

*Defendants.*

Civil Action No. 14-cv-03695(KM)(MCA)

Civil Action

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     On June 9, 2014, Stacie Percella (hereinafter "Plaintiff" or "Percella") filed a Complaint ("Complaint") in the District Court of New Jersey Docket No. 2:14-cv-03695-KM-MCA ("Litigation"), which is the above-captioned matter.  (See, Certification of T. Lentini, Exhibit "A").

2.     On October 7, 2014, Plaintiff filed an Amended Complaint against the Defendant City of Bayonne (hereinafter "City"), Joseph Waks, individually, (hereinafter "Waks"), and Richard Censullo, individually, (hereinafter "Censullo")(collectively "Defendants") in the Litigation alleging a violation of 42 U.S.C. § 1983 ( hereinafter "§1983") and the New Jersey Law Against Discrimination (hereinafter "LAD") by the Defendants.  (See, Certification of T. Lentini, Exhibit B).

3.     On January 9, 2001,  Percella was hired by the City as a clerk in the Health Department. (See, Certification of T. Lentini, Exhibit C, Percella 0145).

4.      On April 4, 2006, Percella was appointed to the position of Deputy Registrar and Principal Clerk Typist in the Health Department for the Defendant City. (See, Certification of T. Lentini, Exhibit D, Percella 0153).

5.      In her position as Deputy Registrar, Plaintiff was responsible for distributing birth and death certificates and to make any corrections to these certificates to ensure accuracy. (See, Certification of T. Lentini, Exhibit E, Deposition of Stacie Percella at 15:19-21).

6.      During her time as Deputy Registrar for the City, Defendant Waks was her supervisor in the Health Department. (See, Certification of T. Lentini, Exhibit E, 16:18-20).

7.      Percella testified that in or about May or March 2010 or 2011, that the Registrar's Office was moved out of the Health Department to the City Clerk's Office, leaving her without job duties. (See, Certification of T. Lentini, Exhibit E, 18:1-11; 20:1-7).

8.      However, in actuality, Percella was approved for a transfer to the Municipal Services Department effective on November 30, 2009. (See, Certification of T. Lentini, Exhibit F, Percella 075).

**PERCELLA'S MINOR DISCIPLINE FOR NOVEMBER 2009 31-A**

9.      Percella testified that she was never subjected to discipline while employed as the Deputy Registrar for the Defendant City. (See, Certification of T. Lentini, Exhibit E, 20:8-11).

10.      However, on November 6, 2009, Plaintiff was served with a Preliminary Notice of Disciplinary Action, or 31-A, (hereinafter November 2009 31-A) while she was employed as the Deputy Registrar. (See, Certification of T. Lentini, Exhibit G, Percella 167).

11.     The November 2009 31-A sought the suspension of Percella for five (5) days without pay and charged her with "Incompetency; Inefficiency or Failure to Perform Duties; Conduct Unbecoming a Public Employee; Neglect of Duty; Other Sufficient Cause." (See, Certification of T. Lentini, Exhibit G, Percella 167).

12.     The November 2009 31-A charged Percella with notarizing an official document during the course of her employment, as Deputy Registrar, and certifying under oath that Mr. Khoung Ton Duong (hereinafter Mr. Duong") personally executed a document. However, Mr. Duong did not appear before Percella because he was not present in New Jersey at the time the certificate was signed. (See, Certification of T. Lentini, Exhibit G, Percella 168).

13.     After being presented with the November 2009 31-A, Percella changed her testimony and admitted she had been subjected to discipline while employed as the Deputy Registrar. (See, Certification of T. Lentini, Exhibit E, 21:4-12).

14.     Percella testified that she witnessed Mr. Duong sign the birth certificate. (See, Certification of T. Lentini, Exhibit E, 22:16-23:1).

15.     On October 28, 2009, following an investigation, the Investigators Report for the Defendant City was drafted regarding the investigator's interactions with Mr. Duong in October 2009. Specifically, the Investigator reported that he spoke with Mr. Duong on October 20, 23, and 24, 2009 regarding whether Mr. Duong signed the birth certificate. (See, Certification of T. Lentini, Exhibit I, Percella 175-176).

16.     In the Investigator's Report, in a phone call on October 20, 2009, Mr. Duong indicated he had only come to Bayonne once, on June 25, 2009, to sign a certificate before moving to North Carolina but he received a call from the Defendant City informing him he needed to return to fix an error with the certificate. On October 24, 200, Mr. Duong informed the Investigator that

his brother had signed paperwork from the Defendant City on Mr. Duong's behalf. (See, Certification of T. Lentini, Exhibit I, Percella 175-176).

17.     On January 12, 2010, Assistant City Attorney Donna Russo (hereinafter "Russo") forwarded a letter to Percella informing her that the City would call Claims Investigator Vincent Cuseglio (hereinafter Cuseglio") to provide testimony at the departmental hearing. Russo stated Cuseglio would provide testimony that confirmed Mr. Duong was not present nor did he execute the certificate in question that Percella notarized in her official capacity as Deputy Registrar. (See, Certification of T. Lentini, Exhibit H, Percella 195).

18.     On February 18, 2010, Russo forwarded a memorandum to Percella informing her that on January 29, 2010 Peter Cresci, Esquire, attorney for Percella, informed Russo that Percella was waiving her request for a formal hearing. Enclosed with this memorandum was a Final Notice of Minor Disciplinary Action suspending Percella for two days. (See, Certification of T. Lentini, Exhibit I, Percella 200).

19.     Percella testified that she did not take any further steps to appeal her two-day suspension because "there is nothing you can do about it." (See, Certification of T. Lentini, Exhibit E, 27:17-22).

20.     Percella testified that the November 2009 31-A and two-day suspension were retaliatory action taken by Peggy Lanni, Acting Director of the Health Department, because, at some unspecified time, Percella refused to issue a hot dog vendor a license without a health officer present. (See, Certification of T. Lentini, Exhibit E, 28:2-29:10.

21.     Percella testified that she did not have any facts or evidence to support her claim that the November 2009 31-A and two-day suspension was an act of retaliation for her refusal to issue a hot dog license.  (See, Certification of T. Lentini, Exhibit E, 30:5-9).

22.     Percella testified that in 2011 the Registrar's office was transferred to the City Clerk's Office and she was only notified by a posting on the Health Department door. (See, Certification of T. Lentini, Exhibit E, 30:16-18).

23.     Percella testified that after the move of the Registrar's Office to the City Clerk's office, she performed the essential functions of her position by "still g[iving] out the health licenses and the cats and dogs and t[aking] in all the health complaints[,]" while remaining in the Health Department. (See, Certification of T. Lentini, Exhibit E, 30:19-23).

**PERCELLA DISCIPLINE FOR FEBRUARY 2011 31-A**

24.     Prior to this incident, on June 25, 2010, Michael McKittrick (hereinafter "McKittrick"), the City's Registrar, wrote a letter to Jason O'Donnell (hereinafter "O'Donnell"), Director of Municipal Services, informing O'Donnell that McKittrick believed he was working in a hostile work environment due to the actions of Percella. (See, Certification of T. Lentini, Exhibit J, Percella 185-186).

