# EXHIBIT E

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3
          Civil Action No. 14-cv-03695(KM)(MCA)
4

5   STACIE PERCELLA,                    )
                                        )
6                                       )
                 Plaintiff,             )    DEPOSITION UPON
7                                       )    ORAL EXAMINATION
          -vs-                          )         OF
8                                       )    STACIE PERCELLA
    CITY OF BAYONNE, JOSEPH WAKS,       )
9   INDIVIDUALLY, and RICHARD           )
    CENSULLO, INDIVIDUALLY,             )    ORIGINAL
10                                      )
                 Defendants.            )
11  --------------------------------

12          Wednesday, August 24, 2016

13

14       T R A N S C R I P T  of the deposition of

15   STACIE PERCELLA, called for oral examination in the

16   above-entitled action, said deposition being taken

17   pursuant to Rules governing Civil Practice in the

18   Courts of New Jersey, by and before RENEE V.

19   BETHEL, a Certified Court Reporter of the State of

20   New Jersey, at the CRESCI LAW FIRM, 830 Avenue A,

21   Bayonne, New Jersey, commencing at 10:15 a.m.

22
                     PAONE & ASSOCIATES
23               Certified Court Reporters
                    36 Tomahawk Trail
24              Denville, New Jersey  07834
                     (973) 586-3272
25                  Fax (973) 664-0721

Stacie Percella - August 24, 2016

15

1   were in the position?

2   A    A clerk is a minimal job when you go into

3   the City.  So it's one of the base jobs.  So it's

4   just a regular secretarial job.  So they just

5   trained me on the office training.

6        Q    Okay.  And about how long were you a

7   clerk in the Health Department?

8   A    Before I was deputy registrar?

9        Q    Yes.

10  A    2006, I was appointed deputy registrar.  I

11  had a dual title.

12       Q    So you were a deputy registrar and

13  what else?

14  A    Well, they change it all the time.

15  Keyboarding clerk 3, that's what it is called now.

16  Back then, it was a principal clerk typist.

17       Q    What were your duties as deputy

18  registrar?

19  A    To give out birth and death certificates;

20  make any corrections that were needed on the births

21  and deaths.

22       Q    How long did you work as a deputy

23  registrar?

24  A    Until they took me out of my position.

25       Q    Do you recall what year that was?

Paone & Associates

16

1    A      2010?   They moved the registrar out of my

2    office and put him in the city clerk's office.

3            Q       When you say they removed you, who do

4    you mean?

5    A      The administration.

6            Q       When you say the administration, who

7    do you mean?

8    A      The mayor, the business administrator.

9            Q       And who was the mayor at the time?

10   A      Mark Smith.

11           Q       And who was the business administrator

12   at the time?

13   A      At that time, Steve Gallo, G-a-l-l-o.

14           Q       So when you say they moved you out of

15   that position, you mean that Mayor Smith and

16   Mr. Gallo moved you out of that position?

17   A      They are the only people that could.

18           Q       Did you have any supervisors at the

19   office?

20   A      At that time, it was Joe Waks.

21           Q       Now, how were you advised that you

22   were going to be moved out of that position?

23   A      I wasn't.   They just had the registrar pack

24   up all the birth certificates and the death

25   certificates and move them to the clerk's office.

Stacie Percella - August 24, 2016

18

1       Q       So when you say you were moved, what
2   do you mean?
3   A       I was not moved.   They moved the registrar
4   out of my office and put him in the city clerk's
5   office.
6       Q       Okay.
7   A       So now I can't do my duties as a deputy
8   registrar because he's over in another office.
9       Q       Right.   So those duties were taken
10  away from you; correct?
11  A       Yes.
12      Q       Why?
13  A       What I consider it as?
14      Q       Yes.
15  A       Retaliation.
16      Q       For what?
17  A       Signing complaints.
18      Q       Can you elaborate?
19  A       If I can go back, I'm not positive if the
20  date was 2010 or 2011 on when he was moved out.
21  I'm really not.   I just want to let you know that.
22      Q       Thank you.   When you say your duties
23  were taken away out of retaliation for signing
24  complaints, what do you mean by that?
25  A       I signed a complaint, a sexual harassment

Stacie Percella - August 24, 2016

20

1    A      I wasn't told.   There was a sign put on the
2    window that said all deaths and births will now be
3    up in the city clerk's office.
4          Q      And do you recall when that was?
5    A      Either March or May of -- it had to be 2011
6    because I made the complaint to the police
7    department in 2010.   So it was 2011.
8          Q      Okay.   And when you were working as a
9    deputy registrar, were you ever subjected to
10   discipline?
11   A      No.
12                MR. BHALLA:   Let's mark this as SP-1.
13                (A Preliminary Notice of Disciplinary
14          Action (31-A) was marked SP-1 for
15          identification.)
16         Q      Ms. Percella, I'm handing you what's
17   marked as SP-1.   If you could just review that
18   document, and let me know when you are finished.
19   A      Um-hmm.
20         Q      This exhibit is marked SP-1,
21   Preliminary Notice of Disciplinary Action dated
22   November 6th, 2009.   You indicated that you were
23   never subjected to discipline as a deputy
24   registrar; is that correct?
25   A      But I didn't know if -- yes.

21

1          Q     So --

2     A     Well, that's what you're talking about.  I

3     thought it was after my complaint, but go ahead.

4          Q     So is it correct the say that you were

5     subjected to discipline as a deputy registrar?

6     A     Yes.

7          Q     In 2009, you were serving in the civil

8     service title of deputy registrar; correct?

9     A     Yes.

10         Q     And you were subjected to discipline

11    during that time; correct?

12    A     Yes.

13              MR. CRESCI:  Just for SP-1, this is a

14    preliminary notice.  Is there a final notice?

15    Because this doesn't reflect discipline.  This

16    reflects notice.

17              MR. BHALLA:  She already testified

18    that she was subject to discipline.

19         Q     I want to direct your attention to the

20    second page of the document.

21              Around the middle of the paragraph

22    under the provision "Specifications," it states,

23    and I quote, "You notarized official documentation

24    during the course of your employment with the City

25    of Bayonne certifying under oath that a certain

22

1    Mr. Khuong Ton Duong personally executed said
2    document before you when, in fact, Mr. Duong did
3    not appear before you in person as he was not
4    present in this State in order to have done so."
5              That's the allegation against you in
6    this PNDA.  Do you understand that?
7    A    Yes.
8         Q    As you stand here today, do you agree
9    with that allegation?
10   A    No.
11        Q    Turning to what's been marked as
12   Exhibit A, it's the fourth page of the document,
13   and it appears to be a birth record of an
14   individual?
15   A    Correct.
16        Q    And there is a line that states
17   "Father's Signature."  Do you see that?
18   A    Yes.
19        Q    And do you see a signature underneath
20   that?
21   A    Yes.
22        Q    Was that person present when that
23   signature was placed on the piece of paper?
24   A    Yes.
25        Q    Were you present to witness it?

27

1    attorney/client privilege, you are not supposed to
2    answer, but if you have any other recollection as
3    to why you waived the formal hearing, I would like
4    you to answer that question.
5                    MR. GARCIA:  You have to answer, Ms.
6    Percella.
7                    MR. NEMETH:  Yes or no.
8    A      No.
9        Q       You were eventually served with a
10   Notice of Minor Disciplinary Action suspending you
11   for two days; is that correct?
12   A      Yes.
13       Q       And is it fair to say that you don't
14   agree with that discipline?
15   A      I shouldn't have been disciplined at all.  I
16   did not do anything wrong.
17       Q       Okay.  Did you take any further steps
18   to appeal that determination?
19   A      No, because once you only get suspended for
20   two days, there is nothing you can do about it.
21   And they only gave me a two-day suspension because
22   they had no proof that I did anything wrong.
23       Q       And why do you think they suspended
24   you for two days?
25   A      Why did they suspend me?  Why did they come

28

1    after me at all?  I have no clue.

2          Q      Do you think it was a form of

3    retaliation?

4    A      Let's see.  When did this start?  Yep.

5          Q      And who was retaliating against you?

6    A      Peggy Lanni.

7          Q      And who is Peggy Lanni?

8    A      She was the acting director of the Health

9    Department.

10          Q      And why was Peggy retaliating against

11   you?

12   A      Because I wouldn't give out a hot dog

13   license without having the health officer there.

14          Q      Because you wouldn't give out a hot

15   dog license without having a health officer there?

16   A      We didn't have a health officer at the time.

17   So I wouldn't give out a health license.

18          Q      What is your understanding of the

19   rules or protocol with respect to giving out such a

20   license?  Is a health officer supposed to be

21   present?

22   A      Yes.

23          Q      And can you describe to me any

24   disagreement you had with Ms. Lanni in this

25   context?

30

1    without a health officer present?

2    A      I wouldn't know why they did that.

3           Q      But you said --

4    A      That's what I'm saying, yes.

5           Q      Do you have any facts to know that to

6    be true?  Are there any facts that you can tell me

7    to support your feeling that this is why you were

8    subject to minor discipline?

9    A      Of course not.

10          Q      So the deputy registrar's office was

11   basically transferred into the clerk's office at

12   that point; is that correct?

13   A      Not at that point.

14          Q      At what point was that?

15   A      2011.

16          Q      Okay.  And you weren't notified of

17   that other than a posting on the door?

18   A      Correct.

19          Q      And then after that, what were your

20   duties at the Health Department?

21   A      I still gave out the health licenses and the

22   cats and dogs and took in all the health

23   complaints.

24          Q      And how long did you serve in that

25   position?

