# EXHIBIT U

```
 1    UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEW JERSEY
 2    ------------------------------------------------X
      STACIE PERCELLA,
 3
                                         PLAINTIFF,
 4

 5         -against-                     Case No.:
                                         2:14-CV-3695-KM-JBC
 6

 7    CITY OF BAYONNE, JOSEPH WAKS,
      individually and RICHARD CENSULLO,
 8    individually,

 9
                                         DEFENDANTS.
10    ------------------------------------------------X

11

12                   DATE:  June 29, 2016

13                   TIME:  10:12 A.M.

14

15         DEPOSITION of the Defendant, RICHARD

16    CENSULLO, taken by the Plaintiff, pursuant to Notice

17    and to the Federal Rules of Civil Procedure, held at

18    the offices of The City of Bayonne Law Department,

19    630 Avenue C, Bayonne, New Jersey 07002, before

20    Brittany Smith, a Notary Public of the State of New

21    Jersey.

22

23

24

25
```

R. CENSULLO

1   it's how many years ago.
2          Q.    How many times did you meet with Ms.
3   Russo?
4          A.    Concerning?
5          Q.    The complaint.
6          A.    I believe once.
7          Q.    At any other time did Ms. Russo reach
8   out to you and say I concluded my investigation?
9          A.    Yes.
10         Q.    How did she do that?
11         A.    I believe she called and I went to her
12  office and she gave me a copy of her report.
13         Q.    What did you do with that report?
14         A.    Probably threw it in the garbage.  I
15  don't recall what I did with it.  I know I don't
16  have it.
17         Q.    Mr. Censullo, maybe I didn't ask you
18  this question in the beginning when we were talking
19  about Bayonne.  At no time were you an employee of
20  Bayonne; is that correct?
21         A.    No time.
22         Q.    At any time while you were working this
23  interlocal agreement, were you covered by any type
24  of insurance such as what they call E and O, which
25  is errors and omissions insurance?

R. CENSULLO

1    they do the year, the month and the day.  And 090 is
2    the resolution for the year.
3             Sir, have you ever seen these documents
4    before?
5        A.   I may have.  I'm not sure.
6        Q.   Does the $30,000 amount refresh your
7    recollection as to --
8        A.   I think so, yes.
9        Q.   Of that 30,000, does it refresh your
10   recollection of how much you received for your
11   duties with the City of Bayonne?
12       A.   Maybe half.  I'm not sure.
13       Q.   Are there any documents that you know
14   that would tell us how much you were compensated?
15       A.   Only the change of payroll.
16       Q.   When you were paid, on your pay stub,
17   was there any designation that said City of Bayonne?
18       A.   No.
19       Q.   So you were just paid one salary from
20   North Bergen?
21       A.   One salary from North Bergen, yes.
22       Q.   There was also several years later --
23   we'll mark this as C-3.  Mr. Censullo, what I'm
24   going to hand you is a document, a shared services
25   agreement between North Bergen for an environmental

R. CENSULLO

```
 1    was marked as Exhibit C-4 for identification as of
 2    this date by the Reporter.)
 3         Q.    Mr. Censullo, what I placed before you
 4    we marked as C-4.  It's an October 6. 2010 letter
 5    to Donna Russo sexual harassment officer signed by
 6    Stacie Percella.  Have you ever seen this document
 7    before?
 8         A.    Yes.
 9         Q.    When did you first see this document?
10         A.    I believe this was shown to me by Ms.
11    Russo when she asked me to comment on it.
12         Q.    What did you say when Ms. Russo showed
13    you that?
14         A.    I was very much taken aback by it.
15         Q.    Why was that?
16         A.    Because I never said, that I never even
17    used that word.
18         Q.    Did you in fact speak to Ms. Percella
19    on Wednesday, October 6. 2010 at approximately
20    10:30 A.M.?
21         A.    Six years ago -- I could only vaguely
22    recall a comment I may have made to Ms. Russo that I
23    may have just asked how everything was going, but I
24    certainly didn't make that comment.
25         Q.    Did you refer to Ms. Percella's feet?
```

