**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **STACIE PERCELLA,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**CITY OF BAYONNE,**<br><br>**JOSEPH WAKS,**<br><br>**RICHARD CENSULLO**<br><br>          **Defendants.** | Civ. No. 14-3695 (KM) (JBC)<br><br>**OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

On June 9, 2014, plaintiff Stacie Percella initiated this employment action against the City of Bayonne ("the City") and individual defendants Joseph Waks and Richard Censullo. (DE 1) [1] On October 7, 2014, Percella filed an Amended Complaint. (DE 3) Defendants filed an Answer on November 12, 2014 (DE 8), and then discovery ensued.

Before the Court are defendants' three separate motions for summary judgment (DE 118, 121, and 122) and defendants' joint motion to dismiss for spoliation of evidence (DE 119). Percella filed papers in opposition to defendants' motions (DE 127, 128, 129, 130, 131), and she described DE 129 as "essentially a response with [a] Cross-Motion for Summary Judgment" (DE 129 at 1). However, Percella did not file a Notice of Motion or follow the proper

---

[1]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

       "DE" = Docket entry number in this case.

       "Am. Compl." = Amended Complaint (DE 3)

procedures for filing a motion for summary judgment under Fed. R. Civ. P. 56 or Local Civil Rule 56.1. Therefore, I will not consider DE 129 as a cross-motion.

For the reasons explained in this opinion, I will deny defendants' motion to dismiss the action for spoliation of evidence (DE 119), deny defendants' summary judgment motion (DE 118) with respect to Percella's hostile work environment claim, and grant defendants' summary judgment motions (DE 118, 121, 122) with respect to Percella's 42 U.S.C. § 1983 claims, state law discrimination and retaliation claims, and common law contract claims. The net result is that this will go forward as a hostile work environment case.

## I.     Summary

### A. Allegations in the Amended Complaint

Percella is a resident of Bayonne, New Jersey. (Am. Compl. ¶2) At the time Percella filed the Amended Complaint, she had been employed by the City of Bayonne for fifteen years. (Am. Compl. ¶6) For most of her tenure, Percella held the civil service position of Deputy Registrar. (Am. Compl. ¶¶6-7); (DE 118-8)

Before filing this action, Percella filed numerous complaints with the City, including a request for investigation into alleged payroll fraud (DE 118-17 at 2), a complaint of sexual harassment against defendant Censullo (DE 118-23 at 2), and a harassment complaint against defendant Waks for using profanity in the workplace (DE 118-33 at 2). Percella alleges that "each time" she filed a complaint, she was "retaliated against with adverse employment actions, including suspensions without pay." (Am. Compl. ¶13)

In addition to alleging retaliation, Percella contends that defendant Waks discriminated against her, sexually harassed her, and created a hostile work environment "up until the time of his termination as Director of Municipal Services." (Am. Compl. ¶9) Percella alleges that Waks placed demeaning magnets in the workplace that depicted women in lingerie and stated, "Girls From Bayonne . . . Leave em' Alone" (Am. Compl. ¶9), and that Waks "made

2

offensive, vulgar, derogatory and sexual comments in the workplace," including "Fuck, Fuck, Fuck, You" (Am. Compl. ¶10).

With respect to defendant Censullo, Percella alleges that he interfered with her employment contract and caused her to suffer economically as a result. (Am. Compl. 11)

In Count A of the Amended Complaint, Percella alleges that the City and defendant Waks violated her rights under 42 U.S.C. § 1983 ("Section 1983") by depriving her of her rights under the First and Fourteenth Amendments to the United States Constitution. (Am. Compl. ¶17) Specifically, Percella submits that the defendants violated her rights as a public employee "by failing to take action [and] retaliating against [her]." (Am. Compl. ¶17)

In Count B, Percella alleges that the City and defendant Waks violated the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 et seq. Specifically, Percella alleges that defendants engaged in discrimination and harassment (Am. Compl. ¶¶21-24), created a hostile work environment (Am. Compl. ¶¶26-31) and retaliated against her (Am. Compl. ¶¶35-36).

In Count D, [2] Percella raises the common law claims of interference with contract against defendant Censullo (Am. Compl. ¶¶38-41) and breach of implied covenant of good faith and fair dealing against the City (Am. Compl. ¶¶46-47).

## B. Percella's Employment Transfers within the City

Percella was appointed as Deputy Registrar with the City's Health Department in 2006. (DE 118-9 at 3) Her duties included issuing and making corrections to birth and death certificates. (DE 118-9 at 3) At some point, the Deputy Registrar's Office was made part of the City Clerk's Office. (DE 118-9 at 11) After that transfer, Percella's job duties shifted somewhat; she testified that she "still gave out the health licenses and the cats and dogs and took in all the health complaints." (DE 118-9 at 11)

---

[2] There is no "Count C" in the Amended Complaint.

In 2010, Percella was transferred to the Tax Assessor's Office. The transfer occurred shortly after she filed a sexual harassment complaint against defendant Censullo. (DE 118-9 at 34-35) Percella's pay did not change as a result of that transfer. (DE 118-9 at 35-36) In 2013, Percella was transferred to the Department of Public Works. (DE 118-9 at 34) While Percella's pay did not change, she testified that she was given less responsibility. (DE 118-19 at 36)

### C. Complaints Filed by Percella and Disciplinary Actions Initiated against Her

### 1. Notary incident

On November 6, 2009, the City served Percella with a Preliminary Notice of Disciplinary Action (31-1) charging her with incompetency, inefficiency or failure to perform duties, conduct unbecoming of a public employee, neglect of duty, and other sufficient causes. (DE 118-11 at 2) According to the specification, Percella

> notarized official documentation during the course of [her] employment with the City of Bayonne certifying under oath that a certain Mr. Khuog Ton Duong personally executed said document before [her] when in fact, Mr. Duong did not appear before [her] as he was not present in this State in order to have done so.

(DE 118-11 at 3) The City recommended a five-day suspension without pay. (DE 118-11 at 2) According a Memorandum from the City to Percella, Percella's counsel advised the City that Percella waived her right to a formal hearing to contest the charge. (DE 118-13 at 4)

At her deposition, Percella testified that she did not agree with the allegations raised in the 31-A. (DE 118-9 at 8) Further, Percella testified that she believed the Director of the Department of Health, Peggy Lanni, pursued that disciplinary action as retaliation for Percella's refusal to dispense a hot dog license on a prior occasion. (DE 118-9 at 10)

**2. Percella's Allegation of Payroll Fraud and Subsequent Sixty-Day Suspension**

On September 27, 2010, Percella filed a police report with the Bayonne Police Department alleging that two employees in the Health Department, Vanessa Bryant and Michael McKittrick, used compensation time that did not "appear to be accumulated by them." (DE 118-15 at 2) In support of her allegation, Percella turned over two hundred seventy-four pages of time sheets and other employment-related documentation for all employees in the Health Department. (DE 118-15 at 2) Percella also alleged that she noticed "overages and shortages in the office's case drawer." (DE 118-15 at 2)

The Police Department reported that it "was unable to find any evidence of a crime," but did "find possible errors in the department's record keeping." (DE 118-16 at 2). Police officers met with the City's Business Administrator, Steve Gallo, and the City's Corporation Counsel, Charles D'Amico, and it was agreed the City would conduct an internal investigation. (DE 118-16 at 2) Charles Daglian was then charged with investigating the allegations. (DE 118-17)

According to Daglian's report, Percella alleged the following:

> 1. That fellow employee, Vanessa Bryant, received a 4.75% longevity pay but was only entitled to a 3.75% longevity pay for someone with her years of employment.
> 2. That fellow employee, Vanessa Bryant, received compensation time that she was not entitled to receive.
> 3. That fellow Health Department Employee, Michael McKittrick, received compensation time that he was not entitled to receive.
> 4. That Joseph A. Waks, the Director of Municipal Services, received money as a bonus for not using sick days when in fact, he was not entitled to said bonus.