25.     Specifically, McKittrick accused Percella of verbally attacking him with profanity on numerous occasions and declining to performing the essential duties of the Deputy Registrar. (See, Certification of T. Lentini, Exhibit J, Percella 185-186).

26.     On September 27, 2010, according to the police report, Percella went to the Detective Bureau of the City's Police Department accusing City employee Vanessa Bryant (hereinafter "Bryant") and McKittrick of improperly using compensatory time. Additionally, Percella stated she noticed overages and shortages in the Health Department's cash drawer. (See, Certification of T. Lentini, Exhibit K, Percella 241).

27.     At that time, Percella provided a binder full of documents for the police department to copy and use during their investigation. (See, Certification of T. Lentini, Exhibit K, Percella 241).

28.     In an October 7, 2010 Supplementary Investigatory Report, detectives indicated they reviewed all 274 documents provided by Percella and found no evidence of a crime but possible errors in record keeping. (See, Certification of T. Lentini, Exhibit L, Percella 0244).

29.     In this Supplementary Investigatory Report, detectives detailed that they spoke with Steve Gallo, Business Administrator, Charles D'Amico, City Counsel, Chief Kubert and Deputy Chief Scianni and it was agreed that an internal investigation would be completed by Defendant Waks. (See, Certification of T. Lentini, Exhibit L, Percella 0244).

30.     In regard to this incident, Percella testified that Waks gave himself a $400 stipend and he signed off on the stipend. (See, Certification of T. Lentini, Exhibit E, 31:9-19).

31.     However, Percella testified that there was not a document with Waks signature on it but that she saw the form with the $400 stipend on the computer. (See, Certification of T. Lentini, Exhibit E, 31:24-32:3).

32.     Percella testified that she accused Bryant and McKittrick of improperly signing the sign in sheets that they were using a vacation or sick day but would then use compensation time on the calendar sheet, allowing them to not be charged for their time and also improperly accumulate compensation time. (See, Certification of T. Lentini, Exhibit E, 32:10-16).

33.     Percella testified that the sign in sheets were on the filing cabinet so she could view them. (See, Certification of T. Lentini, Exhibit E, 33:20-25).

34.     Percella testified that the distinction between the sheets was that one sheet was a sign in sheet and the other sheet was a "tally" sheet, that sheet is where she was accusing of Bryant

and McKittrick of improperly using compensation time. (See, Certification of T. Lentini, Exhibit E, 35:14-25).

35.     Percella testified that the sign in sheets were in open view but the calendar sheets were "in an open book on a desk" and that the book was blue and "never locked up." (See, Certification of T. Lentini, Exhibit E, 36:13-23).

36.     Percella testified that the book was on Bryant's desk in her office but that it was open for everyone to see. (See, Certification of T. Lentini, Exhibit E, 36:24-37:9).

37.     Percella testified that she was looking through the book for her own time and allegedly noticed Bryant and McKittrick's compensation time. (See, Certification of T. Lentini, Exhibit E, 37:12-25).

38.     Percella testified that she took the documents from Bryant' desk, made copies of the documents she found regarding Bryant's and McKittrick's compensatory time, and kept them in a personal binder. (See, Certification of T. Lentini, Exhibit E, 41:2-16).

39.     On January 31, 2011, following an investigation at the request of the City, Charles P. Daligan, Esq., City's Investigation Officer, (hereinafter "Daligan") provided his final report to Charles D'Amico. (See, Certification of T. Lentini, Exhibit M, Percella 248).

40.     According to the report from Daligan, as part of his investigation into the allegations made by Percella, the City requested that he investigate how Percella obtained the documents regarding Bryant, McKittrick and Waks. (See, Certification of T. Lentini, Exhibit M, Percella 249).

41.     In his report, Daligan stated that he received a letter from Percella's attorney, Peter Cresci, that Percella was unavailable for an interview, even with her attorney present, and she would only answer questions in writing. (See, Certification of T. Lentini, Exhibit M, Percella 250).

42.     On January 10, 2011, Daligan provide a letter to Peter Cresci to inform him that he could not agree to the interview terms and must meet with her in person to conduct the interview because he needed to judge credibility. Daligan stated he would continue the investigation without her interview, if that was her determination. (See, Certification of T. Lentini, Exhibit N, Percella 233).

43.     Percella testified that she did not "want to appear and cooperate with the investigation" because she did not have to because "[t]he paperwork proved it." (See, Certification of T. Lentini, Exhibit E, 45:2-5).

44.     Percella testified that she did not believe it was important to meet with Daligan because she "met with the police department." (See, Certification of T. Lentini, Exhibit E, 46:20-23).

45.     Further, Percella testified that she was aware that she was not permitted to copy personnel documents of other City employees. (See, Certification of T. Lentini, Exhibit E, 47:13-21).

46.     Percella admitted she accessed the documents and copied the documents without the permission of Bryant or anyone else employed by the Defendant City. (See, Certification of T. Lentini, Exhibit E, 48:2-49:15).

47.     During his investigation, Daligan interviewed Bryant regarding the allegations made against her by Plaintiff. According to Daligan's report, tegarding the longevity pay paid to Bryant, Bryant informed Daligan that she was paid 4.75% longevity pay under the mistaken belief that she was entitled to such based upon her employment with the City since 1998 but she was informed by the Payroll Department that this was incorrect, and she repaid all extra money that she received over that time span. (See, Certification of T. Lentini, Exhibit M, Percella 251-252).

48.     During the investigation, Bryant testified that she did not improperly use compensation time and that the City uses an honor system regarding accumulated compensation time. (See, Certification of T. Lentini, Exhibit M, Percella 252).

49.     Finally, during the investigation, Bryant informed Daligan that after she reviewed the documents, "Ms. Percella should not have had copies of these employee personnel files. All documents were kept in a cabinet in [Bryant's] office but there was not a lock on the cabinet. [Bryant] did state that many times, these documents would have been on her desk in her private office. [Bryant] further stated that she never gave anyone permission to copy any documents accept (sic) for their own personal files. Specifically, [Bryant] never gave Stacie Percella permission to copy documents of other employees that Ms. Percella did indeed have in her possession. Ms. Bryant speculated that Ms. Percella could have come into her office, taken these documents from her desk or cabinet and copied them without [Bryant's] permission but [Bryant] has no direct knowledge of that fact." (See, Certification of T. Lentini, Exhibit M, Percella 252).

50.     Percella testified in the affirmative that she did enter Bryant's office and took the personnel file documents from Bryant's desk or cabinet and copied them without Bryant's permission. (See, Certification of T. Lentini, Exhibit E, 49:16-22).

51.     In the Investigation Report, Daligan summarized his interview with McKittrick, McKittrick testified that he "occasionally worked extra hours during his lunch in which he received compensation time." Further, McKittrick confirmed "that he had accrued compensation time and only got a verbal approval from his supervisor to use said compensation time, but the approval was always in advance." Finally, McKittrick informed Daligan he was familiar with the documents but "[McKittrick] did not know where they were kept nor had he ever made copies of them." (See, Certification of T. Lentini, Exhibit M, Percella 253).