1   A       Until they transferred me over to public
2   works in 2013.
3           Q       Do you recall an incident where you
4   had accused Vanessa Bryant and Michael McKittrick
5   of -- and actually Joe Waks -- of taking
6   inappropriate compensation time, sick time, unused
7   time?
8   A       Yes.
9           Q       I want to ask you a few questions
10  about that matter.  Just describe for me what you
11  were concerned about in terms of what was happening
12  at that time with Mr. McKittrick and Ms. Bryant and
13  Mr. Waks, actually.
14  A       Well, Mr. Waks?
15          Q       You could start with Mr. Waks, yes.
16  A       He gave himself a $400 -- what do you call
17  it -- stipend when he just started for not taking
18  any vacation days, and he wasn't entitled to it,
19  and he signed off on it.
20          Q       And how do you know he signed off on
21  it?
22  A       I saw the paperwork.
23          Q       And how did you see the paperwork?
24  A       It's in the computer.
25          Q       So there would be a document in the

33

1        Q        Is that six months for both Ms. Bryant
2    and Mr. McKittrick?
3    A      Yes.
4        Q        Do you know or can you give me an
5    estimate of how much money they were compensated
6    for for which they should not have been compensated
7    for?
8    A      I think it's all in the paperwork.
9        Q        Okay.  So you are not sure, but you
10   are saying it's in the papers that we have been
11   exchanging in discovery?
12   A      Yes.
13       Q        So when you found out that was
14   happening, what did you do?
15   A      We didn't have a director at the time.  When
16   I was doing -- when I noticed it, there was no
17   director at the time.  So I didn't know who to go
18   to.  So I tried to get in touch with Mark Smith,
19   who was the mayor at the time.
20       Q        Let me just back up and ask you
21   another question.  How were you able to ascertain
22   that Ms. Bryant and Mr. McKittrick were taking
23   vacation and sick time and marking it as comp time?
24   A      The sign-in sheets are right on the file
25   cabinet.  So we can see that.

35

1    deducted.  So it gets deducted from the number of
2    sick days they are permitted or the number of
3    vacation days they are permitted; is that right?
4    A        Correct.
5             Q        And this is all on a work sheet that's
6    in plain view in the office?
7    A        Right.
8             Q        And what you are saying is that rather
9    than use their sick time or vacation time, they
10   would mark the letter "C" instead of the word
11   "sick" or "vacation" in order to be compensated for
12   those days when they shouldn't have; is that right?
13   A        Correct.  They wrote "C."
14            Q        And how did you know that on those
15   days they were either not sick, or they weren't on
16   vacation?
17   A        Because they are writing "C" on the calendar
18   sheet, and they are signing "vacation" or "sick"
19   day on their sign-in sheet.  So you are --
20            Q        I'm sorry.  Repeat that.
21   A        The one sheet is where you sign in.  The
22   other sheet is where they tally everything, and
23   they are supposed to deduct it from it.  Well,
24   that's where they are writing "C."
25            Q        Right.

36

1   A      I'm sure you have copy of it.

2          Q      Um-hmm.   Okay.

3   A      It clearly states it.   So they are never

4   charged for their sick or vacation time.

5          And when I saw a bunch of "C's," that what

6   caught my eye.   I thought how did they get a bunch

7   of "C's"?   I'm working there.   I know you are not

8   working comp time.   So where are you accumulating

9   all this time?

10         Q      All this comp time; correct?

11  A      Right, because there is no overtime in my

12  department.

13         Q      And all of this information for

14  Ms. Bryant and Mr. McKittrick was in plain view in

15  a common area of your office; is that right?

16  A      The sign-in sheets?

17         Q      No.   Anything pertaining to the

18  allegations against these two individuals.

19  A      No.   The rest was in an open book on a desk.

20         Q      And open book on a desk.   Can you

21  describe that book?

22  A      It's a blue plastic book that was never

23  locked up.

24         Q      Okay.   When you say it's on a desk,

25  whose desk was it on?

37

1   A      Vanessa's.

2          Q      Was that your book?

3   A      No.    It was Vanessa's book, the City's book.

4          Q      And was it kept open or closed?

5   A      Open, open for everyone to see.

6          Q      And what was in that book?

7   A      Just the calendar sheets.

8          Q      For just Vanessa or --

9   A      For everybody.

10         Q      And what was Vanessa's title?

11  A      Clerk.

12         Q      So you would go through this book on

13  Vanessa's desk?

14  A      No.   I went to go look for my time to see

15  what I had, and when I was going through, that's

16  when I noticed.  His name pops up before mine.  So

17  that's where I thought where did all these "C's"

18  for the comp time come from?  That's what caught my

19  eye.

20         Q      So what you are saying is that you

21  went through the book to see your time, but in the

22  course of reviewing your own time, you noticed some

23  irregularities with respect to Ms. Bryant and

24  Mr. McKittrick; is that right?

25  A      Right, um-hmm.

41

1    sheets.

2           Q       Okay.  Did you indicate that you kept

3    them in a personal binder?

4    A      Yes.

5           Q       Did you make copies of those

6    documents?

7    A      The copy in the binder.  I made copies of

8    what I saw.

9           Q       So you took those documents on

10   Ms. Bryant's desk and made copies of them and

11   placed them in a personal binder; is that right?

12   A      Yes.

13          Q       And that was your documentation of

14   these alleged wrongdoings; right?

15   A      Right.  That's how I was keeping track of

16   what was going on.

17          Q       After the police department

18   investigated or interviewed you -- I'm sorry -- do

19   you recall what happened next?

20   A      What happened next?  They said that they

21   were going to investigate it.

22          Q       Do you recall them pursuing the

23   investigation?

24   A      Detective Diaz went over all the paperwork.

25   She noticed all the discrepancies in their vacation

Stacie Percella - August 24, 2016

45

1   A       Yes.

2           Q       So why wouldn't you want to appear and

3   cooperate with the investigation?

4   A       Because I don't have to.  The paperwork

5   proved it.

6           Q       So you felt that your testimony wasn't

7   necessary, and the so-called "paperwork" was

8   sufficient to substantiate your allegations;

9   correct?

10          MR. CRESCI:  Objection.  She already

11  answered that she met with Nicky Diaz, the

12  detective of Bayonne Police Department, and

13  answered all of their questions.  You are trying to

14  make it seem like she didn't answer anyone's

15  questions.

16          MR. BHALLA:  You can question her on

17  redirect as to what she --

18          MR. CRESCI:  No.  Then I'm objecting

19  to your question.  It lacks foundation.

20          MR. BHALLA:  Okay.

21          MR. CRESCI:  Because you are saying

22  she never gave statements.  Very serious

23  allegations made and she met with the deputy chief

24  of police and the detectives.

25          MR. BHALLA:  She didn't meet with

Stacie Percella - August 24, 2016

46

1    Mr. Daglian.

2            MR. CRESCI:  Who is Mr. Daglian?  I

3    don't even know who that is.

4            MR. BHALLA:  He was retained to

5    investigate her allegations.

6            MR. CRESCI:  Where?  We haven't seen

7    any documentation on that.  Again, lack of

8    foundation.

9        Q     You can answer.  Why didn't you meet

10   with Mr. Daglian?

11   A    I just told you.  The paperwork proved

12   itself.

13       Q     You don't think it was important for

14   Mr. Daglian to assess your credibility?

15   A    Who is he?  The police department -- where

16   is the police report?  Did you read it?

17           MR. CRESCI:  There is no question.

18   You have to answer his questions.  He doesn't have

19   to answer yours.

20       Q     You didn't feel it was important to

21   meet with Mr. Daglian?

22   A    No, because I met with the police

23   department.

24       Q     Go to page 5 of this exhibit.  The

25   last paragraph says, "Finally, I spoke to

Paone & Associates

Stacie Percella - August 24, 2016

47

1   Ms. Bryant on the documents that were in the
2   possession of Ms. Stacie Percella.  She reviewed
3   all the documents and advised that Ms. Percella
4   should not have had copies of these employee
5   personnel files.  All the documents were kept in a
6   cabinet in her office, but there is no lock on the
7   cabinet.
8          "She did state that many times, these
9   documents would have been on her desk in her
10  private office.  She stated that she never gave
11  anyone permission to copy any documents except for
12  their own personnel files."
13         Were you permitted to copy personnel
14  documents relating to other employees in Bayonne?
15         MR. CRESCI:  Objection.  Just lack of
16  foundation.  There is no evidence that these were
17  personnel files.
18      Q      You can answer.  You can answer the
19  question.
20         MR. CRESCI:  Yes, you can.
21  A     Was I permitted?  No.
22      Q      Back then at the time, were you aware
23  that you were not permitted to review and copy
24  personnel records of other employees?
25  A     No, but I saw something wrong.  So that's

48

1    why I did.

2          Q       Okay.  And did you access these

3    documents from Ms. Bryant's cabinet or from her

4    desk?

5    A      Her desk where she left them open.

6          Q       Did you access them and copy them with

7    her permission?

8    A      No.

9          Q       Did you seek her permission?

10   A      No.

11         Q       Why not?

12   A      Because she was stealing time.  Why would I

13   go and ask a person that's stealing time, "Can I

14   take your time record?  I want to prove that you

15   are stealing time"?

16         Q       Did you ask for permission from anyone

17   else in the City?

18   A      No.

19         Q       Did you advise anyone else that you

20   were concerned about people stealing time from the

21   City and direct them to the basis for your

22   concerns?

23   A      When I got the paperwork, I did.

24         Q       It further states, "Specifically, she"

25   -- meaning Ms. Bryant -- "never gave Stacie

Stacie Percella - August 24, 2016

49

1    Percella permission to copy documents of other

2    employees that Ms. Percella did indeed have in her

3    possession."

4              That's a correct statement; correct?

5    A     The only copies I had was of hers and

6    Michael's.

7         Q       That wasn't my question.  My question

8    was is it an accurate statement that Ms. Bryant

9    never gave you permission to copy documents of

10   other employees?

11   A     No.

12        Q       Can you repeat that answer?

13   A     No.

14        Q       "No," it's not a correct statement?

15   A     She didn't give me permission to take them.

16        Q       Okay.  Thank you.  It further states,

17   "Ms. Bryant speculated that Ms. Percella could have

18   come into her office, taken these documents from

19   her desk or cabinet, and copied them without her

20   permission."

21              Is that, in fact, what happened?

22   A     Yes.

23        Q       Mr. Daglian, in his conclusions

24   beginning on page 7 with "Ms. Vanessa Bryant"

25   states that, "Ms. Vanessa Bryant mistakenly

Stacie Percella - August 24, 2016

50

1    received a 1% extra longevity pay for a period of

2    three months and that it was repaid."