R. CENSULLO

```
 1        A.    I believe I may have because I was
 2   under the impression that she had to have surgery
 3   recently.
 4        Q.    Correct.  As you sit here today, you
 5   don't recall making any statement regarding her
 6   chest?
 7        A.    No.  Not at all.
 8        Q.    Did you ask Ms. Percella if she missed
 9   you?
10        A.    No.  I wouldn't.
11        Q.    Did you ask her, how can you lie with a
12   straight face?
13        A.    No.  That's not something I would say.
14        Q.    As we sit here today, you don't recall
15   how the conversation went?
16        A.    I don't recall.
17        Q.    When you gave your statement to
18   Ms. Russo, do you recall what you told her, what the
19   exchange was?
20        A.    Not specifically.  I just remembered
21   absolutely denying using any comment like that.
22        Q.    Other than Ms. Russo, once you were
23   aware that this complaint had been made, did you
24   speak to anyone else besides Ms. Russo?
25        A.    I'm really not sure.
```

R. CENSULLO

1   Q.   Do you recall going up to the front
2   office and speaking to Mayor Mark Smith or Director
3   O'Donnell?
4   A.   I'm really not sure who I spoke to.
5   Q.   We'll mark this as C-5. What I'm
6   giving you, Mr. Censullo, is an October 8, 2010
7   letter to Ms. Russo from Stacie Percella.
8        (Whereupon, the aforementioned Letter
9   was marked as Exhibit C-5 for identification as of
10  this date by the Reporter.)
11  Q.   Mr. Censullo, what I provided you that
12  we marked as C-5 the October 8, 2010 letter to Ms.
13  Russo from Ms. Percella. Have you seen that
14  document before?
15  A.   Yes.
16  Q.   When did you see that document?
17  A.   The last time I saw it was in the
18  package of Ms. Russo's report.
19  Q.   Now, were you aware that there was a
20  meeting with Mr. Gallo, Mr. Waks and Mr. Malloy and
21  Ms. Percella to advise her that she was going to be
22  moved to the tax assessor's office?
23  A.   I don't believe I was aware of that,
24  no.
25  Q.   Does this letter refresh your

R. CENSULLO

1   recollection of a conversation you may have had with
2   Mr. Gallo or Mr. Malloy or Mr. Waks that she would
3   indeed be moved?
4        A.   No.
5        Q.   Did there come a time when you found
6   out that Ms. Percella was being moved to the tax
7   office in order to keep yourself and Ms. Percella
8   separated?
9        A.   What I can recall is I was advised that
10  she was being moved to the tax office.  I was also
11  under the impression that this was a request that
12  she had made to be transferred out of the Health
13  Department and I don't know to what department.  I
14  was advised she had made a request to transfer out,
15  this may have been consistent with that request.  I
16  don't know.
17       Q.   Who advised you of that?
18       A.   I believe it was Mr. Gallo.
19       Q.   Did Mr. Gallo advise you of that at the
20  time that you met with him regarding the initial
21  complaint two days earlier?
22       A.   I don't recall.
23       Q.   Do you recall whether you met with him
24  in person or was it over the telephone?
25       A.   I believe every time I met with Mr.

R. CENSULLO

1  report, not necessarily prior, but either prior or
2  immediately thereafter, did you participate in any
3  type of union grievance hearing regarding this issue
4  of Ms. Percella being moved?
5      A.  No.
6      Q.  If we move down to the third paragraph.
7  "I explained to them I should not be moved from my
8  job as I am an essential part of that office and I
9  have no reason to report to Rich, as he is not my
10 actual boss." Is that a true statement that you
11 were not Ms. Percella's boss?
12     A.  I don't believe I was.
13     Q.  And Joe Waks is the director, was that
14 a true statement at the time?
15     A.  Yes.
16     Q.  The next sentence, "Rich never comes
17 into the office except once every two months for
18 about a half hour." Would that be a true statement
19 during that October 2010 timeframe?
20     A.  No.
21     Q.  What would be the correct response?
22     A.  First of all, she would really have no
23 idea how often I would go into my office since I can
24 go in and out of the town hall while people are at
25 lunch or whatever. Sometimes I wouldn't need to go

R. CENSULLO

1  directly to my office, I could either stop at the
2  Mayor's office or I could stop by the nurse's office
3  and look at whatever problems were there. Many
4  times I would have the REHS stop by my office with
5  whatever needed to be done. Again, short of
6  actually reviewing and signing documents, there was
7  very little need for me to be physically present in
8  the City of Bayonne, but once every two months I
9  don't think is an accurate statement.
10      Q.   What would be accurate, though?
11      A.   I could say maybe twice a month. There
12  may have been a month or so when I went there once.
13  But I don't think I let 60 days go without --
14      Q.   You would agree, though, that Ms.
15  Percella's desk in the Health Department was as you
16  walked in to the Health Department?
17      A.   No.
18      Q.   It was not, where was it located?
19      A.   The Health Department, from what I
20  recall, it had two entrances, was one was where the
21  public would go and there was a glass window or
22  something there.
23      Q.   Correct.
24      A.   And the other one that I would more
25  commonly use was from the nurse's area it was kind