(DE 118-17 at 2) In the course of the investigation, the issue arose of how Percella obtained the employee documents. (DE 118-17 at 3) The City requested that Daglian "investigate that aspect" of the investigation in addition to the fraud allegations. (DE 118-17 at 3)

Daglian reviewed the documents Percella provided to the Police Department and requested an interview with all parties involved. (DE 118-17 at 4) Daglian received a letter from Percella's attorney stating that Percella "would not be available for an interview" but that she "would answer, in writing, any questions submitted in writing to [counsel's] office." Daglian would not consent to those terms because part of his responsibility was to judge the credibility of witnesses, which "could only be done in a personal interview." (DE 118-17 at 5; DE 118-18 at 2) Percella did not participate in an interview. (DE 118-17 at 5)

Waks stated that "he did not know of the bonus for employees who do not use any of their sick time" and that "he never received a check from the City Health Department for th[at] bonus." (DE 118-17 at 5) Gina Valdez, the Senior Accountant in the Payroll Department, confirmed that Waks was not entitled to a bonus and never received such bonus. (DE 118-17 at 7-8)

Bryant, who was responsible for maintaining the employment records for the Health Department, informed Daglian "that she had been receiving, for a short period of time, the 4.75% longevity pay due to her mistaken belief that she was entitled to same based upon the years that she had worked for the City." (DE 118-17 at 5) She received that longevity rate for approximately two months until the Payroll Department informed her that the rate "was too high since she could not count the time that she had been on leave of absence or laid off and that the correct longevity pay was 3.75%." (DE 118-17 at 5-6) Payroll changed her rate, and Bryant "repaid all extra money that she had received." (DE 118-17 at 6)

Bryant also informed Daglian that it was common for the Health Department to allow employees to receive time off for extra hours worked (e.g. during lunch or after scheduled hours) rather than receiving overtime pay. (DE 118-17 at 6) While approval was required to collect the compensation time, that approval generally occurred verbally with no written documentation. (DE 118-17 at 6) Thus, "[i]t essentially was an honor system." (DE 118-17 at 6) Bryant stated that she did not utilize compensation time for which she was not entitled. (DE 118-17 at 6)

Bryant also stated that "Percella should not have had copies of the[] employee personnel files." (DE 118-17 at 6) The documents were kept in an unlocked cabinet in her office or on her desk. (DE 118-17 at 6) However, Bryant "stated that she never gave anyone permission to copy any documents" except "for their own personal files." (DE 118-17 at 6)

McKittrick confirmed the honor system described by Bryant with respect to compensation time. (DE 118-17 at 7) He also stated that he never used compensation time that he was not entitled to receive. (DE 118-17 at 7)

Based upon that information, Daglian concluded as follows. Bryant mistakenly received a one percent longevity pay for a period of three months, that extra payment was repaid, and Bryant did not have the intent to defraud the City when she received the extra payment. (DE 118-17 at 8) Further, there was no proof of wrongdoing concerning Bryant's or McKittrick's use of compensation time. (DE 118-17 at 8-9) Daglian also concluded that "Waks did not do anything to defraud the City." (DE 118-17 at 9) While Waks signed a document indicating that he was entitled to a certain bonus, Daglian found, based upon his credibility determinations, "that this was an innocent mistake." (DE 118-17 at 9) Moreover, Waks never received the payment. (DE 118-17 at 9)

Because Daglian "did not have the benefit of an interview with Ms. Percella, th[e] office c[ould] only speculate that she received the documents improperly by taking them from the possession of Ms. Bryant without Ms. Bryant's knowledge or consent and copying same." (DE 118-17 at 10) The possession of private personnel documents is "strictly against Bayonne Employee Policy." (DE 118-17 at 10) Further, Percella indicated in her statement to the Police Department that she gave copies of the documents to her attorney, a person "not employed by the City of Bayonne." (DE 118-17 at 10) Therefore, Daglian recommended that Percella "be charged in a disciplinary hearing for the improper possession and distribution of these documents." (DE 118-17 at 10)

On February 17, 2011, the City served Percella with a Preliminary Notice of Disciplinary Action (31-A) charging her with confiscating and copying

7

personnel documents. (DE 118-14) On May 9, 2011, Percella was served with a
Final Notice of Disciplinary Action (31-B) sustaining the charges of conduct
unbecoming of a public employee, misuse of public property, and "other
sufficient cause." (DE 118-20 at 2) The City imposed a sixty-day suspension
(DE 118-20 at 2), which was upheld by the Office of Administrative Law
("OAL")[3](D 118-21 at 8) and the Civil Service Commission (DE 118-22).[4]

### 3. Percella's Sexual Harassment Complaint against Censullo

On October 6, 2010, Percella filed a complaint of sexual harassment with
the City's Sexual Harassment Officer, Donna Russo. (DE 118-23 at 2) Percella
alleged that on that date, defendant Censullo approached her and stated,
"Chesty, how is your feet doing,"[5] asked Percella if she "missed him," and when
Percella responded, "no," stated, "you can lie with a straight face." (DE 118-23
at 2)

On October 8, 2010, Percella wrote another letter to Russo indicating
that Steve Gallo, defendant Waks, and Terrence Malloy informed Percella that
she was being "transferred immediately" to the Tax Assessor's Office so that
she could be separated from Censullo. (DE 118-24 at 2) Percella interpreted
that transfer as retaliation for filing the complaint. (DE 118-24 at 2)

Censullo denied the allegations in Percella's complaint (DE 118-25 at 5,
6, 14) and testified that, after Percella lodged the complaint, Gallo advised
Censullo that Percella "was being moved to the tax office." (DE 118-25 at 8)

---

[3] The OAL concluded that Percella's "actions in taking and disclosing
confidential employee personnel records without authorization was a clear violation of
the City's personnel records and confidentiality policies." (DE 118-21 at 8) Therefore,
the OAL sustained the charges of conduct unbecoming of a public employee and
misuse of public property. (DE 118-21 at 8) However, the OAL dismissed the "other
sufficient cause" charge. (DE 118-21 at 8)

[4] After the payroll investigation, on June 25, 2010, McKittrick filed a hostile
work environment complaint against Percella. (DE 118-14 at 4) "Due to her actions,
her verbal abuse and her declining to do her job, [McKittrick] ask[ed] that [she] be
removed from the department." (DE 118-14 at 4) It is unclear from the record what
resulted after that complaint was filed.

[5] Percella had undergone foot surgery. (DE 118-9 at 27-28)

Censullo was "under the impression that this was a request she had made to be transferred out of the Health Department" (DE 118-25 at 8) Further, Censullo testified that, while he did not tell Gallo to transfer Percella, he did state that he "wouldn't be comfortable" being in the office with her. (DE 12106 at 6) Censullo was not employed by the City of Bayonne. (DE 118-25 at 4) Rather, Censullo was employed by the City of North Bergen, which engaged in shared services with the City of Bayonne. (DE 118-25 at 4)

Based on her investigation, Russo found "no reasonable basis" upon which to find that any act of sexual harassment occurred on October 6, 2010. (DE 118-26 at 6) Russo explained: "There are no witnesses to the verbal exchange alleged to have occurred between Percella and Censullo nor any other evidence with which [Russo] could find" that the harassment occurred. (DE 118-26 at 6) Russo noted, however, that she found three inconsistencies with Percella's statements: first, Percella reported that the exchange occurred in the first floor hallway as Censullo and Percella were passing each other, but Percella later stated that the exchange took place near her desk; second, Percella initially stated that she did not discuss the incident with anyone at City Hall except for Russo and one other person, but Health Officer Simon Stergion "reported that not only did Percella recite the allegations to [him] but she specifically inquired of Stergion whether he overheard Censullo's statements"; finally, Percella indicated that she had no other contact with Censullo prior to the alleged incident other than when they were introduced, but Censullo "provided a very detailed account of at least three (3) occasions where Percella pursued substantive meetings with Censullo . . . regarding her complaints against co-employees Lanni, McKittrick and Stergion." (DE 118-26 at 6-7) Russo recommended that no further action be taken with respect to Percella's complaint because "[Percella ha[d] since been transferred to the Tax Assessor's Office at her [Percella's] request."[6] (DE 118-26 at 7)

---

[6] In context, Russo wrote: "No further action by the City is warranted nor necessary with respect to Percella's complaint. Moreover, Percella has since been

Percella did not reiterate a claim for sexual harassment against Censullo in the Amended Complaint.

### 4. Disciplinary Incident Related to Interaction with D'Amico

On June 30, 2013, Percella was served with a Notice of Minor Disciplinary Action charging her with insubordination and conduct unbecoming of a public employee. (DE 118-27 at 2) The Notice included the following specification: "On June 19, 2013, during work hours and while on City property (City Hall) you encountered Corporation Counsel Charles D'Amico in a hallway and made the following statement twice to Mr. D'Amico: 'You are a disgrace' in a voice loud enough for third parties to hear." (DE 118-27 at 2) The City recommended a two-day suspension without pay. (DE 118-27 at 2) It is unclear from the record whether discipline was imposed.