52.     During the investigation, Daligan interviewed Defendant Waks and provided a summary of that interview. In the summary, Waks informed Daligan that he began working for the Defendant City as the Director of Municipal Services on August 1, 2010. During that interview, Waks informed Daligan that he "never received a check from the City Health Department for his bonus as was alleged by Ms. Percella. [Waks] also was not aware that anyone thought he was entitled to said bonus," (See, Certification of T. Lentini, Exhibit M, Percella 251).

53.     Percella testified that she "wouldn't know if [Waks] got the check, but he signed off on it[.]" (See, Certification of T. Lentini, Exhibit E, 50:13-21).

54.     In his report, Daligan provided a summary of his interview with Senior Accountant in the Payroll Department Gina Vazquez (hereinafter "Vazquez"). Vazquez advised that the "Payroll Department did check to see who was entitled to the sick time bonus for the fiscal year 2010 and those dates were verified by her department. They had received a document from the Health Department advising that Joe Waks was entitled to his bonus. But when it was investigated, it was clear that [Waks] was not entitled to said bonus as he had just began (sic) his employment. Ms. Valdez advised Ms. Bryant that Mr. Waks was not entitled to said payment and Mr. Waks never received the bonus payment[.]" (See, Certification of T. Lentini, Exhibit M, Percella 253-254).

55.     In conclusion, Daligan found that Bryant was credible and found that the charge by Percella that Bryant "fraudulently received extra longevity pay to be unfounded and should be dismissed." (See, Certification of T. Lentini, Exhibit M, 254).

56.     In conclusion, Daligan found that McKittrick was a "very credible witness" and that McKittrick "never received compensation time for any period that he was not entitled to

receive same." Daligan recommended dismissal of that charges against McKittrick. (See, Certification of T. Lentini, Exhibit M, Percella 255).

57.     In conclusion, Daligan found that Waks was a "credible person" and concluded that Waks never received a stipend payment and recommended that the charge be dismissed. (See, Certification of T. Lentini, Exhibit M, 255).

58.     In conclusion, Daligan stated he did not have the opportunity to interview Percella, so he was left to speculate that she received the documents improperly "by taking them from the possession of Ms. Bryant without Ms. Bryant's knowledge or consent and copying same." Further, Daligan indicated, by Percella's testimony to the Police Department, she stated "she had given these documents to her attorney and therefore, a person, not employed by the City of Bayonne, was in possession of Bayonne City employee personnel files." Daligan recommended Percella should be charged in a disciplinary hearing for her possession and distribution of the personnel files. (See, Certification of T. Lentini, Exhibit M, Percella 256).

59.     On February 18, 2011, Percella was served with a Preliminary Notice of Disciplinary Action, or 31-A, ("February 2011 31-A") seeking a suspension and her removal because Percella obtained the confidential personnel records of Bryant and McKittrick. (See, Certification of T. Lentini, Exhibit J, Percella 184-185).

60.     On April 25, 2011, Anthony J. DeSalvo, Esq., (hereinafter "DeSalvo"), was appointed as the hearing officer at the March 24, 2011 hearing for Percella related to her February 2011 31-A. (See, Certification of T. Lentini, Exhibit O, Percella 387).

61.     In DeSalvo's hearing conclusion report to Steven Gallo, City Business Administrator, DeSalvo documented that at the hearing the only witness to testify was Daligan on behalf of the City. At the hearing, Daligan's report was produced as evidence. DeSalvo

summarized that Daligan testified that, as a result of his investigation, "it was his opinion Ms. Percella had obtained employee confidential personnel documents of which Ms. Percella did not have permission to have access or copy and were disseminated to members of the police department and to her attorney Peter Cresci, Esq. which were in violation of the City of Bayonne policy and other sufficient cause under N.J.A.C. 4A:2-2.3." (See, Certification of T. Lentini, Exhibit O, Percella 387).

62.     Further, DeSalvo documented that Percella declined to testify at the hearing and produced no testimony or evidence to refute the testimony and findings of Daligan. (See, Certification of T. Lentini, Exhibit O, Percella 387).

63.     Based upon the credible testimony of Daligan and Percella's failure to provide testimony or refute Daligan's testimony, DeSalvo recommended the charges against Percella be sustained and found the sixty (60) day suspension to be reasonable. (See, Certification of T. Lentini, Exhibit O, Percella 387).

64.     Percella testified that she appealed DeSalvo's decision to the OAL and that the OAL judge "agreed" with DeSalvo's decision. (See, Certification of T. Lentini, Exhibit E, 53:3-14).

65.     On May 9, 2011, a Final Notice of Disciplinary Action, or 31-B, (hereinafter May 2011 31-B") was issued to Percella suspending her for sixty days, May 17, 2011 to August 8, 2011, based upon the investigation conducted by Daligan and hearing conducted by DeSalvo. (See, Certification of T. Lentini, Exhibit P, Percella 181).

66.     On April 16, 2012, Administrative Law Judge Walter M. Braswell (hereinafter "ALJ Braswell") issued his preliminary decision regarding the May 2011 31-B. After reviewing the submissions of all parties, the facts, and the law, ALJ Braswell concluded that Percella clearly

violated the City's personnel record and confidentiality policies and upheld Percella's sixty-day suspension. (See, Certification of T. Lentini, Exhibit Q, Percella 338-344).

67.　　On May 16, 2012, the Civil Service Commission adopted ALJ Braswell's decision and upheld Percella's sixty-day suspension. (See, Certification of T. Lentini, Exhibit R, Percella 336-337).

68.　　Percella testified that she believed the discipline imposed against her for the February 2011 31-A and May 2011 31-B was in retaliation from "the administration, Joe Waks, Steve Gallo" and Charles D'Amico for the sole reason that she had "made complaints." (See, Certification of T. Lentini, Exhibit E, 53:15-54:5).

## PERCELLA'S SEXUAL HARASSMENT COMPLAINT AGAINST CENSULLO

69.　　On October 6, 2010, Percella submitted a letter to Russo informing her that on "October 6, 2010, at approximately 10:30am Health Officer Richard Censullo came up to [her] and said, 'Chesty how is your feet doing?' Then proceeded to ask [Percella] if [she] missed him? [Percella] said no and [Censullo] said you can lie with a straight face." (See, Certification of T. Lentini, Exhibit S, Percella 264).

70.　　On October 8, 2010, Percella served a letter upon Russo regarding a meeting Percella had with Steve Gallo, Waks, and Terrence Malloy about her sexual harassment complaint against Censullo. Additionally, in the letter, she stated that she was being transferred to the Tax Assessors Office and was told "it was in her best interest to keep [her] separated from [Censullo] at this time, until the situation [was] resolved." In the letter, Percella wrote that she believed she was being "punished for an ongoing situation that is supposedly being investigated by the police department at this time along with this complaint that [Percella] made against [her] boss on October 6, 2010." (See, Certification of T. Lentini, Exhibit T, Percella 266).