3            Are you aware of the fact that this

4    amount was repaid?

5    A       No.

6            Q       Mr. Daglian concludes with respect to

7    Mr. McKittrick that, "he never received

8    compensation time for any period that he was not

9    entitled to receive same."

10           Is it fair to say you disagree with

11   that?

12   A       Yes.

13           Q       And it also states with respect to

14   Mr. Waks that he never received a payment for a

15   stipend.  Is it fair to say you disagree with that?

16   A       Even though he signed off on it?  I wouldn't

17   know if he got the check, but he signed off on it,

18   didn't he?

19           Q       I'm not answering questions.

20   A       I'm just saying he signed off on his own

21   stipend.

22           MR. BHALLA:  Mark this as SP-6.

23           (A letter from Anthony J. DeSalvo

24       dated 4/25/11 was marked SP-6 for

25       identification.)

Stacie Percella - August 24, 2016

53

1    unreasonable.  He explains that in the last

2    paragraph of that document.

3                   Did you appeal that decision?

4    A       Yes.

5            Q       And why did you appeal it?

6    A       Because I didn't do anything wrong.

7            Q       And what was the result of that

8    appeal?

9    A       The judge stayed with it.

10           Q       Excuse me?

11   A       The judge agreed upon it.

12           Q       Agreed with the findings of

13   Mr. DeSalvo?

14   A       We went to OAL court.

15           Q       Now, do you think that the discipline

16   imposed upon you was any form of retaliation

17   against you?

18   A       Yes.

19           Q       Do you know which individuals were

20   engaging in retaliation against you?

21   A       The administration, Joe Waks, Steve Gallo.

22           Q       Anyone else?

23   A       D'Amico.

24           Q       Anyone else?

25   A       That's about it.

**Paone & Associates**

54

1      Q      Do you know why they were trying to

2  retaliate against you?

3  A      Because I made complaints.

4      Q      Any other reason?

5  A      No.  That's the only reason.

6      Q      Are you familiar with a gentleman

7  named Richard Censullo?

8  A      Yes.

9      Q      And who is he?

10 A      He was the health officer.

11     Q      Of Bayonne?

12 A      Yes, and North Bergen.

13     Q      Do you recall the first time you met

14 him?

15 A      August 7th, 2010.

16     Q      That was the first time you met him?

17 A      Yes.

18     Q      You said August 7th?

19 A      Correct.

20     Q      And can you describe to me the context

21 in which you met him?

22 A      My acting health director said he was coming

23 in.  We had to fill out a job description of what

24 we all did and have it ready for him by August 7th.

25     Q      When you say "him," do you mean --

Stacie Percella - August 24, 2016

56

```
 1   A     Four weeks or so, four to six weeks.
 2         Q     And when you returned to work --
 3   strike that.  Do you recall when you returned to
 4   work?
 5   A     No.
 6         Q     Okay.  Was it before October?
 7   A     Yes.
 8         Q     Do you recall meeting Mr. Censullo on
 9   or about August 6th, 2010?
10   A     Yes.
11         Q     And where did you meet him?
12   A     In the Health Department.
13         Q     Where specifically in the Health
14   Department?
15   A     I was sitting at my desk, and he was coming
16   out from the back of where his office was.
17         Q     Okay.  And did he have any interaction
18   with him at that time?
19   A     He came up to me.
20         Q     Okay.  Did he say anything to you?
21   A     That's when he said, "Hi, Chesty.  How is
22   your feet doing?"
23         Q     What did you take that to mean?
24   A     "Hi, Chesty.  How is your feet doing"?
25         Q     Yes.
```

Paone & Associates

Stacie Percella - August 24, 2016

57

```
 1    A      Looking at my chest.
 2          Q      Was he looking at your chest?
 3    A      I wasn't looking at him at the time when he
 4    said it.  He was coming from this way.
 5          Q      Okay.
 6    A      So I turned.  So I wasn't looking where his
 7    eyes were going.  I can't remember that.
 8          Q      So you weren't looking at him, but he
 9    was to your side?
10    A      Right next to me right here.
11                MR. CRESCI:  You have to tell the
12    court reporter --
13    A      To my right.
14                MR. CRESCI:  Good.
15          Q      So he was about two to three feet to
16    your right; is that correct?
17    A      One foot.
18          Q      And he said, "Hi, Chesty.  How is your
19    feet doing?"  Is that right?
20    A      Correct.
21          Q      And do you think he was asking a
22    question?
23    A      What do you think that is?  "Hi, Chesty.
24    How is you feet doing?"
25          Q      Yes.  Did you --
```

Paone & Associates

58

1    A      Obviously, he was asking about my foot and

2    my surgery, but that's not how you go about asking

3    somebody.  So he was talking about my chest.

4         Q      So when he says "Chesty," that was a

5    reference to your chest?

6    A      Yes.

7         Q      You took it to be a reference to your

8    chest?

9    A      Yes.

10        Q      And it's fair to say you took it to be

11   an inappropriate reference to your chest?

12   A      Correct.

13        Q      Did you react to that statement?

14   A      I just looked at him.  And then he went on

15   to say did I miss him, and I said, "No."

16        He said, "Well, you can lie with a straight

17   face, can't you."

18        Q      Did you respond to that statement,

19   "Well, you can lie with a straight face, can't

20   you"?

21   A      No.  I put my head down because I got little

22   upset.  And he turned around, and he went to go

23   speak to Simon Stergion, who was in the room also

24   but was on the telephone.

25        Q      So before that incident occurred, the

Stacie Percella - August 24, 2016

59

```
1   only other time you had met Mr. Censullo was on
2   August 7th of 2010; is that correct?
3              MR. CRESCI:  You have to say "yes" or
4   "no."
5              THE WITNESS:  I'm trying to think.
6              MR. CRESCI:  Okay.  Sorry.
7   A     I'm sure he was making himself -- probably
8   maybe once or so, but I didn't interact with him.
9        Q     Prior to this incident on October 6th,
10  2010, did you ever have any interactions with him
11  that were unpleasant or uncomfortable?
12  A     No.  I didn't really talk to him.
13       Q     Are you sure you hadn't met him in the
14  hallway of City Hall when he made that --
15  A     No.  I was at my desk.
16             MR. BHALLA:  Just mark this as SP-7.
17             (A confidential memo from Donna Russo
18        was marked SP-7 for identification.)
19       Q     I'm not going to ask you about each
20  page of this document.  So if you don't mind
21  perusing it and letting me know when you are
22  finished.
23             If you can, turn to the top of the
24  second page.  On that page at the top, the first
25  paragraph states, "I interviewed Percella initially
```

62

1   6th, you stated that the incident took place in the

2   hallway, your testimony is that Ms. Russo simply

3   heard incorrectly; is that right?

4   A       Obviously.

5           Q       Okay.  Do you think when -- have you

6   ever heard anyone use the word "Chesty" to describe

7   the chest of a woman?

8   A       Yeah.  Haven't you?  Yeah.  "She's got a big

9   chest," something like that.

10          Q       I mean the word "Chesty."

11  A       No.  Well, that's the first time anybody

12  ever said it to me.

13          Q       Have you ever heard that term used,

14  "Chesty"?

15  A       What do you mean?

16          Q       I mean have you ever heard somebody

17  use the term "Chesty" either to you or anyone else?

18  A       He was talking about my chest.

19          Q       I didn't ask you what he was talking

20  about.  I asked you if you ever heard that term

21  used either to you or to anyone else in your entire

22  life?

23  A       I don't know.

24          Q       Do you ever recall that term being

25  used in reference to you or --

64

1        MR. BHALLA:   I'm just trying to

2   clarify the record.

3        MR. CRESCI:   The record is clear.   I

4   think the record is clear.   You have asked the same

5   question three times.   You have asked her if she

6   has ever heard the word in her entire life.   She

7   said, "I don't know."   So if she didn't know three

8   minutes ago, is she going to know now?

9        Q        With respect to anyone else; correct?

10  It's a "yes" or "no" answer.

11       MR. CRESCI:   I think she said, "I

12  don't know."   We have read the question back.

13       You said, "yourself or anyone else."

14       And she said, "I don't know."

15       Q        Has Mr. Censullo ever engaged in --

16  strike that.   Is it fair to say that you took that

17  remark that you claim Mr. Censullo made to you as a

18  form of harassment?

19  A        Sexual harassment, yes.

20       Q        Has Mr. Censullo ever engaged in any

21  other forms of sexual harassment against you?

22  A        No.

23       Q        Including sexual harassment.

24  A        Just that.

25       Q        Have any other employees in Bayonne

Stacie Percella - August 24, 2016

65

1   engaged in any forms of sexual harassment against

2   you?

3   A      No.

4          Q      Is there anything else about

5   Mr. Censullo's conduct in the workplace while you

6   two were working together that you found to be

7   inappropriate?

8   A      No.  I didn't engage with him.

9          Q      So it's that single remark that was

10  made to you that you viewed as a form of sexual

11  harassment; correct?

12  A      Yes.

13         Q      And nothing else; right?

14  A      No.

15         Q      Do you think when Mr. Censullo made

16  that remark to you, he might have actually been

17  saying "Stacie," not "Chesty"?

18  A      No.

19         Q      You are sure you heard the word

20  "Chesty"?

21  A      Yes.

22         Q      Okay.  Do you recall an incident in

23  June of 2013 where you encountered Mr. D'Amico in

24  the hallways of City Hall and called him a

25  disgrace?