R. CENSULLO

1    of like a back area.
2        Q.    Past the conference room.
3        A.    Right.
4        Q.    Mr. Censullo, what we're going to mark
5    as C-7 is an October 18, 2010 document.  It's a
6    two-page document from Ms. Russo addressed to you.
7              (Whereupon, the aforementioned Memo was
8    marked as Exhibit C-7 for identification as of this
9    date by the Reporter.)
10       Q.    Mr. Censullo, have you had an
11   opportunity to review the two page-document that was
12   previously bates stamped 327 to 328?
13       A.    I did.
14       Q.    C-7 is a letter to you from Ms. Russo;
15   is that correct?
16       A.    Yes.
17       Q.    If we look at page two, the bottom
18   paragraph or the last paragraph.  "This letter shall
19   confirm your appointment for your interview on
20   October 21, 2010 at 1:00 P.M. in the law department
21   conference room."  Do you see that?
22       A.    I do.
23       Q.    Did you in fact meet with Ms. Russo on
24   October 21, 2010 at 1:00?
25       A.    I know I met with her, but I don't know

R. CENSULLO

1  consistent with the investigation of allegations.
2  Every effort will be made to protect Ms. Percella
3  from retaliation, so I ask that at this time you
4  refrain from any and all contact with Ms. Percella,
5  either on personal or professional level during the
6  pendency of this investigation." Did you understand
7  that when you read that letter?
8      A.    Yes.
9      Q.    Did you have any contact with Ms.
10 Percella?
11     A.    None.
12     Q.    At any time after this complaint was
13 filed and investigated by Ms. Russo, did you ever
14 stand in front of Ms. Percella's desk talking on the
15 cell phone for an extended period of time?
16     A.    No.
17     Q.    Do you recall a Colleen Torres having
18 to come down from her position to stay with Ms.
19 Percella while you and her were in the Health
20 Department together?
21     A.    No.
22     Q.    Do you know who Colleen Torres is?
23     A.    No.
24     MR. CRESCI:  It's about 11:45, we need
25 to take a quick break.

R. CENSULLO

1  Q. Did you make any efforts to find out,
2 based on their work title or position title, who did
3 that job?
4  A. No.
5  Q. Did you think, as the deputy registrar,
6 that was Percella's job?
7  A. I thought it might have because she was
8 also, as I understood, a senior clerk typist. If
9 you're a clerk in that area and somebody needs, for
10 example, a license or a different type of, I don't
11 know who jumps in or who does what.
12  Q. If we turn the page to the page that's
13 marked bates stamp 261. With regard to the specific
14 incident of October 6, 2010 that Ms. Percella
15 alleged, in that first paragraph "Censullo stated
16 that you walked over to Stergion's desk from his
17 office in the morning after his arrival at City Hall
18 at about 10:00 A.M., he said a general hello and
19 then stated to Percella "how was your foot, Stacie,"
20 to which she replied "still a little sore."
21 Censullo then reports he told Percella "you were
22 missed when you were gone." Are those two
23 statements that you recall having said to Ms. Russo?
24  A. I really don't. I may have because I
25 was told about her operation. In generalities, I

76

R. CENSULLO

1  just may have asked how she felt, that was it, out
2  of courtesy.
3      Q.   So the allegation that Ms. Percella
4  made on October 6, 2010 regarding her chest, in this
5  statement at least and here today under oath, you
6  said you did not make that statement?
7      A.   I absolutely did not make that
8  statement.
9      Q.   Mr. Censullo, do you know who Anthony
10 Delsalvo is?
11     A.   No.
12     Q.   Prior to working with the City of
13 Bayonne, did you know who Charles D'Amico was or is?
14     A.   I only knew Mr. D'Amico was an
15 attorney.  That was basically all I knew, I had no
16 real dealings or contact with him.
17     Q.   What about a Charles Gaglione, do you
18 know who that is?
19     A.   No.
20          MR. CRESCI:  Mark this as C-9.
21          (Whereupon, the aforementioned Letter
22 was marked as Exhibit C-9 for identification as of
23 this date by the Reporter.)
24     Q.   What I placed before you, Mr. Censullo,
25 is a letter dated May 21, 2012 to Mr. D'Amico from

DIAMOND REPORTING    (877) 624-3287    info@diamondreporting.com

76