### 5. Disciplinary Incident Related to Percella's Interaction with a Resident

On July 12, 2013, Percella as serviced with a Preliminary Notice of Disciplinary Action (31-A) for charges unbecoming of a public employee; incompetency, inefficiency or failure to perform duties; neglect of duty; and other sufficient cause (providing inaccurate information). (DE 118-28 at 2) The Notice included the following explanation:

> On July 8 and 9, 2013, a Bayonne citizen ("Citizen") notified the Department of Public Works (DPW) of a potentially hazardous condition regarding a tree. During the course of your employment, you responded to the Citizen in a rude and harsh tone unbecoming of a City employee; failed to effectively and adequately respond to the report of a potential hazard; failed to perform job duties assigned to you; failed to respond to the reported hazard in a reasonable, effective and efficient manner, failed to respond to a potential hazard in a competent manner; and provided Citizen with misinformation to wit: (1) "we only have four (4) workers assigned to trees and [the] mayor always has men doing other things" and (2) "me and my boss have discussed

---

transferred from the Health Department to the Tax Assessor's Office at her request. My investigation as compliance Officer is now concluded." (DE 11-26 at 7)

> this and nothing ever gets done because men are
> assigned to do other things by the mayor"; (3) "you are
> Number 50 on the list" and "it will take another year for
> the City to respond."

(DE 118-28 at 2) Thereafter, a hearing officer concluded that Percella's failure "to accurately identify and act accordingly to a potentially hazardous situation was neglecting and/or being inefficient in her duties as well as giving inaccurate and misleading information." (DE 118-29 at 5) Further, the officer found that a sixty-day suspension was warranted based on Percella's prior disciplinary record. (DE 118-29 at 5) Percella then failed to appear for a plenary hearing before the OAL and an Administrative Law Judge granted the City's motion to dismiss the appeal. (DE 118-30 at 2). The Civil Service Commission affirmed. (DE 118-31 at 2).

### 6. Allegations of Harassment Involving defendant Waks

#### a. Directing Profanity at Percella

On September 17, 2013, Percella complained to Russo that Waks cursed at her in the workplace. (DE 118-33 at 2) Percella alleged that she "went to the Health Department in regards to business [she] had with code-enforcement regarding tree planting." (DE 118-33 at 2) Percella reported that she "spoke to Tom Keyes and then started speaking with Laura Kline and Beth Styles." (DE 1118-33 at 2) According to Percella, Waks left his office and then, five minutes later he "came up to where [she] was sitting and said, 'Get The Fuck Out Of My Office.'" (DE 118-33 at 2) Percella alleged that Waks "continued to yell that [she] better get out" because she was bothering his employees. (DE 118-33 at 2) When Percella started to leave, he told her 'it's his office and [she] better not come back." (DE 118-33 at 3)

In the course of investigating the complaint, Russo interviewed Waks and Percella and witnesses Keyes, Kline and Styles. (DE 118-34 at 3) All three witnesses stated that Percella entered the Health Department for business-related purposes but, after a very brief period, began to speak with Kline and Styles about personal, *i.e.*, non-job-related, matters. (DE 118-34 at 3-5) Waks

left the office, returned a few minutes later, and instructed Percella, without using profanity, to leave the office as she was not conducting business. (DE 118-34 at 3-5) Percella refused and Waks reiterated his instruction for her leave the office. (DE 118-34 at 3-5) When Percella ignored his second instruction, Waks cursed at her. (DE 118-34 at 3-5) Kline and Styles reported that Waks stated, "Fuck you"; Keyes reported that Waks told Percella to "Get the fuck out of [his] office." (DE 118-34 at 3-5)

During Russo's interview with Percella, Percella stated that she was "not personally offended by the use of profanity" but did not think it was appropriate "at work" and "from a supervisor." (DE 118-34 at 5) Percella informed Russo that she believed Waks was retaliating against her "because she filed an OPRA request seeking records to support her claim for payment of overtime hours during Hurricane Sandy." (DE 118-34 at 5) Percella also stated that she believed she was "treated differently than other employees when she was assigned to Director Waks' department for example, she was not permitted to visit the deli . . . and get coffee as other employees [were] allowed to do so."[7] (DE 118-34 at 5)

---

[7] Percella testified that Waks left "letters" on her desk instructing her that she was not permitted to visit the store across the street or have any visitors for more than ten minutes. (DE 118-9 at 54) Percella testified that the "letters" were directed solely at her and not to other employees in the office. (DE 1180-9 at 55) She explained that the instructions were written on Waks' letterhead to make it "look like he sent it to all of the employee, but it was only put on [her] chair." (DE 118-9 at 55)

Waks testified that he told Percella that she could not have visitors at her desk. (DE 118-32 at 26) However, he denied instructing Percella that she could not leave to purchase coffee. (DE 118-32 at 26) Rather, he testified that he instructed all employees as follows:

> [S]tarting time is at 8:30 so if you have business to conduct like get your coffee or not go to the bathroom, but whatever you have to do I don't really care what it was. Starting time was 8:30 so do that stuff ahead of time and be in your office at 8:30. Not walk in the building at 8:30 then go get your coffee and do whatever.

(DE 118-32 at 26-27)

Russo reported that at no time during the interview or in Percella's written complaint did Percella maintain that she was "afraid, concerned or alarmed by Mr. Waks or his comments." (DE 118-34 at 5) Percella never indicated "that she felt pressured, frightened, intimidated or incapacitated as a result of Director Waks' profane utterance." (DE 118-34 at 5)

Waks admitted to Russo that he stated "fuck you" to Percella "out of frustration when his repeated efforts to have her leave the Health Department and cease conversing about non-business related matters with employees" failed. (DE 118-34 at 6) Waks believed that Percella was "making her presence known and 'flaunting herself' in the Health Department to annoy Director Waks who effectuated a transfer of Ms. Percella to Public Works . . . and also testified against Ms. Percella to in her appeal of a previous disciplinary action." (DE 118-34 at 6)

Russo concluded that this "single incident" did not constitute harassment. (DE 118-34 at 7) Russo noted that it was "undisputed that the excited utterance of Director Waks in his use of profanity towards Mr. Percella was one incident and when the incident was over there was no further interaction." (DE 118-34 at 7) Thus, "[t]here was no repetitious or persistent characteristics of the complained behavior." (DE 118-34 at 7)

Russo recommended minor discipline for Waks: that he "be required to participate in a training or counseling that includes instruction on proven managerial skills." (DE 118-34 at 8) Russo also recommended that the "Public Works Director take appropriate action to make certain that Ms. Percella visit[s] the Health Department on official business only and then promptly return[s] to her work station." (DE 118-34 at 8). Moreover, Russo noted that "Percella should understand" that the September 17, 2013 incident could have "very well" supported a disciplinary action against her for insubordination. (DE 118-34 at 8) However, Russo refrained from making such a recommendation. (DE 118-34 at 8)

13

Waks testified that he underwent an anger management course with his personal therapist, who sent a confirmation letter to the City upon its completion. (DE 118-32 at 26)

### b.  Pencil Incident

Percella testified that Waks once threw a pencil that almost hit her. (DE 118-9 at 68) Percella explained that she, Waks, Stergion, and Animal Control Officer Lisa Menendez met to discuss an issue relating to feral cats in the City. (DE 118-9 at 68) Percella alleged that Waks became enraged during the meeting and began to scream and curse at Stergion. (DE 118-9 at 68-69) Percella allegedly instructed Waks not to speak to Stergion in "that way" because Stergion is "an older gentleman." (DE 118-9 at 69) Waks then allegedly said to Percella: "If you don't like your fucking job, go find another one." (DE 118-9 at 69) Percella testified that Waks then "stood up" and "flung" a pencil, which hit a wall and bounced back in the direction of Percella's face. (It apparently did not hit her.) (DE 118-9 at 69) Percella did not file a complaint after the incident. (DE 118-9 at 70)

During his deposition, Waks admitted that he "got frustrated" and threw a pencil, but did not did not recall throwing the pencil "at any particular person." (DE 118-32 at 18) Waks also testified that after the conference concluded, he "took everyone out to lunch to Café Bello including Ms. Percella." (DE 118-32 at 20)

### c.  Magnet Incident

Percella testified that, on an unknown date, she observed an offensive magnet near her desk, near Stergion's work area, and on a file cabinet in front of her desk. (DE 118-9 at 72-73, 77) The magnet (DE 3-1) depicts three women clad in lingerie and states, "Girls from Bayonne . . . Leave 'em alone." (DE 3-1 at 1) Above each woman is a different national flag: one for Poland, one for Italy, and one for Ireland. (DE 3-1 at 1) The top of the magnet states, "joewaks.com."