71.     Percella testified that, regarding the alleged sexual harassment by Censullo, she was sitting at her desk when Censullo, who came from the back of the office, approached her and said "Hi Chesty. How is your feet doing?" and she took this to mean he was looking at her chest. (See, Certification of T. Lentini, Exhibit E, 56:15-57:1).

72.     However, Percella testified that she was not looking at Censullo at the time he allegedly said "Hi Chesty. How is your feet doing?" but that Censullo was about a foot away from her to her right. (See, Certification of T. Lentini, Exhibit E, 57:2-17).

73.     Percella testified that she looked at Censullo and he asked her if she missed him and she said "No" to which Censullo responded "Well, you can lie with a straight face, can't you." (See, Certification of T. Lentini, Exhibit E, 58:13-17).

74.     Percella testified that prior to October 6, 2010, she never had any unpleasant or uncomfortable encounters with Censullo and that the incident occurred at her desk and not in the hallway of City Hall. (See, Certification of T. Lentini, Exhibit E, 59:9-15).

75.     Censullo testified that at no time during his tenure with the City was he an employee of the City but was working with the City pursuant to an interlocal agreement. (See, Certification of T. Lentini, Exhibit U, Deposition of Richard Censullo, 50:17-21).

76.     Further, Censullo testified that he did not receive pay or a pay stub from the City but was paid one salary from North Bergen. (See, Certification of T. Lentini, Exhibit U, 53:16-21).

77.     Censullo testified that he was "very much taken aback" by the allegations from Percella because he "never even used that word" in reference to Percella's allegation of Censullo referring to her as "Chesty." (See, Certification of T. Lentini, Exhibit U, 56:12-17).

78.     On November 24, 2010, Russo provided a Confidential Memorandum to Stephen Gallo, Business Administrator, regarding her investigation into the sexual harassment complaint filed by Percella against Censullo. In her Confidential Memorandum, Russo summarized her interviews with Percella, Simon Stergion (hereinafter "Stergion"), Censullo, and Debby Falciani (hereinafter "Falciani"), and Russo provided her findings. (See, Certification of T. Lentini, Exhibit V, Percella 257-268).

79.     On October 20, 2010, Russo met with Percella regarding her sexual harassment complaint against Censullo. Russo reminded Percella of the City's "zero tolerance" policy for sexual harassment in the workplace. In the interview, Russo summarized that Percella stated that "at approximately 10:30 a.m., Censullo had emerged from the conference room area in the Health Department, walked past Health Officer Simon Stergion who was sitting at his desk and walked towards and approached Percella while she was sitting at her assigned desk. He was leaning up against a file cabinet near her desk. Percella reports that Censullo stated to her 'how is your feet doing, Chesty?' Percella reports that she responded 'fine'. Then Censullo inquired further 'did you miss me?' Percella reports that she replied 'no' to which Censullo further commented 'you can lie with a straight face" and then turned around and started speaking with Stergion." (See, Certification of T. Lentini, Exhibit V, Percella 258).

80.     Percella testified that she had never heard anyone use the term "chesty" to describe a woman's chest prior to this alleged incident. (See, Certification of T. Lentini, Exhibit E, 62:5-12).

81.     Percella testified that this single remark was her only basis for sexual harassment against Censullo. (See, Certification of T. Lentini, Exhibit E, 64:20-65:14).

82.     Further, Russo reports that Percella then informed Russo that she texted her attorney, Peter Cresci, to inquire whether the occurrence with Censullo was sexual harassment and she reported Peter Cresci responded "yes, go see Donna Russo."  (See, Certification of T. Lentini, Exhibit V, Percella 258).

83.     Percella reported to Russo that she never had any similar encounter with Censullo. Percella informed Russo she barely saw Censullo whenever he would show up for work "which she described as 'rarely'" and that Censullo mostly interacted with Stergion. Percella informed Russo "she was only introduced to Censullo briefly when he was appointed as Health Officer and has had no other contact with him."  (See, Certification of T. Lentini, Exhibit V, Percella 258).

84.     Percella informed Russo that only Stergion was present in the room and that Percella did not believe Stergion could substantiate her allegations because "you know Sy" and that he was on the phone and "probably distracted." However, Percella admitted she never discussed the incident with Stergion.  (See, Certification of T. Lentini, Exhibit V, Percella 258).

85.     During this interview, Russo documented that Percella filed a workplace retaliation complaint on October 8, 2010 regarding her transfer from the Health Department. (See, Certification of T. Lentini, Exhibit V, Percella 259)

86.     Russo informed Percella that Russo had knowledge that Percella had requested a transfer from the Health Department for "quite sometime." (See, Certification of T. Lentini, Exhibit V, Percella 259).

87.     According to Russo, Percella acknowledged she had requested a transfer from the Health Department but desired to be transferred to the Police Department because she "always aspired to be a member of law enforcement[.]" (See, Certification of T. Lentini, Exhibit V, Percella 259).

88.     During her investigation, Russo interviewed Stergion who informed Russo that he did not recall any incident involving Percella on October 6, 2010. He informed Russo that Percella told Stergion that Censullo "hollered across the room" "Hey, Chesty, how is your feet?" but Stergion told Percella he "did not hear anything like that." (See, Certification of T. Lentini, Exhibit V, Percella 259-260)

89.     During her investigation Russo interviewed Censullo who informed her in his 36 years of working as a Public Health Officer he has never had a sexual harassment complaint brought against him. (See, Certification of T. Lentini, Exhibit V, Percella 260).

90.     Censullo reported to Russo that he had limited interaction with Percella. He explained he met her for the first time when he was hired and Percella informed Censullo that Percella had "bad blood" with Peggy Lanni because Peggy Lanni "wrote her up" for forging a signature on a birth certificate. Censullo stated his next encounter was when he requested Percella process new business licenses for food establishments, but she declined to do the work. His third encounter was when Percella came to Censullo to "bad mouth" McKittrick. His fourth encounter was when Percella came to Censullo to complain about Stergion's recommendation to reconfigure the office area. (See, Certification of T. Lentini, Exhibit V, Percella 260).

91.     Regarding the October 6, 2010 allegations, Russo documented that Censullo informed her that he walked past Percella's desk and said, "How is your foot, Stacey?" and she replied, "a little sore" to which he replied, "you were missed while you were gone." (See, Certification of T. Lentini, Exhibit V, Percella 261).

92.     During his interview with Russo, Censullo denied using the word "chesty" "in [his] life." Censullo informed Russo that it was his belief that Percella "want[ed] out of that Department

because of conflicts with other employees" and Censullo was her excuse to be transferred. (See, Certification of T. Lentini, Exhibit V, Percella 261).

93.     Additionally, Censullo testified that he did not recall making any statement about Percella's chest, he would not have asked her if she missed him, and would not ask her about lying with a straight face. (See, Certification of T. Lentini, Exhibit U, 57:4-13).