Stacie Percella - August 24, 2016

66

```
 1   A      I didn't call him a disgrace.

 2          Q      What did you call him?

 3   A      I didn't call him anything.

 4          Q      Can you tell me what happened on that

 5   date?

 6   A      We just passed each other in the hallway.

 7          Q      Did he say anything to you?

 8   A      No.  He just looked at me.

 9          Q      Did you look at him?

10   A      Yeah, I just looked at him.

11          Q      Do you have any reason to dislike

12   Mr. D'Amico?

13   A      Do I dislike him?

14          Q      Do you have any reason to dislike him?

15   A      I don't like him.

16          Q      Why not?

17   A      Because he's part of the administration that

18   seems to be harassing me.

19          Q      That's the Smith administration?

20   A      Yes.

21          Q      You were served with a Notice of Minor

22   Disciplinary Action for allegedly calling

23   Mr. D'Amico a disgrace; is that correct?

24   A      Correct.

25          Q      Calling for a suspension for two days
```

Paone & Associates

Stacie Percella - August 24, 2016

68

```
 1    A       Correct.

 2            Q       Do you know why Mr. D'Amico would do

 3    anything like that?

 4    A       Because he's not a nice guy.

 5            Q       And you think he would fabricate these

 6    allegations against you?

 7    A       Yes, I do.  And they made my boss sign a

 8    suspension.  When I asked my boss why did he sign,

 9    he said, "They made me."

10            Q       Is it fair to say that you also view

11    this as a form of retaliation against you?

12    A       Yes.

13            Q       And why would Mr. D'Amico be

14    retaliating against you?

15    A       I have no clue.  Because I made complaints.

16            Q       Any other reason?

17    A       No.

18            Q       When did you start working at the

19    Department of Public Works?

20    A       February of 2013.

21            Q       Did you request to be transferred

22    there?

23    A       No.  Joe Waks got me transferred over there.

24            Q       From the Tax Assessor's office?

25    A       No.  Now you are going way back.  When I was
```

71

1  me out of my position and put me in a file clerk's

2  job in the Tax Assessor's office doing nothing.

3       Q      After you were, in your opinion,

4  sexually harassed by Mr. Censullo, would you want

5  to be working in the same space as him?

6  A      I shouldn't be removed from my job.  I

7  didn't do anything wrong.

8       Q      So your testimony is that Mr. Censullo

9  should have been moved to a different office, not

10 you; is that right?

11 A      He's only there a half an hour a day every

12 couple of months.  Yes, move his office.

13      Q      Now, going back to when you were

14 working at the DPW, what were your responsibilities

15 there?

16 A      Now we are moving over there now?  Now I'm

17 going three years later?

18      Q      We are talking about 2013 when you

19 were at the DPW's office.

20 A      Well, now I don't have my deputy registrar

21 duties anymore because I'm not doing that.  Now I

22 take care of all the work that contains of the

23 forestry, the recycling, any other position for

24 Public Works, potholes.

25      Q      Now we are going back.  When you were

Stacie Percella - August 24, 2016

72

 1    initially transferred from the Health Department to
 2    the Tax Assessor's office, did your pay change?
 3    A      No.
 4          Q      Okay.  And before you were working at
 5    the Department of Public Works, which office were
 6    you working in?
 7    A      I was back in the Health Department.
 8          Q      Back in the Health Department.  And
 9    when you were transferred to DPW, did you still
10    receive your same rate of pay?
11    A      Yes.
12          Q      But you indicated that you had lesser
13    responsibilities in the DPW; is that correct?
14    A      Correct.
15          Q      Okay.  And do you know why you were
16    transferred to the DPW department?
17    A      Because Joe Waks didn't want me in the
18    Health Department anymore.
19          Q      Did he tell you that?
20    A      He told us that at the deposition.  We found
21    out.
22          Q      Did he say why?
23    A      Because he don't like me because I filed
24    complaints, and I filed open requests wanting to
25    know where my money was when they didn't pay me my

Stacie Percella - August 24, 2016

73

1    Sandy money, and everybody else was paid.  I was
2    the only one that wasn't.
3         Q       So your transfer to the DPW, in your
4    view, was yet another form of retaliation; is that
5    correct?
6    A    Yes.
7         Q       I want to direct your attention to an
8    incident that occurred on July 8th and 9th of 2013
9    with someone who made a phone call in connection
10   with a hazardous condition.  Do you recall that
11   incident?
12   A    Yes.
13        Q       Can you describe to me what happened?
14   A    I had a woman call at 4:40 and say that she
15   said that the Public Works' forestry department
16   chopped her tree and made it hazardous.
17        And I said -- and she told me the address,
18   and I told her, "No, that was not us," that she
19   should call Public Service.  They were going around
20   and trimming people's trees.
21        Q       So she told you that the tree was in a
22   hazardous condition?
23   A    Well, to her it was hazardous.
24        Q       Right.  And did you ask her why she
25   thought it was hazardous?

Stacie Percella - August 24, 2016

74

1    A      Well, she told me that it was trimmed, and I
2    said that it was not us that did it.  So she has to
3    call Public Service.
4         So she goes, "Okay.  I will call Public
5    Service," because we were getting a whole bunch of
6    calls back then because Public Service was going
7    around the whole town trimming the trees and making
8    them look like "V's".  So the people didn't like
9    it.
10        Q      When you were advised that there was a
11   hazardous condition, as an employee of the
12   department and receiving that kind of call, what
13   typically would you do?
14   A      I'd call my guys to go out and check the
15   tree.
16        Q      You didn't do that at this time, did
17   you?
18   A      At 4:30 when it was not us that cut the
19   tree?  I knew what she was talking about, and I
20   told her to call Public Service so they could come
21   and fix it or whatever at 4:30, but she called back
22   the next day.
23        Q      When she called back the next day,
24   what did she say?
25   A      She said that Public Service told her to

75

```
1    call us.
2            Q       To call Bayonne?
3    A       Yes, even though they cut the tree.
4            Q       So she called you back; right?
5    A       Yes.
6            Q       And the next day; right?
7    A       Yes.
8            Q       And can you describe the conversation
9    for me?
10   A       I was talking with Lucia Romero, and she
11   said that Public Service cut her tree, that it was
12   correct that Public Service did it, and she wanted
13   it fixed.
14           And then she started going on to say that
15   she put in for a tree trim, say, the year before or
16   something like that.  So I looked it up, and I told
17   her that she was on the list for a tree trim, and
18   we will get to it soon.
19           But then she started going on and on about
20   that the tree needs to be fixed, and I knew what
21   she was talking about.  My boss knew what she was
22   talking about, that they were ugly looking trees.
23           The people didn't like the way they were
24   trimmed because they were cutting around the wires,
25   and now they make the trees look like "V's."
```

Stacie Percella - August 24, 2016

77

1   agreed that it was a horrible looking tree.

2        Q     Do you think it's appropriate for you

3   to blame PSE&G for what they did?

4   A     Of course.  We all knew it.

5        Q     Did you make a reference to Mayor

6   Smith's office in that conversation?

7   A     Did I make a reference to Mayor Smith's

8   office?  She said she was going to call the mayor's

9   office because she knew somebody up there.  I said,

10  "Go ahead."

11       Q     Did you, in any way, say that Mayor

12  Smith was responsible for the problems that she was

13  having?

14  A     No.  I said that when we were talking about

15  what -- she was asking what the guys do or what

16  they do on a daily basis.  We got into a

17  conversation about that.  I was on the phone with

18  her for twenty minutes, twenty-five minutes.

19       So it's not like I'm sitting there just

20  trying to get her off the phone.  I'm sitting there

21  telling her what the process is and what the guys

22  do during their time and why she's on the list and

23  so forth.

24       Q     Did you ever say that sometimes Mayor

25  Smith takes people off the job --

Stacie Percella - August 24, 2016

78

```
 1   A      Yes, I did.
 2        Q      Let me finish -- which backs things up
 3   or words to that effect?
 4   A      Yes, I did.
 5        Q      Do you think it was appropriate to
 6   make that statement to a citizen calling in a
 7   complaint?
 8   A      Well, when she was demanding for us to go
 9   out there and trim her tree, I said that we
10   couldn't do that.  I said, "The guys are already
11   backed up," I said "because when they are doing
12   their job, then if the mayor or the supervisors
13   take them off the job to go and do something else,
14   they get backed up even further."
15        I was only telling her what the process is
16   and why we get behind on our tree trims.  That's
17   all.  I didn't say anything bad about the mayor.  I
18   was just giving her what the process was and the
19   conversation of how the forestry division runs and
20   why it was taking so long for her tree to get
21   trimmed.
22        And that's when she made the reference that
23   she was going to call the mayor's office herself
24   because she knew somebody up there.  I said,
25   "Okay."
```

Stacie Percella - August 24, 2016

79

 1            MR. BHALLA:  I'm just going to give

 2    this to you to mark as SP-8.

 3            (A Preliminary Notice of Disciplinary

 4        Action (31-A) was marked SP-8 for

 5        identification.)

 6        Q      I want to direct your attention to the

 7    third page of this document.  It's a Preliminary

 8    Notice of Disciplinary Action dated July 12th,

 9    2013, in connection with this July 8th and 9th,

10    2013, incident we have been discussing.

11            The third page states -- alleges that

12    you, "provided a citizen with misinformation to

13    wit;(1) 'we only have four workers assigned to

14    trees, and mayor always has men doing other

15    things'; and (2) 'me and my boss have discussed

16    this, and nothing ever gets done because men are

17    assigned to do other things by the mayor'; (3) 'you

18    are Number 50 on the list, and it will take another

19    year for the City to respond."

20            Let's go to the first statement which

21    states, "We only have four workers assigned to

22    trees, and mayor always has men doing other

23    things."  Did you make that statement?

24    A      No, I didn't.  This is Lucia Romero saying

25    this.

Paone & Associates

Stacie Percella - August 24, 2016

80

1        Q        Ms. Romero is a citizen; is that
2    right?
3    A        That's right.  So, obviously, who wrote this
4    up?  That's Donna Russo again.
5        Q        So you are saying No. 1 is inaccurate;
6    correct?
7    A        Well, we only had, at the time, yeah, four
8    workers.
9        Q        So it's accurate that you had four
10   workers, but your testifying that the mayor -- you
11   never said that the mayor always has men doing
12   other things; correct?
13   A        No.
14       Q        Number 2 says, "Me and my boss have
15   discussed this, and nothing ever gets done because
16   men are assigned to do other things by the mayor."
17   Did you make that statement?
18   A        In our twenty-minute discussion?  Probably.
19   When I said when the mayor has them go off the job,
20   I didn't say that the mayor has them constantly
21   doing other things.  He's not.  It's when they get
22   pulled from a job.  So they taking my words and
23   twisting them.
24       And I never said that it's going to take a
25   year for it to get done.  I told her it would take

Stacie Percella - August 24, 2016

81

1    a few weeks.