Percella testified that she knew Waks produced the magnets, but that she did not actually see him place the magnets anywhere in the office. (DE

118-9 at 72-73) Because she found the magnets "offensive" and "disgusting," Percella removed them from the office. (DE 118-9 at 74) Percella testified that the phrase "Girls from Bayonne, leave 'em alone" means that women from Bayonne are "trash" and "sluts." (DE 118-9 at 74) Percella further testified that the phrase is common in Bayonne and that "[e]veryone takes it that way." (DE 118-9 at 74-75) Percella testified that she found the magnet harassing, especially because she was the only woman in the workspace where the magnets were placed. (DE 118-9 at 79) She was also offended because she identified as Irish and Polish. (DE 118-9 at 75) However, Percella did not file a complaint about the incident. (DE 118-9 at 79-80)

Waks testified that he could not recall "specifically" placing the magnet in the workplace but that he was "sure [he] did." (DE 118-32 at 20) Further, he recalled that there was "one on [his] cabinet and one on Michelle O'Reilly's door." (DE 118-32 at 20) He explained that O'Reilly placed the magnet on her door after she asked him for one. (DE 118-32 at 20) However, Waks testified that he had no knowledge of a magnet being placed on Percella's desk. (DE 118-32 at 21)

Waks further testified that that before he created the magnet, he heard the saying "Girls from Bayonne Leave 'em Alone" from "somebody" and that the phrase did not "really mean anything to [him] specifically." (DE 118-32 at 21) Nevertheless, he "like[d] the saying and [he] like[d] the imagery" on the magnet. (DE 118-32 at 21) He explained that while he brought the magnets into the office, he "definitely did not place it on people's desk." (DE 118-32 at 22-23)

**D. Percella's Alleged Failure to Produce Text Messages**

Defendants move to dismiss the entire action for Percella's alleged spoliation of evidence, namely text messages. (DE 119-1) During discovery, defendants demanded plaintiff produce "any and all documents memorializing any communication between [Percella] and any other person or entity, except for [Percella's] attorney, regarding the subject matter giving rise to this action or the subject matter that is referenced in any of the pleadings that have been filed in this action." (DE 119-7 at 8) Defendants also requested that plaintiff

produce "all other documents relevant to proving or disproving any of [Percella's] claims in this matter." (DE 119-7 at 10)

On May 9, 2017, defendants' counsel informed plaintiff's former counsel that Percella was in possession of text messages between herself and City employees relevant to the litigation. (DE 119-8 at 2) Defendants demanded that Percella produce those messages by May 12, 2017. (DE 119-8 at 2) By way of email, Percella's counsel informed defendants that the messages were being produced. (DE 119-11 at 2) Defendants later informed Percella's counsel that there were "problems" with her "screen shots of the text messages," noting that most of the screen shots did not have dates and that it was clear certain messages were missing. (DE 119-12 at 2) Defendants then provided a suggested web link that detailed how to print iMessages, and requested Percella's "telephone log or iMessage history from her telephone carrier . . . from January 1, 2010 through December 31, 2016." (DE 119-12 at 2) Defendant also requested that Percella produce all exchanges between herself and Mayor James Davis. (DE 119-12 at 2-3) Percella had filed a parallel state court sexual discrimination against Mayor Davis, which was eventually dismissed for Percella's failure to produce discovery and violation of court orders. (DE 119-16 at 6)

On October 24, 2019, Percella testified that she no longer owned the phone in which the messages are located because the phone is "dead" and "doesn't work."[8] (DE 119-17 at 3) At that time, Percella stated that she did not recall if the phone was still in her possession at her house. (DE 119-17 at 3-4) However, on December 27, 2019, defendants' counsel emailed plaintiff's counsel stating:

> [O]n December 5, 2019, during the telephone conference with Judge Clark, with the Judge on the call, in the Percella/Bayonne federal matter, you informed me your client found her cell phone containing the texts in reference to the Percella/Bayonne state matter. Be

---

[8] Percella produced a receipt from March 18, 2017, indicating that she purchased a new cellphone on that date. (DE 119-20 at 2)

> advised I shall notify you shortly of a date for the City's
> expert's forensic examination of plaintiff's cell phone.
> Also be advised if the cell phone is 'lost' or 'damaged' in
> any manner it will constitute destruction of evidence
> and shall further warrant dismissal with prejudice of
> plaintiff's amended complaint.

(DE 119-15 at 2)

## II.   Discussion

### A.  Defendants' Motion to Dismiss for Spoliation of Evidence

I will first address defendants' motion to dismiss the action for spoliation of evidence. (DE 119)

Defendants contend that they have been "deprived of the right to prepare a defense" because Percella "has failed to produce her iMessage log in response to Defendants' discovery requests." (DE 119-2 at 8) Defendants submit that "[t]he AT&T text log has 825 text messages between Plaintiff and Mr. Davis. *Plaintiff has produced none of them.* The 835 text messages not produced have been destroyed by Plaintiff by her failure to retain her cell phone containing the text messages." (DE 119-2 at 10) In their reply, defendants point to three text messages[9] from Percella to Davis that mention Waks, and submit that they "have no idea of the number of other messages relevant to the Defendants' defense of this matter that Plaintiff destroyed." (DE 137 at 8)

Percella contends that her cellphone "never played any role" in this federal court action. (DE 127 at 1) Further, the phone messages are not relevant to plaintiff's claims of sexual harassment, hostile work environment, or retaliation, because those claims involve events that occurred inside the

---

[9]  The messages state:

"Joe Waks FB page. He's an asshole."

"Mural – Waks – I just saw him!! we should talk! Bad taste in my mouth. Hurtful. I know it's not you that would do that. Does not look good. :("

"Joe the Greek talking with Waks on Ave E Willow. All the morons are out there on 33 Ave E. Ruane, Waks, Greaves, Makowski."

(DE 137 at 8); (DE 119-8 at 27)

workplace. (DE 127 at 2) Moreover, Percella submits that defendants have failed to demonstrate "prejudice suffered by the alleged 'spoliation' of evidence." (DE 127 at 6) She contends that prejudice cannot be established because defendants now have the records at issue. (DE 127 at 6)

Defendants' rely on Federal Rule of Civil Procedure 37(e) in arguing that this action should be dismissed for spoliation of evidence. That rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

"Spoliation is usually referenced in instances where evidence has been altered or destroyed." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)). However, the Third Circuit has stated that "a party's failure to produce a document can have the same practical effect as destroying it" and, thus, "under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation." *Id.* "Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and, [4] the duty to preserve the evidence was reasonably foreseeable to the party."

*Id.* Further, "a finding of bad faith is pivotal to a spoliation determination." *Id.* at 79.

Here, defendants have failed to establish that the alleged missing messages are relevant to the action and that their non-production prejudices their defense. "When a party moving for spoliation sanctions cannot offer 'plausible, concrete suggestions as to what [the lost] evidence might have been,' there should be no finding of prejudice." *GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 83-85 (3d Cir. 2019) (alteration in original) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)).  Other than referring to three messages in which where Percella abused Waks by name (*see* n.9, *supra*), defendants have not explained how any of the messages will help disprove Percella's claims or suggest what the lost evidence would have revealed.

Further, "a dispositive sanction 'is a last resort and should be imposed if no alternative remedy is available.'" *Id.* (quoting *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012)) (holding that the District Court did not abuse its discretion in determining that a lesser sanction than default judgment was warranted where, *inter alia*, the destroyed evidence was "not so clearly central or critical" to the case and were not the "sole piece of evidence"). Defendants here have failed to establish that such an extreme remedy is warranted.

In addition to dismissal of the action, Rule 37(e) provides for the presumption "that the lost information was unfavorable to the party" and authorizes an instruction to the jury "that it may or must presume the information was unfavorable to the party." Fed. R. Civ. P. 37(e)(2)(a) and (b). Here, even if we presume the unproduced text messages are unfavorable to Percella, defendant has not shown how the text messages are relevant or prejudicial to this action. Therefore, I find the imposition of Rule 37 sanctions unwarranted.

**B.  Defendants' Failure to Respond to Plaintiff's Request for Admissions**

Next, I address plaintiff's argument that defendants' summary judgment motion must fail because the defendants failed to respond to certain requests for admissions. The facts therein, she argues must therefore be deemed admitted. (DE 129 at 2)

Federal Rule of Civil Procedure 36(a)(1) provides:

> A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:
> (A) facts, the application of law to fact, or opinions about either; and
> (B) the genuineness of any described documents.