94.     Censullo testified that he was unaware of an October 8, 2010 meeting between Steve Gallo, Waks, Terrence Malloy and Percella. (See, Certification of T. Lentini, Exhibit U, 58:19-24).

95.     Censullo testified that he was advised by Steve Gallo that Percella was being transferred to the Tax Assessors Office and that Percella had previously requested a transfer from the Health Department. (See, Certification of T. Lentini, Exhibit U, 59:5-18).

96.     Percella testified that when she was transferred to the Tax Assessor's Office her pay did not change. (See, Certification of T. Lentini, Exhibit E, 71:25-72:3).

97.     Censullo testified that it was an accurate statement that he was not Percella's supervisor and that Waks was her supervisor. (See, Certification of T. Lentini, Exhibit U, 63:6-15).

98.     Censullo testified that Percella was inaccurate when she stated that Censullo was only physically present in the Health Department once every two months. Further, he testified that Percella would not know how often Censullo was physically present because there were multiple entrances to the Health Department. Censullo testified that he would be physically present in the City's Health Department "maybe twice a month." (See, Certification of T. Lentini, Exhibit U, 63:16-65:1).

99.     Further, Censullo testified that during the investigation and after the investigation he did not have contract with Percella and did not stand in front of her desk for an extended period of time while speaking on his cell phone. (See, Certification of T. Lentini, Exhibit U,68:9-16).

100.    In further support of his statements to Russo, Censullo testified that he was aware Percella had an operation and walked over from Simon Stergion's desk and said a general hello and then stated to Percella, "how was your foot, Stacie," to which Percella replied "still a little sore" and Censullo stated "you were missed while you were gone." He testified that is was absolutely untrue that he referred to Percella as Chesty. (See, Certification of T. Lentini, Exhibit U,75:12-76:8).

101.    In her confidential memorandum, Russo provided her Findings and Recommendations. She found that there are no witnesses or evidence that an act of sexual harassment occurred on October 6, 2010. Russo found Percella to not be credible due to inconsistencies in her statements to Russo. These inconsistencies were that Percella first reported the incident occurred in the hallway but later stated the incident occurred at her desk in the Health Department. Further, Percella informed Russo she did not discuss the specifics of the event with anyone but Russo and one other employee. However, during the investigation, it was apparent Percella discussed the incident with Stergion and Debby Falciani. Third, Percella informed Russo she had no contact with Censullo other than first meeting him and this incident, but Censullo documented at least three other meetings where Percella complained about co-workers, two of which were her supervisors (McKittrick and Lanni). (See, Certification of T. Lentini, Exhibit V, Percella 261-262).

102.    Russo recommended that no further action is required regarding Percella complaint and that Percella was transferred from the Health Department pursuant to her request. (See, Certification of T. Lentini, Exhibit V, Percella 262).

### June 2013 Minor Discipline of Percella

103.    On June 20, 2013, Percella was served with a Notice of Minor Disciplinary Action seeking her suspension for two days for her actions on June 19, 2013. Specifically, the City charged her with "during work hours and while on City property (City Hall), [Percella] encountered Corporation Counsel Charles Mr. D'Amico in a hallway and made the following statement twice to Mr. D'Amico: 'You are a disgrace' in a voice loud enough for third parties to hear." (See, Certification of T. Lentini, Exhibit W, Percella 419).

104.    Percella testified and denied the allegations but admitted she did not like Charles D'Amico. (See, Certification of T. Lentini, Exhibit E, 66:2-15).

105.    Percella testified she believed this was retaliation against her for filing complaints. (See, Certification of T. Lentini, Exhibit E, 68:10-15).

### July 8, 2013 and July 9, 2013

106.    Percella testified that in 2013 she was transferred to the Department of Public Works (hereinafter "DPW") which she believes was retaliation. (See, Certification of T. Lentini, Exhibit E, 73:3-6).

107.    Percella testified on July 8, 2013, a resident of the City (hereinafter "Resident") called the DPW to inform the DPW that a tree was cut down and it created a hazardous condition. Percella testified that she informed the Resident that DPW did not cut the tree and she should call Public Service because Public Service trimmed the trees. (See, Certification of T. Lentini, Exhibit E, 73:13-25).

108.   Percella testified that in her normal course of business, when she is advised of a hazardous condition, she would call the DPW workers to go check the condition. However, this time she did not do that because it was 4:30 and DPW did not cut the tree. (See, Certification of T. Lentini, Exhibit E, 74:10-22).

109.   Percella testified that the resident called back the next day. Percella testified that the Resident said she requested a tree trim form the City a year before and Percella looked up her request informed the Resident she was on the list. Percella told the Resident that Public Service cut the trees and the trees looked horrible and believed it was appropriate to blame Public Service to a citizen of the City. (See, Certification of T. Lentini, Exhibit E,75:8-77:4).

110.   Percella testified that she informed the Resident that Mayor Smith takes DPW workers off of assigned jobs to work on other projects. (See, Certification of T. Lentini, Exhibit E, 77:24-78:25).

111.   On July 12, 2013, Percella was served with a Preliminary Notice of Disciplinary Action, 31-A, (hereinafter "July 2013 31-A"). The July 2013 31-A charged Percella with four violations under N.J.A.C. 4A:2-2.3 for conduct unbecoming a public employee; incompetency, inefficiency or failure to perform duties; neglect of duty; other sufficient cause. The July 2013 31-A sought the suspension of Percella for sixty days without pay. (See. Certification of T. Lentini, Exhibit X, Percella 17).

112.   Specifically, the factual allegations surrounding the July 2013 31-A were on July 8, 2013 and July 9, 2013, Resident informed the DPW of a potentially hazardous tree condition on her property. During the course of her employment, Percella responded to the Resident in a "rude and harsh tone unbecoming of a City employee; failed to effectively and adequately respond to the report of a potential hazard; failed to perform job duties assigned to you; failed to respond to the

reported hazard in a reasonable, effective and efficient manner; and provided [Resident] with misinformation to wit: (1) 'we only have four (4) workers assigned to trees and mayor always has men doing other things' and (2) 'me and my boss have discussed this and nothing ever gets done because men are assigned to do other thing by the mayor;' and (3) 'you are Number 50 on the list and it will take another year for the City to respond.'" (See. Certification of T. Lentini, Exhibit X, Percella 17).

113.    When questioned whether she informed the Resident that the City "only ha[s] four (4) workers assigned to trees and mayor always has men doing other things," Percella testified that it was the Resident "saying this" and denied she said the mayor required workers to do other things. (See, Certification of T. Lentini, Exhibit E, 79:20-80:13).

114.    However, Percella testified that she informed the Resident that Mayor Smith takes DPW workers off of assigned jobs to work on other projects. (See, Certification of T. Lentini, Exhibit E, 77:24-78:25).

115.    Percella testified it was appropriate to inform the Resident that "me and my boss have discussed this, and nothing ever gets done because men are assigned to do other things by the mayor." (See, Certification of T. Lentini, Exhibit E, 81:12-18).

116.    Percella testified that she informed the Resident that she was number 50 on the list to have her trees trimmed. Further, Percella testified that she kept an Excel spreadsheet and knew the Resident was number 50 on the list. (See, Certification of T. Lentini, Exhibit E, 81:19-82:17).