2         Q       So to the extent that nothing ever

3    gets done, you are saying it's because men are

4    assigned to do other things by the mayor; correct?

5    A    No, I didn't say that.

6         Q       You didn't say that.  Okay.  Do you

7    think it would be appropriate for you to say that?

8    A    I didn't say that.  If we are having a

9    conversation -- so this lady is translating back to

10   who?  Who was she talking to, and where is she

11   getting this information from?

12        Q       My question is, had you said that, do

13   you think that would be appropriate?

14   A    If you are having a conversation with a

15   citizen, we always talk.  So, yes.

16        Q       So it would be appropriate to say

17   that?

18   A    Yes.  It's not a big deal.

19        Q       Number 3 says, "You are Number 50 on

20   the list, and it will take another year for the

21   City to respond."  Is that an accurate statement

22   that you stated that?

23   A    No.

24        Q       Did you, at one point, see where she

25   was on a list?

Stacie Percella - August 24, 2016

82

1    A      Yes.

2           Q      Was that list --

3    A      I made the list.

4           Q      And was that list kept on a computer,

5    or was it a hard copy, paper list?

6    A      It was an Excel list that I kept, and I knew

7    that she was No. 50 because I was making it easier

8    for the guys to go out and do sections of town.  So

9    I numbered them where I can send them on a certain

10   day, one, two, three, four, five, six.

11          That's why I know she was No. 50.  That's

12   where the "50" came from.  And that's why I knew it

13   was not going to take another year.  We were

14   already halfway through our list.

15          Q      So you never told her it was going to

16   take another year to respond?

17   A      No.

18          Q      That's your testimony.  And how long

19   did you say it would take to respond?

20   A      Two weeks.

21          Q      I just want to show you what's marked

22   as --

23                 MR. BHALLA:  Let's mark this as SP-9.

24                 (A letter from Anthony DeSalvo dated

25          1/7/14 was marked SP-9 for identification.)

Paone & Associates

Stacie Percella - August 24, 2016

85

1    the form of the question.

2          Q      According to this report, you were

3    even more nasty, according to Ms. Romero in the

4    report.

5                 MR. CRESCI:  Objection.  The report

6    states that.  Ms. Romero didn't even appear at the

7    hearing.

8          Q      The document in front of you indicates

9    that, during the second conversation with

10   Ms. Romero, you were even more nasty than the first

11   day when you spoke with her; is that correct?

12   A      As I stated before, would you talk to me for

13   twenty minutes if I was a nasty person?  No.

14         Q      So your testimony is that you were not

15   nasty; is that right?

16   A      No, I wasn't nasty.  I had a twenty-minute

17   conversation with the woman explaining to her how

18   the department works.  And she still wanted her

19   tree done when she wanted it done, and she was

20   going to call the mayor's office.  So I said, "Go

21   right ahead."

22         Q      And how was your demeanor?

23   A      Normal.

24         Q      How was her demeanor?

25   A      She talked normal.  She just wanted to have

Stacie Percella - August 24, 2016

1   I'm just saying if they get pulled off by the mayor

2   to do something, they've got to go do it.  So now

3   they are putting your tree behind because they are

4   out doing other things.

5        So I'm just telling her.  I'm having a

6   conversation; if they get pulled off the job.

7        Q    And you feel -- and I understand you

8   didn't tell this to the caller, but you feel that

9   sometimes when these people get pulled off special

10  jobs -- excuse me -- get pulled off jobs, it's as a

11  special favor to the mayor?

12  A    I feel?  I know.

13       Q    You know.  How do you know that?

14  A    Because my boss would say it.  "The mayor

15  wants this done.  So they have to go do it."

16       Q    Who is that boss?

17  A    Gary Chmielewski.

18       Q    And would he indicate that it's as a

19  favor to the mayor?

20  A    Not a favor to the mayor.  It's what the

21  mayor says.

22       Q    Do you think the tree trimming that

23  PSE&G was doing constituted a hazardous condition?

24  A    No.  They just make them ugly, and she

25  didn't like her ugly tree.

92

1    report.

2                    MR. BHALLA:  That's your opinion.

3                    MR. CRESCI:  No.  You are saying that

4    Ms. Romero --

5         Q       Why don't you just answer my question?

6                    MR. CRESCI:  No, lack of foundation.

7                    Do not answer it.

8                    Ms. Romero never said that.  If you

9    want to say Mr. DeSalvo --

10                    MR. BHALLA:  Read my question again.

11   Actually, I will repeat it.

12        Q       If someone complains of a hazardous

13   condition in the City of Hoboken -- my mind is in

14   other places -- the City of Bayonne, what do you

15   think your obligation is as an employee of the

16   City?

17   A       I normally send the supervisor out there to

18   look at it.

19        Q       And why didn't you do that this time?

20   A       Because we all knew that Public Service was

21   cutting the trees and then making them look ugly.

22        Q       So you assumed it was not a hazardous

23   condition?

24   A       They didn't even give me a chance to send a

25   supervisor over there.  I did not have a chance to.

93

1      Q      And you were suspended based upon the

2   facts of this incident and your prior record for

3   sixty days without pay; correct?

4   A      In which my boss and his assistance would

5   not sign, yes.  They made this other employee sign

6   the suspension sheet.

7      Q      Which employee is that?

8   A      Joe Cannarozzo.

9              MR. BHALLA:  Mark this as SP-10.

10             (An initial decision was marked SP-10

11       for identification.)

12      Q      What's in front of you is an initial

13   decision in connection with the incident we have

14   been discussing before Judge Rigo.

15             The first page indicates, "the

16   petitioner not appearing and not calling or

17   otherwise contacting this court and not providing a

18   reason for her absence, and the petitioner having

19   been duly notified of the scheduled hearing of June

20   10, 2014, I find that there is good and sufficient

21   cause to grant respondent's motion to dismiss this

22   matter."

23             Do you see that?

24   A      Yes.

25      Q      Do you know why you did not attend the

Stacie Percella - August 24, 2016

94

1  hearing in this matter?

2              MR. CRESCI:  Objection as to

3  attorney/client privilege unless you have

4  independent knowledge.

5  A      No.

6      Q      So you appealed the decision but

7  failed to appear for the hearing; is that correct?

8              MR. CRESCI:  Again, I would object to

9  attorney/client privilege.

10      Q      You can answer.

11              MR. CRESCI:  If you know.

12  A      What?  No.

13      Q      It's not correct?

14              MR. BHALLA:  Can you repeat the

15  question?

16              MR. CRESCI:  I don't want you to say

17  anything.  I objected.  Do you have any independent

18  knowledge --

19              MR. BHALLA:  No, you are not asking

20  the question.  I'm asking the questions.

21              Just read the question back to the

22  witness.

23              MR. CRESCI:  And the objection.

24              MR. BHALLA:  And the objection.

25              (The requested portion of the record

Stacie Percella - August 24, 2016

95

1           was read back.)

2                     MR. CRESCI:  I think she answered it.

3                     MR. GARCIA:  Why don't you restate

4     what appears to be a "yes" or "no" question?

5                     MR. CRESCI:  Right.  She answered,

6     "No."

7                     Don't answer the question again.  This

8     is getting ridiculous.

9                     You are asking three times the same

10    question, and she answered it.

11                    MR. GARCIA:  So --

12                    MR. CRESCI:  No, there is no

13    clarification.  She said, "No."

14          Q      So you appeared for the hearing?  Did

15    you appear for the hearing, "yes" or "no"?

16                    MR. CRESCI:  Which hearing?

17          Q      The hearing that's referenced in this

18    exhibit scheduled for June 10th, 2014, did you

19    appear at that hearing?

20    A      No.

21          Q      Why?

22                    MR. CRESCI:  I'm going to object.

23    That was asked and answered.

24                    MR. BHALLA:  No, it wasn't.

25          Q      If you know.

Stacie Percella - August 24, 2016

```
 1   A     It was mayor's election.

 2         Q     What was the mayor's election?

 3   A     June 10th, 2014.  I wasn't at the hearing.

 4         Q     Were you voting; volunteering the

 5   election?  Is that the reason why you couldn't

 6   attend the hearing?

 7               MR. CRESCI:  I think she answered the

 8   question.

 9               MR. BHALLA:  I would like to elaborate

10   on the answer.

11         Q     What about the mayor's election

12   prevented you from attending this hearing?

13               MR. CRESCI:  Objection.  She didn't

14   say it prevented her from attending the hearing.

15   Lack of foundation.

16         Q     The question is still pending, just so

17   you know.

18               MR. CRESCI:  Do you want to read the

19   question back, the last question.

20               (The requested portion of the record

21         was read back.)

22               MR. NEMETH:  Document the time for the

23   record, how much time is going on in between

24   answers.

25   A     I didn't go.
```

Paone & Associates

1               (As per Mr. Nemeth, 45 seconds elapsed

2          between the reading of the last question by

3          the reporter and Ms. Percella's answer.)

4          Q      You haven't answered my question.  You

5     explained why you didn't go, but I'm asking you

6     what specifically about the mayor's election

7     prevented you from going?  Were you volunteering?

8     Were you a poll worker?  Was there something else?

9     A     I was volunteering.

10         Q      For whom?

11    A     Jimmy Davis.

12         Q      Did you ask for an adjournment of the

13    hearing because of your volunteer duties for Mayor

14    Davis?

15    A     I didn't say it was for Mayor Davis.

16         Q      I thought you said you were

17    volunteering for Mayor Davis; is that right?

18    A     I didn't go to the hearing.  That's your

19    answer.

20         Q      So my question is did you or your

21    attorney request an adjournment because you weren't

22    available on June 10th because of the election?

23    It's a "yes" or "no" answer to the question, or if

24    you don't know, just tell me you don't know.