A matter is deemed admitted if, after thirty days of service, the party to whom the request is directed fails to answer or object to the request. Fed. R. Civ. P. 36(a)(3). A matter admitted under Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). The Third Circuit recognizes that "Rule 36 admissions are conclusive for purposes of the litigation and are sufficient to support summary judgment." *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992) (citing *Anchorage Assocs. V. Virgin Islands Bd of Tax Review*, 922 F.2d 168, 176 n.7 (3d Cir. 1990))

However, "[s]ubject to Rule 16(e), the court may permit withdrawal or amendment [of the admissions] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). The district court has "recognize[d] that a disposition on the merits is preferred over a decision based upon procedural technicalities" even where a party has not moved to withdraw or amend the admissions. *Sunoco, Inc. (R & M) v. MX Wholesale Fuel Corp.*, 565 F. Supp. 2d 572, 577 (D.N.J. 2008)

In *Sunoco*, the Court applied a two-part test to determine whether it would grant a motion for withdrawal or amendment, even though the defendant MX did not move for it. *Id.* The two-part test asks (1) whether the withdrawal or amendment will "subserve the presentation of the merits" and (2) whether the nonmoving party will be prejudiced by permitting the moving party to amend or withdraw their admissions. *Id.* (internal quotation marks omitted) (citing Fed. R. Civ. P. 36(b)). The *Sunoco* Court found that that MX admitted that it owed Sunoco $1,533,894.00, and that even if MX moved to withdraw or amend that admission, that Sunoco would be prejudiced "since it was not until after Sunoco filed its motion for summary judgment that MX raised for the first time its argument contrary to its earlier statements that it did not owe Sunoco money." *Id.* at 578.

It may be that the defendants failed to respond timely to requests for admissions, and if so, that was a lapse. Nevertheless, I am concerned as always with the underlying merits. Under the circumstances, I will not deem the facts to be admitted.

First, deeming the facts admitted would not "promote the presentation of the merits of the action," *see* Fed. R. Civ. P. 36(b), because many of the Requests seek admissions that contradict the evidence in the record. For example, Request #3 seeks an admission that Percella did not request to be transferred. (DE 128-3 at 19). However, Russo reported that Percella was transferred to the Tax Assessor's Office upon her own request (DE 118-26 at 6) and Censullo testified that he was "under the impression" that Percella requested the transfer to the Tax Assessor's Office (DE 118-25 at 8). Request #18(d) seeks an admission that defendants would not allow the police to prosecute Percella's allegation that employees were stealing time and, instead, "wanted to do their own investigation via Defendant Waks through Charles Daglian." (DE 18-3 at 22) However, the police report indicates that the police did not find evidence of a crime and that the police and City agreed an internal investigation would take place. (DE 118-16 at 2) Request #30 seeks an

admission that plaintiff had no disciplinary history prior to 2012. (DE 128-3 at 24) However, Percella was served with a 31-a form on November 2009 for improperly notarizing a document (DE 118-11 at 2) and was suspended for sixty days in 2011 for confiscating and copying employee personnel documents without permission (DE 118-20 at 2). Request #46 seeks an admission that Percella reported Waks for posting the offensive magnet "to the assigned EEO officer, but no action was taken." (DE 128-3 at 27) However, Percella testified that she did not file a complaint after discovering the magnet. (DE 118-9 at 79-80) Finally, Request #48 submits that when the City investigated Percella's "allegations as to Defendant Waks' hostile behavior," they did not interview her. (DE 128-3 at 27) However, Russo details, at length, her interview with Percella regarding the profanity incident. (DE 118-34 at 3-5)

Second, I find that Percella would not be prejudiced because defendants, in their Answer, had already formally denied most of the allegations in the Amended Complaint. (DE 8) Thus, the facts here are distinguishable from *Sunoco,* where the defendant contradicted the admission for the first time after the plaintiff filed for summary judgment. *See Sunoco*, 565 F. Supp 2d at 578. Here, defendants contradicted the admissions sought in the Requests in their Answer, well before they filed motions for summary judgment.

Given the above circumstances, I reject Percella's argument that the facts in the Requests for Admissions be deemed trued and relied upon by the Court in denying defendants' motions for summary judgment. I turn now to the merits of those motions.

## C. Defendants' Motions for Summary Judgment

### 1. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the

light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

23

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### 2. Section 1983 Claim

To state a Section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In the Amended Complaint, Percella alleged that the City and Waks deprived her rights under the First and Fourteenth Amendments "by failing to take action [and] retaliating against [her]."[10] (Am. Compl. ¶17) Percella alleged that defendants "attempted to wrongfully punish" her for engaging in the following protected speech: reporting illegalities stemming from the distribution of FEMA funds; reporting failures to abide by the Open Public Records Act; reporting co-workers' falsification of time sheets; reporting the failure of a

---

[10] In briefing to this Court, Percella explained that the Amended Complaint "cites the Fourteenth Amendment insofar as it incorporates against the First Amendment protection of free speech." (DE 129 at 13) However, Percella also submits that the "Complaint does mention substantive or procedural due process or the Equal Protection clause. Further, it is clear that Defendant City of Bayonne denied Plaintiff her due process rights under Title Code 02948 Deputy Registrar." (DE 129 at 13) The statement is false; the Amended Complaint does not raise a due process claim or even mention due process or equal protection. And, other than those two quoted sentences, Percella's briefing submits no argument in support of a due process violation. Therefore, I decline to entertain Percella's belated and unsupported due process challenge.

24

health officer to abide by his contract; and reporting the falsification of health inspections and licenses. (Am. Compl. ¶17) Percella also alleged that she was retaliated against for refusing to "perform illegal functions."[11] (Am. Compl. ¶18)

### a. *Monell* Claim Against the City

Municipalities are "included among those persons to whom [Section] 1983 applies." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable under [Section] 1983 on a respondeat superior theory." *Id.* at 691. Rather, such entities may only be held liable for constitutional torts caused by "action pursuant to official municipal policy of some nature." *Id.* Relief is appropriate where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the constitutional deprivation arises from "a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 290-91.

To succeed on a Section 1983 claim against a municipality, the "plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). Causation "can be established by alleging 'that policymakers were aware of similar conduct in the past, but failed to take precautions against future violation, and that this failure, at least in part, led to their injury.'" *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 176 (3d Cir. 2001) (quoting *Losch*, 736 F.3d at 910).

---

[11] The record demonstrates that Percella filed harassment complaints against Censullo and Waks and instigated an investigation into payroll fraud. However, the record is scarce with respect to the FEMA and OPRA incidents. Plaintiff mentions that she reported FEMA and OPRA violations but does not connect that reporting to any adverse employment action or any form of retaliation. In this section and throughout the opinion, I focus on the suspensions and other adverse employment actions Percella experienced and the events leading to those incidents based on the factual record.

Here, Percella has not alleged or produced any evidence of a policy or custom that caused a deprivation of her constitutional rights. Indeed, Percella mentions a "policy" just once in her discussion of the Section 1983 claim:

> The federal first and fourteenth amendments as enforced under §1983, prohibit an employer from taking retaliatory action as read in the light most favorable to the plaintiff, the Complaint's Fourteenth Amendment claim is plainly intertwined with the First Amendment claims as employee because the employee objects to any activity, policy, or practice that "the employee reasonably believes . . . is a violation of law, or a rule or regulation promulgated pursuant to law." Because plaintiff made the above stated protected communication, her actions were protected by the First and Fourteenth amendments.

(DE 129 at 13-14) That conclusory statement does not identify what City policy or custom allegedly violated Percella's rights or point to factual evidence that any such policy exists. To the contrary, the undisputed evidence discussed above establishes that the City investigated every complaint Percella lodged.

Therefore, Percella has submitted no evidence to support a Section 1983 claim against the City. Summary judgment is granted in the City's favor on the § 1983 *Monell* claim.

### b. First Amendment retaliation claim against Waks

To establish a First Amendment retaliation claim under Section 1983, "plaintiffs must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) "A defendant

may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Id.*

### 1. Allegations not involving protected speech or outside the statute of limitations

Where, as here, the plaintiff is a government employee, she must show that in engaging in First Amendment protected activity, "she spoke, not merely as an employee, but as a citizen, on a matter of public concern." *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 633 (D.N.J. 2014); *see also Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003) (noting that a government employee's speech must involve a matter of public concern to constitute protected speech). "Speech involves a matter of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Thus, to be protected, public speech must not concern "merely personal grievances." *Brennan*, 350 F.3d at 412 (internal quotation marks omitted) (quoting *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994)). "Courts determine whether an employee's speech involves public concern by reference to the speech's 'content, form, and context,' which encompasses 'the employee's motivation as well as whether it is important to our system of self-government that the expression take place.'" *Falco v. Zimmer*, 767 F. App'x 288, 302 (3d Cir. 2019) (first quoting *Lane*, 573 U.S. at 241, then quoting *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015)); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.") .

It is clear that Percella was not speaking as a citizen on a matter of public concern when she improperly notarized a document or when she spoke to a resident in the course of her employment in the Public Works Department. In both of those instances, Percella was acting as an employee for the City and

not as a citizen. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Therefore, I will not discuss the disciplinary actions that followed those incidents.