117.    On January 4, 2014, DeSalvo submitted a letter to Daligan and Seth M. Gollin, Esq. regarding the December 5, 2013 hearing for Percella related to the July 2013 31-A. DeSalvo documented that Charles D'Amico testified on behalf of the City regarding the complaint about Percella filed by the Resident. Prior to the hearing, D'Amico spoke with the Resident on the

telephone and received her permission to record the conversation. During the hearing, D'Amico played the taped conversation between himself and the Resident. During the phone conversation, the Resident informed D'Amico she called DPW regarding a hazardous tree condition and that the employee, Percella, "had a rude demeanor" and insisted the problem was to be handled by Public Service and not the City. The Resident indicated that Percella informed her to call Public Service to resolve the issue. (See, Certification of T. Lentini, Exhibit Y, Percella 024-025).

118.    The Resident continued that she called Public Service and was informed to contact the City. She indicated she called the DPW again and spoke with Percella who was nastier and informed the Resident she would be placed on the list for the job to be completed. The Resident reiterated that Percella informed her that DPW only had four workers and the mayor calls them to do other jobs aside from tree duty. The Resident stated Percella informed her that she was number 50 on the list and would have to wait about a year. The Resident informed D'Amico she believed this conversation was disrespectful and inappropriate for Percella to speak about the mayor and her supervisor. (See, Certification of T. Lentini, Exhibit Y, Percella 025).

119.    Due to this conversation, D'Amico contacted DPW to check on the potentially hazardous tree condition at the Resident's home, which was subsequently remediated. (See, Certification of T. Lentini, Exhibit Y, 025).

120.    During this hearing, DeSalvo recounted that Percella testified on her own behalf. Percella testified that on July 8, 2013 Resident called DPW regarding the trimming of trees and Percella informed her Public Service was cutting the trees. Further, she testified that she was not rude, did inform the Resident that she was number 50 on the list and did inform the Resident that the mayor does take workers to other jobs. (See, Certification of T. Lentini, Exhibit Y, 026).

121.    DeSalvo found that the Resident did call the DPW regarding a hazardous condition of a tree in her yard. Further, DeSalvo found that the report of a hazardous condition "required immediate action on the part of Ms. Percella to notify the appropriate individuals to investigate whether or not such a condition existed." DeSalvo found that Percella "failed to act in a competent manor (sic) and neglected her duty regarding same." DeSalvo found that Percella's justification for not calling anyone to the Resident's home to check on the condition "further illustrates inefficiency and neglect of duty." Finally, he found that Percella's comment to the Resident regarding Public Service were inappropriate and "certainly unbecoming of a City Employee as well as an inaccurate portrayal to the public at large." (See, Certification of T. Lentini, Exhibit Y, 026).

122.    As such, DeSalvo determined the City had met its burden and found the charges against Percella were sustained and that based on her prior disciplinary record a 60-day suspension was warranted. (See, Certification of T. Lentini, Exhibit Y, 026-027).

123.    In her defense, Percella testified that she was not nasty with the Resident because if she was, why would the Resident speak to her for at least twenty minutes. (See, Certification of T. Lentini, Exhibit E, 85:8-21).

124.    Percella testified that she did not believe the tree trimming by Public Service constituted a dangerous condition. (See, Certification of T. Lentini, Exhibit E, 89:22-25).

125.    Further, Percella testified that if someone complains of a hazardous condition in the City that her obligation was to send the supervisor to the location to inspect the hazardous condition. (See, Certification of T. Lentini, Exhibit E, 92:12-18).

126.     Percella testified that she did not report the complaint of a hazardous condition to her supervisor because "we all knew Public Service was cutting the trees and making them look ugly." (See, Certification of T. Lentini, Exhibit E, 92:19-23).

127.     On July 2, 2014, Administrative Law Judge Caridad F. Rigo (hereinafter "ALJ Rigo") provided his decision regarding Percella's appeal of the May 2011 31-B. ALJ Rigo granted the City's motion to dismiss the appeal because Percella failed to appear for a plenary hearing on June 10, 2014, and failed to contact or call the court or provide a reason for her absence, even though ALJ Rigo found Percella had been duly notified of the hearing. (See, Certification of T. Lentini, Exhibit Z, Percella 004-005).

128.     On August 13, 2014, the Civil Service Commission issued a Final Administrative Action Order, after reviewing the July 2, 2014 decision from ALJ Rigo, and dismissed Percella's appeal without prejudice due to lack of prosecution. (See, Certification of T. Lentini, Exhibit AA, Percella 006).

129.     After refusing to answer the question, Percella testified that she did not appear for the hearing before ALJ Rigo because it was the mayor's election on June 10, 2014 and she was volunteering for Jimmy Davis. (See, Certification of T. Lentini, Exhibit E, 93:25-97:19).

130.     However, immediately after this she testified that she did not know why she did not request an adjournment of the hearing before ALJ Rigo due to the election. (See, Certification of T. Lentini, Exhibit E, 97:20-25).

### September 2013 Incident Between Percella and Joseph Waks

131.     At some time in July 2010, Defendant Waks was appointed by Mayor Mark Smith as the Director of Municipal Services. (See, Certification of T. Lentini, Exhibit BB, Deposition of Joseph Waks 12:13-24.

132.    On September 17, 2013, Percella filed a letter with Russo regarding an incident between Percella and Waks. In this letter, Percella alleged she was in the Health Department regarding a business matter with code enforcement. At this time she spoke with three employees, Tom Keyes (hereinafter" Keyes"), Laura Kline (hereinafter "Kline"), and Beth Styles (hereinafter "Styles"). She alleged Waks walked through the Health Department and came back five minutes later and told Percella to "Get the Fuck Out Of My Office." Further, he told again to get the fuck out. She responded that "you cannot tell me I can't be in here, these are my co-workers" and that Waks responded "Fuck You." (See, Certification of T. Lentini, Exhibit CC, Percella 431).

133.    Percella testified that prior to the September 17, 2013 incident with Waks, he had informed Percella, via letters, that she was not allowed to go to the store across the street to get coffee and was not allowed to have visitors in her office. She testified these letters were only given to her. (See, Certification of T. Lentini, Exhibit E, 100:12-101:4).

134.    However, Percella testified that she did not recall who this letter regarding personal visitors was addressed to. (See, Certification of T. Lentini, Exhibit E, 107:7-108:7).

135.    Waks testified that he implemented a rule with limiting communications with employees regarding personal matters because certain employees would abuse the ability to communicate with co-workers. (See, Certification of T. Lentini, Exhibit BB, 82:9-83-14).

136.    Further, Waks testified that he did not prohibit Percella from getting coffee but informed all employees that the start of work was 8:30 a.m. and that employees should get coffee or tend to other personal matters before the start of work. See, Certification of T. Lentini, Exhibit BB, 83:15-84:1).

137.    Percella testified that she believed it would be a reasonable policy to limit the amount of time employees can visit with other employees and personal visitors. (See, Certification of T. Lentini, Exhibit E, 104:2-105:4).