25    A     I don't know.

Stacie Percella - August 24, 2016

100

1      Q      Notwithstanding your disagreements
2  with his conduct in that regard, I want to ask you
3  about his demeanor in your interactions with him.
4  How would you describe his demeanor?
5  A      To me only or --
6      Q      You only.
7  A      He was nasty.
8      Q      Was he occasionally nasty or routinely
9  nasty?
10 A      Routinely.
11     Q      In what way?
12 A      Well, he would walk in; slam doors; walk by
13 you; ignore you.  I was the only one that had
14 letters on my desk that said I wasn't allowed to go
15 to the store across the street.  I wasn't allowed
16 to have any visitors in the office.
17     Q      So you had notes to that effect?
18 A      Yes.
19     Q      That you weren't allowed to go across
20 the street?
21 A      To get coffee, yes.
22     Q      And you were not allowed to --
23 A      Have visitors in the office for more than
24 ten minutes.
25     Q      And these were handwritten or

Stacie Percella - August 24, 2016

101

1     typewritten notes?

2     A      He typed them up.

3            Q       And they were directed solely at you?

4     A      Yes, they were.

5                    MR. BHALLA:  Mr. Cresci, I do not

6     recall seeing any such notes that the witness is

7     referring to.  Can you please produce them?

8                    MR. CRESCI:  I don't have them, but if

9     we have them, we will produce them.

10           Q       Can you describe these notes?

11    Specifically, were they formal memorandums on, say,

12    letterhead, or were they simply something that he

13    put on a piece of paper, or something else?

14    A      He put them on his letterhead, but he only

15    put them on my chair.

16           Q       Were they notes addressed in a memo

17    format or a different format?

18    A      He made it look like he sent it to all of

19    the employees, but it was only put on my chair.

20           Q       When you say he made it sound like --

21    he seemed like he sent it to other employees, what

22    do you mean?

23    A      "To all" or whatever it said.

24           Q       Were they in a memo format?

25    A      It was on a letterhead.

Stacie Percella - August 24, 2016

104

1    there is no visitors in the office for more than

2    ten minutes.

3         Q    Do you think that's a reasonable

4    policy?

5    A    He wasn't there to see me.  He was there to

6    see an employee in the back, and he stopped by to

7    say hello.

8         Q    I asked you if you thought this was a

9    reasonable policy.

10   A    For ten minutes?  Yeah.  Then she shouldn't

11   be having anybody in her office for three hours.

12        Q    So you think it's a reasonable policy?

13   A    For ten minutes?  What is -- what are you

14   trying to get at?

15        Q    I'm asking you what you think about

16   the substance of --

17   A    Well, there is no policy.

18        Q    Okay.  Well, the substance of the

19   direction that Mr. Waks gave you that you weren't

20   to have visitors in your office for more than ten

21   minutes, do you think that's a fair and reasonable

22   policy?

23   A    No.  It was only aimed at me.

24        Q    If it was aimed at everyone, would it

25   be reasonable?

Stacie Percella - August 24, 2016

105

1    A    Yeah.

2         Q    So you think it's --

3    A    If it was for everyone, but it wasn't,

4    obviously.

5         Q    So you agree with me that having a

6    policy of not allowing visitors in the workplace

7    for more than ten minutes is reasonable; right?

8    A    No, I don't.  How about that?  No.

9         Q    You just told me --

10   A    Well, I just changed my mind.

11             MR. CRESCI:  Relax.

12             THE WITNESS:  No, because he's

13   aggravating me.

14        Q    Okay.  So now you don't think it's

15   reasonable; is that right?

16   A    No, I don't.

17        Q    Why not?

18   A    Because he's only picking on me.  Okay?

19        Q    If there was a policy that was uniform

20   to all employees, would you think it was

21   reasonable?

22   A    Well, put it in the handbook, and then it

23   will be.  Okay?

24        Q    So it is reasonable?

25   A    Put it in the handbook.

Stacie Percella - August 24, 2016

107

```
1   A      Good.
2         Q      So you stated that it wasn't a
3   reasonable policy.  Then you stated it was.  No.
4   Strike that.  You stated it was a reasonable
5   policy.  Then you said it wasn't.
6   A      Whatever.
7         Q      Then you said it was.  Now you are
8   saying it wasn't.  So just so the record is clear,
9   your position right now is that it's not a
10  reasonable policy to limit visitors for
11  nonbusiness-related reasons to ten minutes.  Is
12  that your --
13  A      Whatever you want to put it down as.  How
14  about that?  Because you are going to twist it like
15  Donna Russo twisted things.  Do whatever you want.
16  Say whatever you want.
17        Q      You didn't answer my question.
18               MR. CRESCI:  I think she did.  She did
19  answer it.
20        Q      But that policy was directed -- unlike
21  the coffee note, this note was directed at all
22  employees; is that right?
23  A      No.  It was only given to me because
24  obviously Vanessa had children in her office for
25  three hours and her sister in there.
```

Paone & Associates

Stacie Percella - August 24, 2016

108

1      Q      The way it was written, it said, "To

2   all employees"?

3   A      I don't know.  Go find the note.  Go ask Joe

4   Waks for it.

5      Q      So you don't recall who it was

6   addressed to; right?

7   A      No.

8                MR. BHALLA:  The witness answered "No"

9   for the record.

10      Q      Any other way in which Mr. Waks was

11   nasty to you in terms of his demeanor that you

12   haven't already indicated?

13   A      I didn't speak to the guy after every time

14   he retaliated against me.  I ignored him.

15      Q      Okay.  So other than what you have

16   testified so far, there are no other ways in which

17   his demeanor was inappropriate or nasty.  Is that

18   right or are there other --

19   A      What do you mean, how many times he's cursed

20   at me?  What you are trying to get at?

21      Q      You indicated that he curses.  He

22   slams door.

23   A      That's right.

24      Q      He writes memos that you feel are

25   directed at you and were inappropriate.  So these

111

1    A      He walked out of the office, walked past us

2    as we were chitchatting, and when he came back into

3    the office, he just walked right up to me and said,

4    "Get the fuck out of my office."

5         Q      Did you respond to him?

6    A      I said, "I'm here doing business."

7         He goes, "I don't care." He goes, "Get the

8    fuck out."

9         I said, "Don't talk to me like that in front

10   of people."

11        And then he said, "Fuck you."

12        I said, "Good.  So I'll go call my union."

13        Q      So it seems like he also used the eff

14   word.  When I say that, I mean the word "fuck."  So

15   he used the eff word towards you no less than three

16   times --

17   A      Three times.

18        Q      -- in that interaction.  Is that your

19   testimony?

20   A      Correct.

21             MR. BHALLA:  I just want to introduce

22   SP-11.

23             (A letter from Stacie Percella was

24        marked SP-11 for identification.)

25        Q      If you could, just review that

Stacie Percella - August 24, 2016

112

1   exhibit.  Have you reviewed the exhibit?

2   A    Yes.

3       Q    Okay.  This is a letter that you have

4   written to Ms. Russo complaining about what we have

5   just been discussing, this verbal altercation with

6   Mr. Waks.  I just want to verify, since this is a

7   letter that you wrote, that the contents of the

8   letter are accurate as you recollect them.

9          Are the contents of the letter you

10  have written to Ms. Russo marked SP-11 true and

11  accurate?

12  A    Correct.

13      Q    In the third paragraph in the second

14  line -- well, we will go to the first line.  The

15  first line -- actually, the third paragraph --

16  excuse me -- says, "He came back five minutes later

17  and came up to where I was sitting and said, 'Get

18  the fuck out of my office.'  I said, Excuse me.  I

19  am here doing business."

20         Is that what you stated to him after

21  he said, "Get the fuck out of my office"?

22  A    Yes.

23      Q    Were you, in fact, doing business when

24  he approached you?

25  A    No.  I conducted my business with Tom, and I

Stacie Percella - August 24, 2016

113

1   was talking to the girls.

2        Q      Okay.  So that time, you were just

3   chitchatting; right?

4   A    Yes.

5        Q      Okay.

6   A    I didn't know I wasn't allowed.

7             MR. BHALLA:  Mark this as SP-12.

8             (A memo from Donna Russo was marked

9        SP-12 for identification.)

10       Q      You have in front of you SP-12.  It's

11  a memo from Donna Russo with her investigation and

12  findings into this incident you just described.

13  Can you just review that memo, and let me know when

14  you are finished?

15             Are you ready?

16  A    I'm ready.

17       Q      Okay.  In the second page of the memo,

18  there is a summary of the interview of the witness

19  named Thomas Keyes.  Do you know Mr. Keyes?

20  A    Yes.

21       Q      He indicates that, according to this

22  summary, "He" -- and when I say "he," I mean

23  Mr. Waks -- "walked up to Ms. Percella and told her

24  to leave the area as she was not conducting

25  business there and was disrupting the others from

Stacie Percella - August 24, 2016

114

1   doing their jobs.  Mr. Waks did not curse upon
2   first encountering Ms. Percella."
3            Is that an accurate statement?
4   A    No.  Why don't you go read the other two
5   because they go differently than his.  So you are
6   only picking out his.  So no.
7        Q    I will get to those.
8   A    No.
9        Q    Okay.  So the statement is not
10  accurate; right?
11  A    Nope.
12       Q    And later on he indicates that
13  Mr. Waks used profanity in the workplace and told
14  Ms. Percella to, "Get the fuck out of my office."
15            MR. CRESCI:  Objection.  You said,
16  "he."  This is Ms. Russo's report; right?
17            MR. BHALLA:  Yes.
18       Q    Is that an accurate statement?
19  A    That he yelled, "Get the fuck out of my
20  office"?  Yeah.
21       Q    Mr. Keyes, according to the summary,
22  indicated that Mr. Waks only used the eff word
23  once, not three times.  Is that an accurate
24  recollection?
25  A    No.