Further, defendants submit that all of Percella's allegations that occurred more than two years prior to the filing of her initial Complaint in 2014 are barred by the statute of limitations. (DE 118-3 at 8) A Section 1983 claim "is governed by the statute of limitations that applies to personal injury tort claims in the state in which such a claim arises." *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015) (internal quotation marks omitted) (*Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009)). In New Jersey, the limitation period on personal injury actions is two years. *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 919 (3d Cir. 1991).

State law, unless it is inconsistent with federal law, governs the "issue of whether a limitations period should be tolled." *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010). New Jersey law dictates that "a statute of limitations can be tolled based upon equitable principles, including the discovery rule" which, "postpones a claim from accruing if a plaintiff is reasonably unaware that he has suffered an injury or . . . that it was the fault of an identifiable person." *Id.* (citing *Freeman v. New Jersey*, 788 A.2d 182, 878 (N.J. Sup. Ct. App. Div. 2002); *Caravaggio v. D'Agostini*, 765 A.2d 182, 187 (N.J. 2001). Federal law "governs the issue of what constitutes accrual." *Id.* Accrual occurs "when the plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'" *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry and Dry Cleaning Pen. Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)).

Percella submits that any time bar is inapplicable under a "continuing violation" theory. (DE 129 at 3-4) The continuing violation doctrine is an

equitable exception to the application of the statute of limitations that may apply "when a defendant's conduct is part of a continuing practice." *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted) (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)). Where there is a continuing practice, "an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Id.* (internal quotation marks omitted) (quoting *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). For the doctrine to apply, "a plaintiff must establish that the defendant's conduct is 'more than the occurrence of isolated and sporadic acts.'" *Id.* (quoting *West*, 45 F.3d at 755). "A discrete act in itself constitutes a separate actionable unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013). Discrete acts can include "termination, failure to promote, denial of a transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, (2002). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate 'unlawful employment practice.'" *Id.* The Third Circuit interprets *Morgan* as "establish[ing] a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. The former must be raised within the applicable limitations period or they will not support a lawsuit." *O'Connor v. City of Newark*, 400 D.3d 125, 127 (3d Cir. 2006)

Here, Percella merely submits that her "employment retaliation with the Defendant City of Bayonne continued right through when Defendant Joseph Waks was terminated from employment on or before July 1, 2014 [while] the subject complaint was filed June 10." (DE 129 at 3) She has not attempted to demonstrate a continuing practice. Instead, she makes the puzzling, conclusory, and circular statement: "under the continuing violation theory, the allegations brought by the Plaintiff continued." (DE 129 at 10) Plaintiff has submitted no evidence to demonstrate that the adverse employment

consequences she experienced were anything more than discrete and isolated acts. Moreover, each allegation of retaliation is "individually actionable." *See O'Connor*, 440 F.3d at 127. In 2010, Percella could have brought a retaliation claim when she was transferred to the Tax Assessor's Office two days after she filed a sexual harassment complaint against Censullo. (*See* DE 118-24 at 2) Additionally, a retaliation claim was actionable in May 2011 when the City suspended Percella for sixty days (May 7, 2011 to August 8, 2011) after the payroll fraud incident. (*See* DE 118-20 at 2) Therefore, only incidents that took place within the timely filing period – two years prior to June 2014 – will be considered for purposes of Percella's Section 1983 claim. *See Morgan*, 536 U.S. at 114. Thus, the alleged acts of retaliation arising from Percella's allegation of payroll fraud and involving Percella's complaint of sexual harassment against Censullo are time-barred.

The following alleged acts of retaliation remain: the June 2013 disciplinary action taken after Percella called Corporation Counsel D'Amico a "disgrace," Waks's use of profanity in September 2013, the occasion when Waks threw a pencil, and the occasion when Percella removed the allegedly offense magnets. I will address them in turn.

## 2. The June 2013 Incident

Percella was charged with insubordination and conduct unbecoming of a public employee when she allegedly called D'Amico a "disgrace," using "a voice loud enough for third parties to hear." (DE 118-27 at 2) In this instance, I cannot identify sufficient evidence that Percella spoke on a matter of public concern; the statement is nonspecific and, apparently, personal. The allegation of First Amendment retaliation based on this allegation must fail. Public speech does not concern "merely personal grievances." *Brennan*, 350 F.3d at 412. As the Supreme Court has noted, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149. Thus,

30

"[w]hile as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id.*

In *Connick*, the plaintiff, Meyers, was employed as an Assistant District Attorney in New Orleans. *Id.* 140. After Myers was informed that she was to be transferred to a different section, she distributed a questionnaire to fifteen of her peers in the office. *Id.* at 141. The Supreme Court viewed the questions in Myers's questionnaire "pertaining to the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court." *Id.* at 148. The Court noted that Myers did not "bring to light actual or potential wrongdoing or breach of public trust," and, if the questionnaire was released to the public, it "would convey no information at all other than the fact that a single employee is upset with the status quo." *Id.*

Similarly, I find that Percella's comment that D'Amico was a "disgrace" conveyed her dislike and disapproval but revealed no information to the public about an official's alleged wrongdoing. Such personal grievances do not form the basis of a First Amendment retaliation claim. *See Brennan*, 350 F.3d at 412.

### 3. The September 2013 Incident

On September 17, 2013, Percella filed a complaint against Waks for directing profanity towards her in the workplace. (DE 118033 at 2) On that date, Percella went to the Health Department to discuss business with one co-worker, and then began to speak with two other co-workers about non-business-related matters. (DE 118-33 at 2-5) While she was there, Waks cursed at her and demanded she leave the office. (DE 118-33 at 3-6) I find that Percella was not engaged in protected activity during this incident. She was not speaking as a citizen on a matter of public concern when she (1) spoke to a co-

31

worker about a code-enforcement issue (DE 118-33 at 2) or (2) spoke to co-workers about personal matters (DE 118-34 at 3-5). Therefore, her Section 1983 claim with respect to this allegation fails.

### 4. The Pencil Incident

With respect to the pencil incident,[12] I also find that Percella was not engaged in protected activity. When Waks threw the pencil, he, Percella and others were engaged in a conference about feral cats. (DE 118-9 at 68) Thus, any speech that Percella engaged in was in the routine course of office business. Percella alleges that during the conference she instructed Waks not to direct profanity towards Stergion; in doing so, she was not speaking as a citizen on a matter of public concern. Such instruction can hardly be considered to relate to "any matter of political, social, or other concern to the community" or be considered a "subject of general interest and of value." *See Lane*, 573 U.S. at 241. Therefore, I find this allegation does not support a First Amendment retaliation claim under Section 1983.

### 5. The Magnet Incident

Finally, I find that even if Percella engaged in protected activity when she removed the allegedly offensive magnets from the workplace, she suffered no adverse employment action as a result. Therefore, this allegation fails under prong two of the retaliation test: no action occurred subsequent to Percella's removal of the magnets that would "deter of person of ordinary firmness" from exercising her rights. *See Lauren W.*, 480 F.3d at 267. Percella did not file a complaint after the incident (DE 118-9 at 79-80) and has not alleged that any transfer, suspension, or other adverse consequence occurred after she removed the magnet. Therefore, this allegation fails to support a First Amendment retaliation claim as well.

---

[12] Although the pencil and magnet incidents occurred at an unknown date, defendants do not contend that these allegations are time barred. (*See* DE 118-3 at 31-32)

In sum, Percella's Section 1983 claims fail against both the City and Waks. I will grant defendants' motion for summary judgment (DE 118) on that basis.

I must add that the Court's task was not made any easier by the utter failure of Plaintiff's counsel to adduce any evidence in opposition to defendants' motion. With respect to the Section 1983 claim, she simply listed what she believed were occasions that Percella engaged in protected activity. (DE 129 at 12-13) For example, citing only the Amended Complaint, counsel for plaintiff writes:

> Plaintiff's protected activity is set forth throughout the litigation, Amended Complaint (Ex.1, ¶12 and ¶41) which state in part, are deemed a Fact:
>
> Plaintiff Percella had a history of voicing her displeasure of illegality and inappropriate activity in the workplace. Plaintiff Percella recognized early on that FEMA money during Hurricane Sandy was being distributed illegally. Plaintiff Percella had recently uncovered that two co-workers were in fact inappropriately fudging their official time sheets in order to gain an advantage of their time and corresponding pay. This matter was allegedly investigated by the Defendant City of Bayonne. While employees Bryant and McKitrick were found to have inappropriately recorded their time, Plaintiff Percella was the punished for bringing such illegality to the attention of management. (Id. ¶12)

(DE 129 at 11) Plaintiff's counsel does not acknowledge that some of that activity occurred outside the statute of limitations. She does not make any attempt to establish a causal link between that activity and retaliatory conduct. She does not honor the fundamental principle that a party opposing a motion for summary judgment cannot rest on the allegations of the complaint.