138.    However, immediately after this, Percella testified that she did not believe it was a reasonable policy. (See, Certification of T. Lentini, Exhibit E, 105:5-10).

139.    In response to the September 17, 2013 letter, Russo initiated an investigation into the allegations made by Percella against Waks. Russo detailed that the City's policy and procedures for sexual harassment includes "any other unlawful harassment" and as such, she conducted her investigation pursuant to the City's policies. According to Russo, she interviewed Percella, Waks, Keyes, Kline and Styles. (See, Certification of T. Lentini, Exhibit DD, Percella 030-031).

140.    In her investigation report, Russo summarized her interview with Keyes. According to this summary, Keyes confirmed that Percella came to the Health Department for a business-related issue but after a "few second discussion" she sat near Stergion and engaged in non-business conversation with Kline and Styles, who were both on duty in the Health Department. Keyes informed Russo that after approximately 10 minutes Waks walked through the Health Department and informed Percella to leave the area as she was not conducting business and was disrupting the Health Department employees. Keyes informed Russo that Waks did not curse at this time. Keyes stated that Percella insisted she had a right to be in the Health Department and Waks responded that he wanted her to leave. At this time, Keyes stated Percella refused to leave and confirmed Waks told her to "get the fuck out of my office." Keyes further stated that Percella did not leave the office after this confrontation with Waks. (See, Certification of T. Lentini, Exhibit DD, Percella 31).

141.    In her investigation report, Russo summarized her interview with Kline. Kline informed Russo that Percella came to the Health Department for a business-related issue which she briefly discussed with Keyes. Following this brief discussion, Styles informed Russo that Percella sat at Stergion's desk to discuss non-business-related matters. Kline stated Waks walked past Kline, Styles and Percella as they were discussing persona matters. Further, she stated to Russo that about five minutes later Waks returned and directed Percella to "get out of my office." At this time, Percella refused and stated she was "on business." Waks responded that she was disrupting the employees and he wanted her out. In response, Percella stated "you can't tell me where to go." At this time, Waks responded "fuck you" to Percella. Following this exchange, Percella picked up the phone to call her union representative but slammed down the phone and left the Health Department. (See, Certification of T. Lentini, Exhibit DD, Percella 32).

142.    In her investigation report, Russo summarized her interview with Styles. Styles stated Percella was initially in the Health Department for a business-related issue but after Percella sat at Stergion's desk to speak with Styles and Kline about non-business matters. Styles stated Waks came out of his office and walked past where Percella, Styles and Kline were speaking about personal matters. Styles stated a few minutes later Waks returned and told Percella to "get out of my office, there is no reason for you to be here." Styles said Percella responded "who are you? I am talking to my co-workers." Styles stated Waks responded "I don't care get out" to which Percella stated "I don't have to listen to you." Following this exchange, Styles said Waks told Percella "Fuck you." Percella tried to call her union representative but did not have the number. At that time, Percella left the Health Department. (See, Certification of T. Lentini, Exhibit DD, Percella 032).

143.    In her investigation report, Russo summarized her interview with Percella. Percella stated that she spoke with Keyes in the Health Department regarding a tree-planning issue. She stated after speaking with Keyes, Percella sat at Stergion's desk and spoke to Kline and Styles for approximately ten minutes. Percella stated during this ten minutes, Waks came up to her and said, "Get the fuck out of here." Percella stated she refused to leave because she believed she was entitled to speak with her co-workers. She claimed Waks yelled "Fuck you" at Percella. During this interview, Percella informed Russo that she had witnesses Waks use profanity before, but not directed towards her, but he did throw a pencil across the room and it nearly hit her. Percella stated she did not report this incident. Additionally, she stated she believed Waks was retaliating against her because Percella made OPRA requests seeking documentation about the overcompensation received by Waks, Bryant and McKittrick. Further, she claimed Waks prevented her from going to the deli for coffee or lunch. During the interview, Percella did not inform Russo that she was "Afraid, concerned or alarmed" by Waks or that she believed Waks was "tormenting her, undermining her frustrating or provoking a reaction from her." Further, she did not indicate she felt "pressured, frightened, intimidated or incapacitated" due to Waks' profanity. (See, Certification of T. Lentini, Exhibit DD, Percella 033).

144.    Percella testified that she finished her business with Keyes and was "talking to the girls" and chitchatting. (See, Certification of T. Lentini, Exhibit E, 112:23-113:1-4).

145.    In her investigation report, Russo summarized her interview with Waks. Waks provided a written and oral statement contradicting the facts asserted by Percella but admitting he stated "fuck you" to Percella during their confrontation. Waks informed Russo that he believed Percella was making her presence known to annoy Waks because he effectuated a transfer of

Percella from the Health Department to Public Works and testified against Percella in a disciplinary hearing. (See, Certification of T. Lentini, Exhibit AA, Percella 034).

146. As a result of her investigation, Russo found that this single incident did not constitute harassment. She found no repetitious or persistent nature regarding the profanity. Russo documented that Percella stated she would have no issue going to the Health Department, although she tries to avoid Waks. Further, she found Percella was upset with Waks asking her to leave the Health Department, but she was not upset with his use of profanity but that the use of profanity is unprofessional. Russo found that Percella's actions were insubordinate because Director Waks requested she leave the Health Department and Percella refused. Especially because Percella admitted her business was completed with Keyes and she was having a non-business-related conversation with Kline and Styles. Russo recommended Waks attend training or counseling that includes instruction on managerial skills. Russo recommended DPW ensure Percella only visits the Health Department for business related matters. (See, Certification of T. Lentini, Exhibit AA, Percella 034-037).

147. Waks testified he completed his counseling with his therapist and the therapist sent a letter to the City to confirm his completion of the required counseling by the City. (See, Certification of T. Lentini, Exhibit BB, 43:20-44:11).

148. Percella testified that Waks used the word "fuck" three times when telling her to leave the Health Department. (See, Certification of T. Lentini, Exhibit E, 111:13-17).

149. Percella testified that Keyes statement to Russo was inaccurate when Keyes said to Russo that "Mr. Waks did not curse upon first encountering Ms. Percella" and that it was inaccurate Waks only said "fuck" one time. (See, Certification of T. Lentini, Exhibit E, 113:17-114:25).

150.    Percella testified that Kline's statement that Waks only used the word "fuck" once was inaccurate. (See, Certification of T. Lentini, Exhibit E, 115:4-21).

151.    Percella testified that Styles interview response that Waks did not use profanity when first encountering Percella was inaccurate and that Styles statement that Waks only used the word "fuck" once was inaccurate. (See, Certification of T. Lentini, Exhibit E, 115:22-116:13).

152.    Percella testified that Keyes, Styles and Kline all provided inaccurate statements about how many times Waks used the word "fuck." (See, Certification of T. Lentini, Exhibit E, 116:25-117:4).