Paone & Associates

Stacie Percella - August 24, 2016

115

1        Q        So that's not consistent with your
2    recollection; right?
3    A        No.
4        Q        Okay.   Let's go to Laura Klein.   She
5    is the next witness that is summarized in this
6    document on the third page.
7                She indicates in the middle of the
8    paragraph, "Director Waks returned back to the
9    Health Department and approached Stacie and
10   directed her to 'get out of my office,' at which
11   time, Ms. Percella refused stating that she was
12   present 'on business.'"
13               Later on, he says -- later on it's
14   indicated that "Ms. Percella refused to leave the
15   area stating, 'You can't tell me where to go.'   At
16   which time, Director Waks said 'Fuck you' to Ms.
17   Percella."
18               He also -- or she also indicates that
19   he only used inappropriate language once, not three
20   times.   Is that consistent with your recollection?
21   A        No.
22       Q        Okay.   The witness Beth Styles is also
23   interviewed, and her interview is summarized right
24   below on the same page.   She also states, according
25   to the summary, that "Director Waks returned to the

1   Health Department and stated to Ms. Percella, 'Get
2   out of my office.  There no reason for you to be
3   here.'"
4               So she also indicates -- or does not
5   indicate that he used profanity when he first asked
6   you to leave.  Is that consistent with your
7   recollection?
8   A      No.
9       Q      And the rest of the summary also
10  indicates that he used profanity on one occasion,
11  specifically stating "Fuck you," not three times.
12  Is that consistent with your recollection?
13  A      Nope.
14      Q      Okay.  So all three of these
15  witnesses, the only witnesses other than yourself
16  and Mr. Waks, indicate that he used profanity once,
17  not three times.
18              MR. CRESCI:  Objection.  Lack of
19  foundation.
20              MR. BHALLA:  Foundation is not a
21  legitimate objection.
22      Q      Is that consistent with your
23  recollection?
24  A      You've got three different stories.  No.
25      Q      All three of these witnesses indicate

117

1    that Mr. Waks used profanity once, not three times.

2    Are you saying that all three of these witnesses

3    provided incorrect information to the investigator?

4    A      Yeah.

5          Q      But the information you provided was

6    correct?

7    A      Yeah, word for word.

8          Q      Word for word?

9    A      Word for word, yes, because I learned to

10   write things down immediately.

11         Q      Well, then let's go to your summary on

12   the same document.  That's on Percella-0033.

13   A      [Inaudible.]

14              MR. BHALLA:  Was that recorded?

15              THE REPORTER:  I didn't because I

16   couldn't hear her.

17              MR. BHALLA:  She said, "Let's go.

18   This is fucking ridiculous."

19              MR. CRESCI:  I don't think that's what

20   she said.

21              MR. GARCIA:  That's what I heard.

22              MR. CRESCI:  Are you a witness?

23              MR. GARCIA:  Just that's what I heard.

24              MR. CRESCI:  And you represent who,

25   Censullo?  That's right.  I don't think the court

120

1    A    He did.

2    Q    Okay.  So all of this indicates --

3    this summary indicates that you told Ms. Russo he

4    used profanity twice, but your testimony is that,

5    as per your letter, he used it three times.

6    A    It goes to show what Donna doesn't listen to

7    what somebody tells her.  Okay?  Because obviously

8    she's only writing it twice when he said it three

9    times.  So Donna just puts what she wants to put

10   down and twists everything.  Typical Donna.  And

11   she does it on every complaint going.

12        Q    Do you think she has something

13   personal against you?

14   A    I don't know.  Ask her.  Don't ask me.  Ask

15   her.

16        Q    Are you aware of any reason why she

17   would do that?

18   A    No, none at all.  I don't know her.  I don't

19   know her at all.  All I do is make a complaint

20   where it has to go, and I made two.  I made two

21   complaints, and I have been retaliated ever since.

22        Q    So you go on to state there that Ms.

23   Percella -- excuse me -- I quote, "Ms. Percella

24   said that she had been witness to Director Waks

25   using profanity many times before but not

121

1    specifically directed at her.  Although, one time
2    he through a pencil across the room, and it nearly
3    hit her."
4              Is that an accurate statement --
5    A      That's right.
6         Q      -- that Mr. Waks threw a pencil which
7    almost hit you?
8    A      Yes, he did.
9         Q      Can you tell me about that incident?
10   A      I was in the office with Simon and the
11   animal control officer, Lisa Menendez.  We are
12   sitting there talking, and we were talking about
13   the feeding of cats where Joe makes his own
14   ordinance up.
15        It's not even an ordinance.  It's a memo
16   where people can feed cats.  It's against the law
17   to feed cats in Bayonne.
18        Q      When you say "Joe," who do you mean?
19   A      Waks.  So obviously we were talking with the
20   animal control officer who had a problem somewhere,
21   and it was getting a little bit loud.
22        So we went into the -- he called us into the
23   conference room, and he starts screaming at Simon,
24   and he starts cursing at Simon and telling him that
25   he "better fucking start doing what he has to do,

1    and people can go and feed the cats."
2         And we are trying to tell him that's not the
3    law.  We have already had meetings over it already.
4    That's when he turned around and said, "If you
5    don't like your fucking job, then go find another
6    one."
7         Q      He said that to Simon?
8    A    To me.
9         Q      Oh, to you.
10   A    Because I told him, "Don't speak to Simon
11   that way.  He's an older gentleman.  Don't scream
12   at him like that."  And he's screaming at him, and
13   he's going on and on over the cats.
14        And he turned around -- when I told him,
15   "Don't be cursing at him like that," he turned
16   around and he goes, "If you don't like your fucking
17   job, go find another one."  And he goes, "And you
18   are going to do what I tell you to do.  If you
19   don't want to do it, I'm going to write you the
20   fuck up."
21        Q      And he said that to you?
22   A    To me.
23        Q      Okay.
24   A    And that's when he stood up, flung the
25   pencil, hit the wall, and came back by my face.

Stacie Percella - August 24, 2016

123

1      Q      When did that incident occur?

2  A      I don't know.

3      Q      Did it occur before or after the

4  September 17th, 2013, incident?

5  A      The pencil throwing was before this.

6      Q      Were there any other witnesses to that

7  incident other than Simon Stergion?

8  A      Simon and Lisa.

9      Q      Lisa --

10  A      -- Menendez.

11      Q      Did you file a complaint against Mr.

12  Waks about that incident?

13  A      No.  It says it right in here.  Why bother?

14  This is what happens when I file a complaint.  I

15  get retaliated against.

16      Q      Do you think it was his intention to

17  throw the pencil at you?

18  A      If he was going to throw it at me that way,

19  that's throwing it at me.  He flung the pencil, it

20  hit the wall, and ricocheted back at me.

21      Q      So he didn't throw the pencil in your

22  direction; is that right?

23  A      He flung it that way.  So it ricochetted off

24  the wall, and it came at my face.

25      Q      Okay.  So bear with me because when

Stacie Percella - August 24, 2016

125

1    to reflect that you were laughing at her responses

2    so that the record is clear.

3         Q    So we are clear, Mr. Waks did not

4    throw this pencil at you, but it ricochetted off a

5    wall and went in your direction; correct?

6    A    That's what I said.

7         Q    And with all this, you know,

8    inappropriate behavior of Mr. Waks with yelling and

9    profanity in the workplace towards Sy, yourself, or

10   others that you testified to, do you think that

11   this conduct of Mr. Waks was attributable to his

12   management style, or was he trying to harass you

13   specifically?

14   A    Say that again?

15            MR. BHALLA:   Read it back.

16            (The requested portion of the record

17       was read back.)

18   A    I couldn't tell what you his management

19   style is.

20        Q    I'm trying to figure out are you

21   testifying that Mr. Waks was picking on you

22   specifically, or do you think he was just generally

23   inappropriate in the workplace?

24   A    Yes.  He was cursing at me specifically.

25        Q    Did you feel like you were being

128

1    direct supervisor.

2    A      No, he wasn't.  I didn't work there, did I?

3    I was in Public Works.  I came over to do some

4    other work.

5            Q      So you are saying that you didn't work

6    for him at that time?

7    A      No, I didn't.

8            Q      So you think it was appropriate for

9    you to stay in there despite being asked to leave?

10   A      I didn't stay.  When he told me to leave, I

11   left.  If he had a problem with me there, why

12   didn't he say it the first time he saw me?

13                  MR. BHALLA:  Mark this as SP-13.

14                  (A black and white photocopy of a wall

15           magnet was marked SP-13 for identification.)

16           Q      I've got in front of you what's marked

17   as SP-13.  Are you familiar with this image, Ms.

18   Percella?

19   A      Yep.

20           Q      Can you describe for me what it is?

21   A      A disgusting magnet.

22           Q      What's your understanding as to who

23   produced this magnet?

24   A      Who produced it?  Joe Waks did.

25           Q      When did you first see this magnet?

Stacie Percella - August 24, 2016

```
 1   A      I don't know the date.
 2          Q      Can you approximate a year?
 3   A      No.
 4          Q      Do you recall where you were when you
 5   saw the magnet?
 6   A      In my office.  It was in front of my desk --
 7   a bunch of decks and file cabinets.
 8          Q      Which office was this?
 9   A      The Health Department.
10          Q      You said it was in front of your desk?
11   A      In front of my desk, in front of Simon's
12   desk, on a file cabinet.
13          Q      Anywhere else?
14   A      Wherever he put them.
15          Q      Do you know that Mr. Waks placed these
16   magnets in those locations?
17   A      They are his magnets.
18          Q      I asked you if you knew whether or not
19   he placed them in the locations --
20   A      I didn't see him.
21          Q      Do you know who put those magnets up?
22   A      No, I don't.
23          Q      When you first saw that magnet -- do
24   you remember when you first saw that magnet?
25   A      I just said no.  I don't know the date.
```

**Paone & Associates**

Stacie Percella - August 24, 2016

130

1       Q       Do you remember your reaction when you
2   first saw this?
3   A       Yes.  "It's disgusting.  Who the hell put
4   this up there?"
5       Q       So you felt it was disgusting?
6   A       Yeah.  I took them down.
7       Q       So you found it offensive?
8   A       Yes, very.
9       Q       Can you tell me specifically what you
10  found offensive about the magnet?
11  A       "Girls from Bayonne, leave 'em alone"?  That
12  means they are trash.  They are sluts.  You leave
13  them alone.  And he has pictures of women up there
14  in their bra and girdles.  Really?
15      The are Polish, Italian, and Irish.  Well,
16  I'm Polish and Irish.  Okay?  It's very offensive.
17      Q       So you were offended by the fact that
18  they were scantily clad women?
19  A       And the saying.
20      Q       Okay.  I will get to that too.  So the
21  saying, you interpreted it as meaning that girls
22  from Bayonne are sluts; correct?
23  A       Everyone takes it that way.  You are not
24  from Bayonne.  So --
25      Q       How do you know that?