On these motions for summary judgment, Percella was required to point to actual evidence that creates a genuine issue as to material fact. She has failed to do so. Defendants, on the other hand, have adduced undisputed evidence that many of plaintiff's Section 1983 claims rest on events outside the statute of limitations, and that the remaining, timely allegations either did not

constitute protected speech or did not give rise to retaliatory conduct. Summary judgment is granted to defendants on the First Amendment retaliation claims.

### c. NJLAD Claims

In Count B, Percella raises claims for discrimination and harassment, hostile work environment, and retaliation under the NJLAD against the City and defendant Waks.[13] (Am. Compl. ¶¶21-36)

### 1. Timeliness of Plaintiff's Claims

At the outset, defendants contend that all of Percella's allegations that occurred more than two years prior to the filing of her initial complaint are barred by the statute of limitations. (DE 118-3 at 8)

The statute of limitations under the NJLAD is two years. *Roa v. Roa*, 985 A.2d 1225, 1231 (N.J. 2010). As in the case of Percella's Section 1983 claims, the continuing violation doctrine may theoretically apply to prevent the application of the time bar. *Id.* The New Jersey Supreme Court adopted "*Morgan*'s analytic framework" in applying the continuing violation theory to an NJLAD claim. *Id.*; *Shepherd v. Hunterdon Dev. Ctr.*, 803 A.2d 611,623 (2002). In analyzing the statute of limitations issue, New Jersey courts ask the following:

> First, have plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants? If yes, then their cause of action would have accrued on the day on which those individual acts occurred.
>
> Second, have plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment? If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding "that some of the

---

[13] For the first time, Percella asserts a claim for disparate treatment based on her gender and disability. (DE 129 at 14) Plaintiff did not raise a disparate treatment claim in the Amended Complaint, nor did she allege that she was a member of a protected class based on disability. Those belated claims will not be considered.

> component acts of the hostile work environment [have
> fallen] outside the statutory time period."

*Shepherd*, 803 A.2d at 623 (line break added; other alterations in original)
(quoting *Morgan*, 536 U.S. at 103).

With respect to her discrimination, harassment, and hostile work
environment claims, Percella refers to Waks's use of profanity and the magnet
incident. (Am Compl. ¶¶21-33). The profanity incident occurred in September
2013 (DE 118-3 at 29), within the two-year period. Percella was unable to
recall when she discovered the magnet. (DE 118-9 at 73) However, Percella
testified that the incident occurred before she was transferred to the
Department of Public Works in September 2013. (DE 118-9 at 80). Thus, it is
unclear whether the incident occurred within the statute of limitations period.
The burden of proof in establishing an affirmative defense – here a statute of
limitations defense – rests on the party who raises it. *See In re St. Lawrence
Corp.*, 248 B.R. 734, 740 (D.N.J. 2000); *see also Ebbert v. Daimler Chrysler
Corp.*, 319 F.3d 103, 108 (3d Cir. 2003) (noting that the employer in an ADA
case bears the burden of proving the expiration of the statute of limitations);
*Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) (holding that the
defendant has the burden of proof regarding its affirmative defenses in Title VII
actions). The defendants have not met their burden of production of evidence
that the magnet incident is time barred. (*See* DE 118-3 at 31-32) Furthermore,
in establishing a hostile work environment claim, Percella can rely on events
that occurred outside of the two-year window that would not be sufficient alone
to establish a hostile work environment. *See Shepherd*, 803 A.2d at 623.
Therefore, I conclude Percella can rely on the magnet incident for the purposes
of her hostile work environment claims.

For the NJLAD retaliation claims, like the First Amendment retaliation
claim, only those incidents that occurred within the two-year period are
actionable. Percella could have raised an NJLAD retaliation claim in 2010 after
she was transferred following a sexual harassment complaint (DE 118-23 at 3),
(DE 118-24 at 2). That event was actionable the moment it occurred. *See*

*Shepherd*, 803 A.2d at 623. By the time she did assert it in this action, it was time-barred. Therefore, that event will not be considered, and summary judgment on the NJLAD retaliation claim is granted.

### 2. Discrimination and Harassment under the NJLAD

To establish a prima facie case of sex discrimination, plaintiff must demonstrate by a preponderance of the evidence that she "(1) is a member of a designated protected class; (2) who was qualified for and performing the essential functions of the job; but (3) suffered termination or other adverse employment action; and (4) others not in the protected class did not suffer similar adverse employment actions." *Schiavo v. Marina Dist. Dev. Co., LLC*, 123 A.3d 272, 284 (N. J. Sup. Ct. App. Div. 2015). It is plaintiff's burden to prove the prima facie elements. *Victor v. State*, 4 A.3d 126, 140 (N.J. 2010).

In the Amended Complaint, Percella alleges that (1) she is a member of a protected class by virtue of her gender; (2) that "Defendant City of Bayonne and Defendant Waks were in violation of the NJLAD when Defendants intentionally discriminated against Plaintiff by neglecting to enforce anti-hostile environment harassment policies. For instances, Defendant Waks posted 'Girls from Bayonne . . . Leave 'em Alone' magnets all over the workplace"; and (3) "[w]hen such activity, such as hostility and sexual harassment were reported to the alleged eeo officer; no action was taken." (Am. Compl. ¶¶21-25) Notably, plaintiff did not allege an adverse employment action in the context of her discrimination claim. Further, Percella testified that she did not report the magnet incident. (DE 118-9 at 79-80) Finally, there is no evidence in the record that any adverse action was taken against Percella when she removed the magnets from the workplace. Therefore, she has failed to establish a prima facie case of sex discrimination, and I will grant summary judgment to defendants with regard to that claim.

### 3. Hostile Work Environment under the NJLD

"To establish a [NJLAD] prima facie hostile work environment claim, the plaintiff employee must show that the conduct complained of would not have occurred but for the employee's membership in a protected class, and that the

conduct was severe and pervasive enough to make a reasonable person believe that the conditions of employment were altered and the working environment was hostile or abusive." *Maddox*, 50 F. Supp. 3d at 627 (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 453-54 (N.J. 1993); That "test can be broken down into four prongs: the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*." *Lehmann*, 626 A.2d at 453. "To support a claim, the conduct must be sufficiently pervasive *or* severe. In some cases, a single incident can trigger liability if the incident is severe enough." *Maddox*, 50 F. Supp. 3d at 627; *see also Taylor v. Metzger*, 706 A.2d 685, 690 (N.J. 1998) ("[A] single utterance of an epithet can, under particular circumstances, create a hostile work environment.").

After the plaintiff establishes a prima facie case, "the defendant must then show a legitimate non-discriminatory reason for its decision," and "the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or that it was discriminatory in its application." *Maddox*, 50 F. Supp. 3d at 627 (citing *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051 (N.J. 1988).

With respect to her hostile work environment claim, Percella alleges that (1) she "belong to a class protected under the NJLAD . . . by virtue of her gender"; (2) "[y]elling 'Fuck, Fuck, Fuck You!' and slamming doors, as well as portraying women in a demeaning fashion create a hostile work environment"; (3) the harassment "was sufficiently severe or pervasive that a reasonable person would have deemed it to be hostile, abusive, intimidating, or offensive"; and (4) "[t]he harassment would not have occurred but for plaintiff's gender. This activity did not occur to male employees." (Am. Compl. ¶¶26-30)

Percella bases the hostile work environment on two events: the profanity incident and the magnet incident. I will address each in turn.