153.    In a contradiction with herself, in her testimony to Russo, Percella claimed Waks used the word "fuck" twice. In her testimony to justify this discrepancy, Percella testified "[i]t goes to show what [Russo] doesn't listen to what somebody tells her. Okay? Because obviously she is only writing it twice when he said it three times. So [Russo] just puts what she wants to put down and twists everything. Typical [Russo]. And she does it on every complaint going." (See, Certification of T. Lentini, Exhibit E, 120:2-11).

154.    Waks testified that he told Percella to "get the fuck out." (See, Certification of T. Lentini, Exhibit BB, 68:17-25).

155.    Further, Waks testified that he calmly and respectfully asked Percella to leave the Health Department twice because she was interrupting employees from doing their work. He testified that Percella twice refused to leave and that he probably used the word "fuck" when further asking Percella to leave but he did not yell at her. (See, Certification of T. Lentini, Exhibit BB, 39:25-41:7).

## Pencil Incident Between Waks and Percella

156.   Percella testified that Waks threw a pencil that almost hit her one time following a meeting. (See, Certification of T. Lentini, Exhibit E, 121:6-8).

157.   Percella testified that she was discussing an ordinance with Stergion and the City's animal control officer, Lisa Menendez (hereinafter "Menendez") regarding feeding cats in the City. Percella testified that Waks drafted a memorandum to allow people to feed cats. She testified that Waks called the three of them into the conference room and Waks started yelling and cursing at Stergion. She testified the three of them tried to inform Waks that it is not the law to allow people to feed the cats. Percella testified that she told Waks to not speak to Stergion in that manner and Waks responded to Percella"[i]f you don't like your fucking job, then go find another one." Then after this discussion, Waks stood up and threw a pencil, it hit a wall and bounced near Percella. (See, Certification of T. Lentini, Exhibit E, 121:9-122:25).

158.   However, Percella testified she never filed a complaint regarding this occurrence. (See, Certification of T. Lentini, Exhibit E, 123:11-15).

159.   Further, Percella testified that Waks did not throw the pencil at her but that it hit the wall and ricocheted towards her. (See, Certification of T. Lentini, Exhibit E, 125:3-6).

160.   Waks testified that the State Department of Health was assisting the City with the trapping, neutering and releasing of cats to control the cat population in the City. Waks further testified that Stergion and Waks did not agree on the issue because Stergion believed that putting any food out for an animal constitutes a violation of a health act because it is considered feeding wildlife. (See, Certification of T. Lentini, Exhibit BB, 47:8-22).

161.   Waks testified that this was a nuanced issue and that he was frustrated during the conversation and threw a pencil but did not recall throwing a pencil at anyone. (See, Certification of T. Lentini, Exhibit BB, 48:3-14).

162.   Waks testified that after this meeting he took everyone out to lunch, including Percella. (See, Certification of T. Lentini, Exhibit BB, 49:1-7).

### Incident Between Waks and Percella Regarding a Magnet

163.   Percella testified that Waks created a magnet that she found to be disgusting. (See, Certification of T. Lentini, Exhibit E, 128:13-24).

164.   The magnet is a drawing of three women in lingerie with the top reading "Girls from Bayonne" and the bottom reading "Leave 'em alone."  In between the phrases is the drawing of the three women in lingerie with "Poland", "Italia", and "Ireland" above each woman's head and picture of each countries respective flag. (See, Certification of T. Lentini, Exhibit B, SP-13).

165.   Percella testified that she did not remember the first time she saw this magnet, nor could she speculate a year and that she saw the magnet in front of her desk in the Health Department on a filing cabinet. (See, Certification of T. Lentini, Exhibit E, 128:25-129:12).

166.   Further, Percella testified that she did not witness Waks place these magnets in any location and she did not know who placed the magnets there. (See, Certification of T. Lentini, Exhibit E,129:15-22).

167.   Percella testified that she found the magnets offensive because she believed the saying "Girls from Bayonne Leave 'em alone" meant girls from Bayonne are "trash" or "sluts." She testified that "everyone" knows what the saying means. (See, Certification of T. Lentini, Exhibit E, 130:9-131:2).

168.    Percella testified it is a common saying in Bayonne but that Waks is not from Bayonne. (See, Certification of T. Lentini, Exhibit E, 132:1-133:5).

169.    Percella testified that as soon as she saw the magnet she took it down and she did not know how long it was up before she took it down. (See, Certification of T. Lentini, Exhibit E, 133:14-134:5).

170.    Percella testified that no other employees complained about the magnet. Percella testified she believed the magnet was sexual harassment. (See, Certification of T. Lentini, Exhibit E, 134:6-135:3).

171.    Percella testified that she did not file a complaint or notify a supervisor because Waks was her supervisor (See, Certification of T. Lentini, Exhibit E, 135:22-136:17).

172.    Waks testified that he recalled this magnet being on his office cabinet and on the door of Michelle O'Reilly's (hereinafter "O'Reilly") door and that O'Reilly had requested the magnet. (See, Certification of T. Lentini, Exhibit BB, 49:18-25).

173.    Waks testified that he had no knowledge of this magnet being placed near Percella's desk and that he created the magnet as a giveaway at a big art show he was having. (See, Certification of T. Lentini, Exhibit BB, 50:9-16).

174.    Further, Waks testified that his wife had the magnets made and that the phrase on the magnet did not mean anything to him but that he liked the saying and the imagery on the magnet. (See, Certification of T. Lentini, Exhibit BB, 50:25-51:12).

175.    Waks reiterated that he gave the magnet to Michelle O'Reilly and did not place it on anyone's desk and that he has no knowledge of the magnet being on anyone's desk. (See, Certification of T. Lentini, Exhibit BB, 52:52-7).

176.    Finally, Waks testified that he first learned that someone complained about the magnet when Percella filed this lawsuit. (See, Certification of T. Lentini, Exhibit BB, 52:8-12).

### Damages

177.    Percella testified that she never saw a physician or psychiatrist as a result of any of the allegations made in her Amended Complaint. (See, Certification of T. Lentini, Exhibit E, 137:11-20).

178.    Percella testified she saw Dr. Martin Levine, her former employer, for medical treatment for stress and anxiety. She saw Dr. Levine less than twenty times over six years and was prescribed Xanax. (See, Certification of T. Lentini, Exhibit E, 137:21-139:21).

179.    Percella testified that other than Xanax, which she took for less than two years, she was not prescribed any medication, nor did she seek treatment from a psychologist or seek any other form of medical treatment. (See, Certification of T. Lentini, Exhibit E, 140:1-16).

**FLORIO PERUCCI STEINHARDT
CAPPELLI TIPTON & TAYLOR, LLC**
Attorneys for Defendants, City of Bayonne,
Joseph Waks, and Richard Censullo.

Dated: May 14, 2020                   By:_____*/s/ Teresa M. Lentini*_____
                                      Teresa M. Lentini, Esquire (23341986)
                                      Nicholas A. Sullivan, Esquire (243092018)
                                      1010 Kings Highway South, Building 2
                                      Cherry Hill, NJ  08034
                                      Telephone: 856-628-8372
                                      Email: tlentini@floriolaw.com