131

1   A      Because everybody knows it.   That's what

2   they say, "Girls from Bayonne, leave 'em alone."

3          Q       So everyone knows girls from Bayonne

4   are sluts?

5   A      That's what they say.

6          Q       Who says?

7   A      People in general.   That's what the magnet

8   means.

9          Q       It's fair to say you don't agree with

10  that; right?

11  A      No.

12         Q       And you said you are Polish and Irish;

13  is that correct?

14  A      Yes.

15         Q       And you also found the insignias of

16  Ireland and Poland under two of the women to be

17  offensive because it suggests that that was a

18  Polish woman and an Irish woman; is that right?

19  A      Well, that's what I am.   Why didn't he put a

20  Jewish one up there?   That's what he is.   Or

21  anything else?   Why?   Well, that's what I am.   It's

22  very offensive.   Sorry.

23      I'm a woman.   You're a man.   That's typical

24  male stuff.   A woman would never put that up.   They

25  wouldn't think of that as art neither.

Stacie Percella - August 24, 2016

132

1       Q      So walk me through how you interpret
2    the term "Leave 'em alone" as suggesting that girls
3    from Bayonne are sluts or trash?
4    A      They have been saying it for years.  I'm
5    fifty-one years old.  I have been hearing it since
6    I'm a young girl.
7       Q      When you say "they," you mean the
8    community of Bayonne?
9    A      Yes.
10      Q      Do men and woman use that phrase from
11   Bayonne?
12   A      No.  The men use it when they are talking
13   about women from Bayonne.
14      Q      So it's a common saying in Bayonne?
15   A      It could be anywhere.  Obviously, he's not
16   from Bayonne.  So where did he get it from?
17      Q      I'm asking about Bayonne.  Is that a
18   common saying in Bayonne --
19   A      I don't know.  I just --
20      Q      Just let me ask the question.
21          MR. CRESCI:  Take your time.  Relax.
22   Relax.
23      Q      Is this phrase on the magnet a common
24   phrase in Bayonne, "Girls from Bayonne, leave 'em
25   alone"?  Is that a common phrase in Bayonne?

Stacie Percella - August 24, 2016

133

1    A      Like I said, I'm fifty-one years old.  I
2    have heard it since I have been a teenager myself.
3          Q      So that would be "yes"?
4    A      Yes.  If my kid said it, I would put soap in
5    his mouth.
6          Q      So this magnet appeared in front of
7    your desk, near Sy's work area, and also it was
8    against a file cabinet all in the Health
9    Department; correct?
10   A      Correct.
11         Q      Was it anywhere else other than those
12   three places?
13   A      I didn't go looking anywhere else.
14         Q      And you said that, when you saw them,
15   you took them down; is that right?
16   A      Yes.
17         Q      Do you know how long they were up
18   before you took them down?
19   A      No.  When I saw them, that's when I took it
20   down, whatever date that was.  I don't recall when
21   that was.
22         Q      Do you remember if it was in the
23   morning of the day or the --
24   A      I don't know.
25         Q      So you can't recall what time of day

Stacie Percella - August 24, 2016

134

1   you saw them?

2   A      No.

3          Q      But as soon as you saw them, you took

4   them down; right?

5   A      Yes.

6          Q      Did any other employees complain about

7   this magnet, to the best of your knowledge?

8   A      No.

9          Q      Did you tell any other employees in

10  the workplace about the magnet when you saw it and

11  took it down?

12  A      Whoever was there at the time.

13         Q      And who was that?

14  A      I don't know.  I know Simon was there.  I

15  don't know who else was there.  I don't remember

16  when it was.  So I could not tell you.  I don't

17  know.

18         Q      Did Simon react to the magnet when he

19  saw it?

20  A      I don't recall.  I don't know.

21         Q      Did you see the magnet as a form of

22  harassment?

23  A      Why would he put it there?

24         Q      That's not an answer to my question.

25  A      Yes, I do.

Paone & Associates

Stacie Percella - August 24, 2016

135

1      Q      Okay.  And you saw it as a form of
2   sexual harassment; correct?
3   A      Yes.
4      Q      Do you think that that magnet was
5   directed at you specifically?
6   A      Well, I was the only girl working in that
7   area.
8      Q      So you were the female in that work
9   area?
10  A      Correct.
11     Q      So it's your testimony that you feel
12  that this magnet was placed at three locations in
13  the workplace specifically to harass you; is that
14  right?
15  A      I don't know why, but it is harassing to see
16  it there.  I don't know why he put it there.
17     Q      Do you know if anyone else -- strike
18  that.  Do you know if any other employees in
19  Bayonne City Hall complained about this magnet?
20  A      Who else could see it?  They were inside --
21  they didn't see it.  I took them down.
22     Q      And did you file a complaint or notify
23  your supervisor about this magnet when you saw it?
24  A      He is my supervisor, Joe Waks.  Who am
25  I going to -- really?

136

1     Q    So that time, he was your supervisor?

2  September 2013, he was not, but now at this time,

3  he was; is that right?

4  A    This showed up -- all right.  There you go.

5  There is a date for you in your head right there.

6  It's before then.  So, yes.  It was before I was

7  moved to Public Works.

8     Q    Okay.

9  A    If you're trying to pinpoint a date, it's

10  before I was transferred out.  So I really couldn't

11  tell you.

12     Q    So you did not -- strike that.  Since

13  this is a case where you felt your supervisor was

14  harassing you, did you try to speak to anyone else

15  higher in the chain of command above Joe Waks about

16  the magnet?

17  A    Never again.  No.

18     Q    You just filed a lawsuit alleging this

19  was harassment?  Is that the first time you raised

20  an objection to this magnet?

21  A    Say that again?

22     Q    By filing this lawsuit and alleging

23  harassment through this magnet, is that the first

24  time that you raised a complaint about this magnet?

25  A    I don't --

Stacie Percella - August 24, 2016

137

1          Q          Do you want me to rephrase?  I'll

2     rephrase.

3     A          Yes, because I'm not understanding it.

4          Q          I apologize.  I'm simply asking you if

5     you ever complained about this magnet to anyone

6     else before filing this lawsuit?

7     A          Every time I make a complaint, I get

8     retaliated against.  So --

9          Q          So your answer is "No" then?

10    A          Who was I going to give it to?

11         Q          You have, through the course of the

12    deposition, alleged a number of forms of harassment

13    or retaliation directed against you.  Did you, at

14    any point, have to see a physician or a

15    psychiatrist as a result of the conduct that you

16    have alleged today?

17    A          No.

18         Q          Did you have to see a psychiatrist as

19    a result of the conduct you have alleged today?

20    A          No.

21         Q          Did you have to seek any form of

22    medical treatment because of the retaliation and

23    harassment that you allege you suffered?

24    A          I went to Dr. Levine's, yes.

25         Q          For what purpose?

Stacie Percella - August 24, 2016

138

1    A      Stress, anxiety.

2           Q      Related to what?

3    A      All the aggravation that they have caused.

4           Q      Did you advise Dr. Levine that you had

5    stress and anxiety specifically because of the

6    aggravation that was caused to you?

7    A      Yes.

8           Q      In the workplace?

9    A      Yes.

10          Q      And you said Dr. Levine is a family

11   practitioner; is that right?

12   A      Um-hmm, yes.

13          Q      And how many times did you see Dr.

14   Levine for this specific purpose?

15   A      Over the course of the six years of being

16   retaliated against?  I couldn't tell you.

17          Q      Can you estimate?

18   A      Didn't you -- no, I can't.  You got the

19   paperwork from his office.  Why don't you count the

20   visits?

21          Q      I'm asking how many visits to Dr.

22   Levine --

23   A      I couldn't tell you.

24          Q      Let me ask the question.  I was asking

25   you how many visits to Dr. Levine were related to

Paone & Associates

Stacie Percella - August 24, 2016

139

1    stress or anxiety that you felt as a result of what

2    you claim was a workplace harassment and

3    retaliation.

4    A    I didn't count how many times I went.

5         Q    Was it more than once?

6    A    Yes.

7         Q    Was it more than ten times?

8    A    Yes.

9         Q    Was it more than twenty times?

10   A    Probably not.  I don't know.

11        Q    Less than twenty?

12   A    I don't know.  It's six years.  So maybe.  I

13   don't know.  I couldn't tell you.  If I knew that,

14   I would have counted.

15        Q    Were you prescribed medication?

16   A    Yes.

17        Q    To help you with your symptoms?

18   A    Yes.

19        Q    And what medication were you

20   prescribed?

21   A    Xanax.

22        Q    How many milligrams.

23   A    Point two five.

24        Q    Per day?

25   A    Up to four times.

Paone & Associates

Stacie Percella - August 24, 2016

140

1       Q       Okay.  And how long did you have to
2   take this medication to deal with these issues?
3   A       I was probably on it maybe two years maybe,
4   not even.
5       Q       Other than the Xanax, were you
6   prescribed any other medication for the stress and
7   anxiety, or was it just that one medication?
8   A       No.  That was it.
9       Q       Okay.  Did you have to see a
10  psychologist because of the workplace harassment
11  and retaliation that you discussed today?
12  A       No.
13      Q       Did you seek any other form of medical
14  treatment that we haven't discussed yet as a result
15  of --
16  A       No.
17      Q       Okay.  Is it fair to say that you felt
18  like you were being retaliated against over the
19  course of your employment during the Smith
20  administration?
21  A       That was the only one.  I was there for four
22  mayors.  I never had a problem before.
23      Q       Do you feel that this harassment and
24  retaliation is continuing on into the new
25  administration?