As discussed, Waks directed profanity at Percella while she was in the Health Department's office. (DE 118-33 at 2) The record reflects different accounts of what Waks actually said. (DE 118-34 at 3-6) Waks informed Russo that he said, "fuck you" to Percella "out of frustration." (DE 118-34 at 6) Kline and Styles corroborated that account. (DE 118-34 at 3-5) Keyes reported that Waks told Percella to "get the fuck out" of his office. (DE 118-34 at 4) Percella informed Russo that Waks instructed her to "get the fuck out" of his office. (DE 118-33 at 2). During her deposition, Percella testified that Waks repeatedly told her to "get the fuck out" and said, "fuck you." (DE 118-9 at 60) She testified that he "used the eff word . . . no less than three times" in that interaction. (DE 118-9 at 60)

Even assuming that Waks directed profanity at Percella three times during the interaction, I find that Percella has failed to establish, or even really to allege, that the conduct occurred *because* of her gender. First, Russo reported that three independent witnesses informed her that Waks used the profane language in anger, after Percella refused to leave the office. (DE 118-34 at 5) Waks informed Russo that he used the word "out of frustration." (DE 118-34 at 6) Second, Percella herself testified that Waks directed similarly profane language at a male co-worker, Stergion.  (DE 118-9 at 68-69) Percella testified that during a meeting Waks "start[ed] screaming at Simon, and he start[ed] cursing at Simon and telling him that he 'better fucking start doing what he has to do.'" (DE 118-9 at 68)

Percella told Russo that she was "not personally offended" by the use of profanity but did not think it was appropriate in the workplace. (DE 118-34 at 5) Her objection did not contain any indication that she thought the profanity was an expression of gender-based hostility. Russo reported that Percella did not allege that she was "afraid, concerned or alarmed" or "that she felt pressured, frightened, intimidated or incapacitated" by the language. (DE 118-34 at 5) *See Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993) (explaining that in the context of a Title VII violation, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered

38

the conditions of the victim's employment."). In short, there is not a reasonable inference to be drawn that Waks's language, however offensive, was intended or perceived as an expression of hostility that was gender-based, or that it created a hostile environment from Percella's perspective.

With respect to the magnet incident, Percella testified that at an unknown date she observed three magnets containing an offensive message: one at her desk, one near Stergion's desk, and one on a file cabinet. (DE 118-9 at 72-73, 77) Waks testified that he did not specifically recall placing the magnets in the office but admitted that he was "sure [he] did." (DE 118-32 at 20). Waks also testified that one magnet was placed on employee Michelle O'Reilly's door because she specifically asked him for one. (DE 118-32 at 20) Waks denied placing a magnet on Percella's desk. (DE 118-32 at 21)

Percella testified that the phrase on the magnet, "Girls from Bayonne . . . Leave 'em Alone" is a common saying in Bayonne, connoting that Bayonne women are "trash" and "sluts." (DE 118-9 at 74) Waks testified that the phrase did not "really mean anything to him specifically" but that he "like[d] the saying." (DE 118-32 at 21) Percella testified that she found the magnets "offensive" and "disgusting" and that she felt especially harassed because she was the only woman in the workspace where the magnets were placed. (DE 118-9 at 79)

It is unclear from the record whether the magnets would have appeared in Percella's workspace but for her gender. Waks admitted to distributing the magnets, but denied that he placed one on Percella's desk in particular. Thus the identity and intent of the person who placed the magnet there cannot be stated for certain. However, viewing all facts and inferences in the light most favorable to plaintiff, I find that it is possible that the placement of multiple magnets depicting women as "sluts" in an area where one woman worked was conduct that occurred because of that woman's gender, and Waks was admittedly the source of the magnets.

Further, I find genuine issue of material fact as to whether the discrimination was sufficiently severe or pervasive. Percella testified that the

phrase on the magnet equates to calling women "sluts" or "trash." She states that it had that particular meaning to people in Bayonne. Waks, despite "liking" the phrase and distributing the magnets, testified that he did not know what the phrase meant, which a fact finder might or might not credit. Percella was the only woman in the workspace where the magnets were placed. A rational fact finder, crediting Percella's testimony, could find that the single incident of posting multiple magnets that refer to women as "sluts" constituted harassment severe enough to establish a hostile work environment claim. *See Metzger*, 706 A.2d at 690 ("[A] single utterance of an epithet can, under particular circumstances, create a hostile work environment."). I hasten to add that a rational fact finder could easily find the contrary as well. But that is the very definition of an issue of fact requiring denial of summary judgment.

Defendants do not address the magnet incident in their arguments regarding Percella's hostile work environment claim. (They discuss it only in relation to the elements of a discrimination claim.) (*See* DE 118-3 at 35-40.) They have not proffered a legitimate, non-discriminatory reason, whatever that might be, for placing the magnets near Percella's workplace.[14]

I will deny defendants' motion for summary judgment with respect to Percella's NJLAD hostile work environment claim.

### 4. Retaliation under the NJLAD

To establish discriminatory retaliation under the NJLAD, a plaintiff must demonstrate that "(1) she engaged in a protected activity known by the

---

[14] Defendants contend that Percella failed to establish a claim of aiding and abetting liability against Waks necessary to establish individual liability under the NJLAD. (DE 118-3 at 40) Individual liability under the NJLAD arises only when a plaintiff can establish that such individual aided and abetted the alleged discrimination. *Cicchetti v. Morris Cty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008) (holding that "individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile work environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person.'") Aiding and abetting requires active and purposeful conduct. *Id.* Here, Waks admitted to bringing the magnets into the workplace. Thus, he engaged in purposeful and knowing conduct. If it can be established that Waks placed the magnets near Percella's workspace, it is possible that individual liability may be established.

employer; (2) she suffered an adverse employment action; and (3) her participation in the protected activity caused the retaliation." *Maddox*, 50 F. Supp. 3d at 622 (citing *Craig v. Suburban Cablevision, Inc.*, 660 A.2d 505, 508 (N.J. 1995)). "A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *Id.* For example, "causation may be found where 'those exhibiting discriminatory animus influenced or participated in the decision to terminate.'" *Id.* (citing *Abramson*, 260 F.3d at 286. Further, causation "may be inferred from temporal proximity: *i.e.*, protected conduct that is 'closely followed' by the adverse action. But temporal proximity, to raise an inference of discrimination on its own, must be 'very close.'" *Id.* at 623-24 (first citing *House v. Carter-Wallace*, 556 A.2d 353 N.J. Super. Ct. App. Div. 1989); *Bimbo v. Burdette Tomlin Mem. Hosp.*, 644 F. Supp. 133 (D.N.J. 1986); then citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

In the Amended Complaint, Percella alleged that she was subject to adverse employment actions – including suspension, diminution of duties, and transfers – because she "object[ed] to the hostility, harassment and differential treatment" by the City and Waks. (Am. Compl. ¶¶35-36) Percella filed one complaint of harassment with the City within the two-year time limitation. As discussed, in September 2013, Percella filed a harassment complaint against Waks for using profanity in the workplace. (DE 118-33 at 2) However, the record demonstrates that Percella was not suspended or transferred after filing that complaint. The adverse actions that Percella alleges – her multiple suspensions without pay and transfers to different departments – occurred outside the limitations period, and indeed from *before* she filed the September 2013 complaint.

Because Percella did not suffer an adverse employment action within the limitations period, I will dismiss her NJLAD retaliation claims.

41

### d. Contract Claims

Finally, Percella alleges two common law contract claims: interference with contract against defendant Censullo and breach of implied covenant of good faith and fair dealing against the City. (Am. Compl. ¶¶38-48) These claims are easily dismissed because Percella has failed to establish any evidence of a contract between herself and the City, does not identify the provision of any such contract that the City breached, and does not identify any provision of any such contract with which Censullo interfered.

Percella does cite the employee manual. That manual, however, is not a contract. It contains the following disclaimer in capitalized and bold letters:

> **THE HANDBOOK IS INTENDED TO INFORM EMPLOYEES OF THE CITY OF BAYONNE ABOUT THE CITY'S EXISTING POLICIES AND PROCEDURES. IT IS NOT A CONTRACT OF EMPLOYMENT, NOR IS IT A GUARANTEE OF ANY PARTICULAR TERM OR CONDITION OF EMPLOYMENT. THE CITY OF BAYONNE IS A CIVIL SERVICE JURSIDICTION, GOVERNED BY THE RULES AND REGULATIONS OF THE NEW JERSEY DEPARTMENT OF PERSONNEL.**

(DE 122-4 at 5); *See Woolley v. Hoffman-La Roche, Inc.*, 491 A.2d 1257, 1271 (N.J. 1985) (holding that *absent a clear an prominent disclaimer*, an implied promise in an employee manual that an employee will be fired only for cause can be enforceable). Moreover, as Percella is a public employee, her terms and conditions of employment are governed by statute and not contract. *DiPaolo v. Passaic Cty. Bd. of Chosen Freeholders*, 731 A.2d 519, 522 (N.J. Sup. Ct. App. Div. 1999) (holding that "the public employment relationship derives from applicable statutory schemes and not from an independent contract between public employer and employee.") Therefore, I will grant defendants' summary judgment motions (DE 121, 122) as they relate to Percella's contract claims.

### III.    CONCLUSION

For the reasons set forth above, I will deny defendants' motion to dismiss the action for spoliation of evidence (DE 119); deny defendants' summary judgment motion (DE 118) with respect to Percella's NJLAD hostile work environment claim; and grant defendants' summary judgment motions (DE 118, 121, 122) with respect to all of Percella's other claims. To be clear, the case will go forward on the NJLAD hostile environment claim only.

An appropriate order follows.

Dated: November 9, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**